# EXHIBIT 14

Ryan E. Hatch (SBN 235577)
 Email: ryan@hatchlaw.com
**HATCH LAW P.C.**
13323 W. Washington Blvd., Suite 302
Los Angeles, California 90066-5164
Telephone: (310) 279-5076
Facsimile: (310) 693-5328

James F. McDonough, III (GA 117088) (*pro hac vice*)
 Email: jim@rhmtrial.com
**ROZIER HARDT MCDONOUGH PLLC**
659 Auburn Avenue NE, Unit 254
Atlanta, Georgia 30312
Telephone: (404) 564-1866

   *For Plaintiff ORION LABS TECH, LLC*

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORION LABS TECH, LLC,<br><br>   Plaintiff,<br><br>  v.<br><br>TALKDESK, INC.,<br><br>   Defendant. | Case No. 4:25-cv-05045-YGR<br><br>**FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Orion Labs Tech, LLC ("Orion Labs" or "Plaintiff") files this First Amended Complaint against TalkDesk, Inc. ("TalkDesk" or "Defendant") alleging, based on its own knowledge as to itself and its own actions, and based on information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      This is a patent infringement action to stop TalkDesk's infringement of the following United States Patents (collectively, the "Asserted Patents") issued by the United States Patent and Trademark Office ("USPTO"):

| U.S. Patent No. | Title | Available At |
|---|---|---|
| 1) 10,110,430 | Intelligent Agent Features For Wearable Personal Communication Nodes | https://ppubs.uspto.gov/pubwebapp/authorize.html?redirect=print/pdfRedirectDownload/10110430 |
| 2) 10,462,003 | Intelligent Agent Features For Wearable Personal Communication Nodes | https://ppubs.uspto.gov/pubwebapp/authorize.html?redirect=print/pdfRedirectDownload/10462003 |
| 3) 10,897,433 | Bot Group Messaging Using General Voice Libraries | https://ppubs.uspto.gov/pubwebapp/authorize.html?redirect=print/pdfRedirectDownload/10897433 |
| 4) 10,924,339 | Intelligent Agent Features For Wearable Personal Communication Nodes | https://ppubs.uspto.gov/pubwebapp/authorize.html?redirect=print/pdfRedirectDownload/10924339 |
| 5) 11,127,636 | Bot Group Messaging Using Bot-Specific Voice Libraries | https://ppubs.uspto.gov/pubwebapp/authorize.html?redirect=print/pdfRedirectDownload/11127636 |
| 6) 11,258,733 | Transcription Bot For Group Communications | https://ppubs.uspto.gov/pubwebapp/authorize.html?redirect=print/pdfRedirectDownload/11258733 |
| 7) 11,328,130 | Translational Bot For Group Communication | https://ppubs.uspto.gov/pubwebapp/authorize.html?redirect=print/pdfRedirectDownload/11328130 |

2.      Orion Labs seeks injunctive relief and monetary damages.

## PARTIES

3.      Orion Labs is a limited liability company formed under the laws of Washington with a registered office address located at 16935 SW 108th Ave, Tualatin, Oregon 97062 (Washington County).

4.     Based upon public information, TalkDesk is a corporation organized and existing under the laws of Delaware.

5.     Based upon public information, TalkDesk lists its Global HQ as being located at 120 Hawthorne Avenue, Palo Alto, California 94301.

6.     Based upon public information, TalkDesk lists 8260 Greensboro Drive, Suite 503, McLean, Virginia 22102 as its "Virginia Office."

7.     Based upon public information, TalkDesk may be served though its registered agent for service, Incorporating Services, Ltd., which is located at 7288 Hanover Green Drive, Suite A, Mechanicsville, Virginia, 23111-1709.

8.     Based upon public information, TalkDesk may also be served though its registered agent for service, Incorporating Services, Ltd., which is located at 3500 S. DuPont Hwy, Dover, Delaware 19901.

9.     On information and belief based upon public information, Defendant directly and/or indirectly develops, designs, manufactures, distributes, markets, offers to sell and/or sells infringing products and services in the United States and in the State of Virginia, including in the Eastern District of Virginia, and otherwise directs infringing activities to this District in connection with its products and services.

## JURISDICTION AND VENUE

10.     Plaintiff repeats and re-alleges the allegations in the Paragraphs above as though fully set forth in their entirety.

11.     This is an action for infringement of a United States patent arising under 35 U.S.C. §§ 271, 281, and 284–85, among others.  This Court has subject matter jurisdiction of the action under 28 U.S.C. § 1331 and § 1338(a).

12.     Venue is proper against Defendant in this District pursuant to 28 U.S.C. § 1400(b) and 1391(c) because Defendant has maintained established and regular places of business in this District and has committed acts of patent infringement in this District from those regular and established places of business. *See In re: Cray Inc.*, 871 F.3d 1355, 1362-63 (Fed. Cir. 2017).

13.     Defendant offers products and services, including through the use of Accused Products, and conducts business in this District.

14.     Defendant is subject to this Court's specific and general personal jurisdiction under due process due at least to Defendant's substantial business in this Judicial District, including: (i) at least a portion of the infringements alleged herein; (ii) regularly transacting, doing and/or soliciting business, engaging in other persistent courses of conduct, or deriving substantial revenue from goods and services provided to individuals in Virginia and this District; (iii) having an interest in, using or possessing real property in Virginia and this District; and (iv) having and keeping personal property in Virginia and in this District.

15.     Specifically, Defendant intends to do and does business in, has and continues to commit acts of infringement in this District directly, and its employees, agents, and/or contractors located in this District use the products or services accused of infringement.

16.     On information and belief, Defendant owns, operates, manages, conducts business, and directs and controls the operations and employees of facilities at a location in this district, including, but not limited to, an office at the following address: 8260 Greensboro Drive, Suite 503, McLean, Virginia 22102, as seen below in **Figure 1**.

Figure 1: *Contacts*, TALKDESK, INC. (last visited July 14, 2024), https://www.talkdesk.com/about/contacts/.

17.     Defendant has and continues to commit acts of infringement from its place of business in this District, including, but not limited to, making, using, selling, offering for sale, and importing of the Accused Products and inducement of third parties to use the Accused Products.

**THE ACCUSED PRODUCTS**

18.     Plaintiff repeats and re-alleges the allegations in the Paragraphs above as though fully set forth in their entirety.

19.     Based upon public information, Defendant owns, operates, advertises, and/or controls products and services that utilize the Accused Products, as defined below, through which it advertises, sells, offers to sell, provides and/or educates customers about its products and services.

20.     Defendant uses, causes to be used, sells, offers for sale, provides, supplies, or distributes its intelligent digital agents, including but not limited to, including the TalkDesk CX Cloud, TalkDesk's Autopilot virtual agent application, TalkDesk's Copilot virtual agent

application, TalkDesk Studio, and TalkDesk's Voice IVR virtual agent application, other substantially similar products and services offered in the past or the future, and all of the prior models, iterations, releases, versions, generations, and prototypes of the foregoing, along with any associated hardware, software, applications, and functionality associated with those products and solutions (collectively, the "Accused Products").

21.     Defendant advertises that "Talkdesk Autopilot™ (formerly known as Talkdesk Virtual Agent™) Digital is a conversational assistant that delivers customers the answers they need quickly and easily, where and when they want it on digital channels. It provides an effective alternative to support customers in offline or peak hours and delivers a near-human conversational experience to the customer." *See Autopilot Digital: Overview*, TALKDESK, INC. (last updated Oct. 31, 2024), https://support.talkdesk.com/hc/en-us/articles/4411552638619-Autopilot-Digital-Overview ("Autopilot Overview").

22.     Defendant also advertises that "TalkDesk Copilot™ (formerly known as Agent Assist™) is a solution that transcribes call interactions in real time, using Natural Language Understanding (NLU) and Natural Language Processing (NLP). Copilot recognizes the intent, and automatically provides the agent with recommendations, improving speed to resolution and handling time." *See Release Notes | Talkdesk Copilot*, TALKDESK, INC. (last updated Oct. 22, 2024),        https://support.talkdesk.com/hc/en-us/articles/10465518079003-Release-Notes-Talkdesk-Copilot.

23.     Defendant also advertises that "Talkdesk CX Cloud's easy-to-use, drag, and drop IVR (Talkdesk Studio) solution stands apart in managing complex call flows. Studio makes it easy to design, build, and deploy compelling customer journeys with clicks, not code." *See 5 things   we   love   about   Talkdesk*,   TALKDESK,   INC.   (Mar.   12,   2021), https://www.talkdesk.com/blog/5-things-love-about-talkdesk/.

24.     Defendant also instructs its customers, agents, employees, and affiliates regarding how to use the Accused Products.  *See, e.g., Autopilot Overview; Talkdesk Copilot*, TALKDESK, INC., (last visited July 14, 2025), https://support.talkdesk.com/hc/en-us/sections/360009231532-

Talkdesk-Agent-Assist; *Talkdesk Studio Guide,* TALKDESK, INC., (last visited July 14, 2025), https://studio.talkdesk.com/docs/talkdesk-studio-intro.

25.     For these reasons and the additional reasons detailed below, the Accused Products practice at least one claim of each of the Asserted Patents.  In addition, Plaintiff's assertions of infringement are supported by the expert declaration of Mr. Ivan Zatkovich (hereinafter, the "Zatkovich Decl.")

### COUNT I: INFRINGEMENT OF U.S. PATENT NO. 10,110,430

26.     Plaintiff repeats and re-alleges the allegations in the Paragraphs above as though fully set forth in their entirety.

27.     The USPTO duly issued U.S. Patent No. 10,110,430 (hereinafter, the "'430 patent") on December 1, 2016, after full and fair examination of Application No. 15/166,531, which was filed on May 27, 2016, which claims priority to a provisional application, filed on May 27, 2015. *See* '430 Patent.

28.     Orion Labs owns all substantial rights, interest, and title in and to the '430 patent, including the sole and exclusive right to prosecute this action and enforce it against infringers and to collect damages for all relevant times.

### SUBJECT MATTER ELIGIBILITY

29.     The claims of the '430 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity.  Rather, the claimed inventions include inventive components and functionalities that improve upon the function and operation of managing communication groups and group communication systems.

30.     The written description of the '430 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

31.     The '430 patent describes a system and method for using intelligent agents in personal communication devices, such as cellphones and wearable devices, to provide assistance

and improve communication experiences. The intelligent agents can be members of a communication group and can perform various functions, such as recording communications, auditing communications, and paging communication devices. The teachings of the '430 patent include a management system and an agent system, and the personal communication devices can operate in groups that are defined by the management system. *See* Zatkovich Decl. at ¶19.

<u>**The Technical Problems That Existed In The Art Of Electronic Inter And Intra-Group Communication Systems In May 2015.**</u>

32.     The specification of the '430 patent provides detailed information about the problems that existed in the art of inter and intra-group electronic communication systems in May 2015. '430 patent at 1:20-33; *see also* Zatkovich Decl. at ¶22.

33.     "Telephones, cellphones, smartphones, computers and tablets provide an efficient way for users to communicate without being in the same physical location. However, these devices often require the user to provide multiple inputs and preferences for each of the communications before the communications can take place. Such preferences may include identification of the individuals involved in the communication, a contact identifier for the individuals in the communication, amongst a variety of other preferences. Moreover, when busy performing other tasks, it is often difficult to interface with the device (*e.g.,* in changing environments, locations and conditions) while concurrently holding a communicating phone, computer, or tablet, and may distract the user from a current task or situation." '430 patent at 1:20-33; *see also* Zatkovich Decl. at ¶23.

34.     There are significant contexts (*e.g.*, emergencies, natural disasters, combat) in which the user distraction cited above could not be tolerated or allowed, In such contexts, the claimed outcomes could not, in 2015 or today, be achieved with only humans in the group, without costly or even catastrophic results. *See* Zatkovich Decl. at ¶24.

35.     Additionally, there were issues in terms of the availability of persons with certain skillsets and abilities to provide ad hoc services to a group. Unless the group consisted of individuals that were well and specifically trained in transcription, annotation, providing security, managing, or being able to search for needed information and provide that information

immediately, it would take time to get such persons into an active group (if possible at all). And even if particular mobile phones of individuals in a group had such functionality, it was not guaranteed (nor were individuals necessarily proficient at such skillsets). *See* Zatkovich Decl. at ¶25.

## The Claimed Advances Of The Intelligent Agent Patents (The '430 Patent, The '003 Patent, And The '339 Patent).

36.    As taught by the specification, the invention of the '430 patent solved the technical problems that existed prior to the inclusion of intelligent agents in communication groups in which the urgent and volatile nature of the context in which the group is communicating precludes having only humans carry out the claimed outcomes, rendering those outcomes unavailable. The inventions disclosed in the Intelligent Agent Patents are intelligent agents instantiated as virtual assistants are equipped with the ability to record and audit group communications and can additionally ad hoc services (voice instructions, security functions, management operations, sub-grouping by group-provided attributes, and search, transcription, and annotation functions) to a group. *See* Zatkovich Decl. at ¶26.

37.    At its most basic, the invention provides "intelligent agent features to personal communication nodes (e.g., wearable personal communication nodes) include systems, methods, and software that receive instructions to instantiate one or more intelligent agent nodes as members of a communication group that includes the personal communication nodes. Each intelligent agent node can be instantiated by a communication group management system, an intelligent agent system and/or by one of the communication group members, for example by executing software on one or more computing systems or devices." '430 patent at 1:37-47; *see also* Zatkovich Decl. at ¶27.

38.    The advances of the '430 patent in the critical and vital contexts of the sorts listed above include:

- The claimed instantiation is immediate, no matter what the circumstances;
- The instantiated intelligent agent is always fully and immediately functional;

1              •   The capabilities of the intelligent agent are not limited to those of possibly

2                   available humans; and

3              •   The intelligent agent is never fatigued or distracted.

4 *See* Zatkovich Decl. at ¶28.

5        39.     All of these advances provide the members of a communication group in contexts

6 of the sorts listed above with needed outcomes not available if only humans were in the group.

7 *See* Zatkovich Decl. at ¶29.

8        40.     Figure 1 of the '430 patent illustrates an exemplary communication system:



**FIGURE 1**

23        41.     "Node **106** can be executed on a single processing or computing system, such as

agent system **130**, or can be executed across multiple processing and/or computing systems. In

some implementations, node **106** may be executed as a virtual node comprising software or

firmware executed by one or more nodes **102-104** or management system **120** in FIG. 1. In other

implementations node **106** can comprise virtualized software executed by a virtual machine that

is instantiated upon demand by any of nodes **102-104**. This virtual machine can be executed in

1    one or more of the computing or processing elements of FIG. 1, such as nodes **102-104**,

2    management system **120**, or agent system **130**. In some implementation, a user or node **102-104**

3    can specify where and/or how node **106** is to be executed (e.g., by selecting a specific host node

4    or host computing system, or by specifying a specific physical location, where specified locations

5    can include a home or business server, a country of execution for distributed computing systems,

6    and others). Moreover, when node **106** generates data and/or other information to be recorded,

7    any of nodes **102-104** or management system **120** can specify where the records and/or data are

8    to be stored (e.g., in a digital storage device, computer-readable medium associated with a

9    particular computing node, a logical location, and/or a physical location).” '430 patent at 5:32-

10   55; *see also* Zatkovich Decl. at ¶31.

11       42.    Figure 2 of the '430 patent depicts exemplary system **200** implementing

12   intelligent agent features for use by personal communication nodes, such as nodes **102-104** of

13   Figure 1.



**FIGURE 2**

27       43.    “Intelligent agent system **210** comprises processing system **220** and

28   communication system **221** which are implemented in and/or otherwise provided by one or more

computing and communication systems system **220** and system **221** are shown as separate systems, though they may be combined and/or implemented in one or more computing systems. One exemplary implementation node **201** (which may comprise one of nodes **102-104** of FIG. 1) comprises intelligent agent system **210** that includes, implements, deploys or otherwise generates intelligent agent **230**. . . . In some implementations intelligent agent system **210** is a virtual machine **210** that includes the elements of intelligent agent **230** (e.g., where the virtual machine and intelligent agent system are executed in a distributed computing environment, such as a cloud server or cloud system." '430 patent at 7:17-26, 33-38; *see also* Zatkovich Decl. at ¶33.

44.     "Processing system **220** includes user interface system **222**, processing circuitry **223** and storage system **224**. Storage system **224** stores or otherwise includes software that comprises intelligent agent **230**." '430 patent at 7:42-45; *see also* Zatkovich Decl. at ¶34. Further,

> Processing circuitry **223** can comprise microprocessors, microcontrollers, and/or other circuitry that retrieves and executes software **225** from storage system **224**. Processing circuitry may comprise a single device or can be distributed across multiple devices, including devices in different geographic areas. Processing circuitry **223** may be embedded in various types of equipment.
>
> Storage system **224** comprises a non-transitory computer readable storage medium, such as a disk drive, flash drive, data storage circuity, or some other hardware memory apparatus. . . . Storage system **224** may be embedded in various types of equipment. In some examples, a computer apparatus can comprise processing system **223**, storage system **224** and software **225**.
>
> Software **225** comprises intelligent agent **230** in some implementations. Intelligent agent **230**, as shown in this non-limiting example, includes voice recognition module **231**, assistant module **232**, audit module **233**, recording module **234**, and security module **235**. In addition, software **225** (including intelligent agent **230**) may include operating systems, utilities, drivers, network interfaces, applications, and other software.

'430 patent at 8:4-27.

45.     Ultimately, in general,

> *[S]oftware **403** can*, when loaded into processing circuit **408** and executed, *transform processing circuitry **408** from a general-purpose computing system into a special-purpose computing*

*system customized to operate as described herein for a
management node, personal communication node, or agent node,
among other operations. Encoding software 403 on storage system
402 can transform the physical structure of storage system 402.*
The specific transformation of the physical structure can depend on
various factors in different implementations of this description.
Examples of such factors can include, but are not limited to the
technology used to implement the storage media of storage system
**402** and whether the computer-storage media are characterized as
primary or secondary storage. For example, if the computer-storage
media are implemented as semiconductor-based memory, software
**403** can transform the physical state of the semiconductor memory
when the program is encoded therein. For example, software **403**
can transform the state of transistors, capacitors, or other discrete
circuit elements constituting the semiconductor memory. A similar
transformation can occur with respect to magnetic or optical media.
Other transformations of physical media are possible without
departing from the scope of the present description, with the
foregoing examples provided only to facilitate this discussion.

'430 patent at 13:30-54 (emphasis added and discussing FIG. 4); *see also* Zatkovich Decl. at ¶35.

### The Claims Of The '430 Patent Provide Technical Solutions To Problems With Inter And Intra-Group Electronic Communication Systems In May 2015.

46.     The '430 patent contains 17 total claims (three independent and fourteen dependent).  This disclosure focuses on claim 7, though the same arguments (and more) apply to the other 16 claims in the patent, each of which requires even more specific technical steps than claim 7.  Bolding, italics, and underlining are used for emphasis below to highlight where the claims capture the technical solutions taught in the specification.  Claim 7 recites:

7. A *non-transitory computer readable storage medium having a
distributed group communications application* stored thereon, the
distributed group communication application including instructions,
which when executed by one or more processors of a group
communication system, *cause the group communication system to*:

*Receive instructions from at least one of the plurality of
personal communication member nodes <u>operating as a
communication group to instantiate an intelligent agent</u>;*

*<u>Instantiate the intelligent agent as a virtual assistant
communication member node</u> in the communication group;
and*

*wherein the instantiated intelligent agent is <u>configured to
record and audit communications</u> among and between the
plurality of personal communication member nodes* in the
communication group.

'430 patent at claim 7 (emphasis added); *see also* Zatkovich Decl. at ¶36.

47.     Several of the dependent claims to the independent claim are also presented below, which provide:

> 8. The non-transitory computer readable storage medium of claim 7 ***wherein the instructions to instantiate an intelligent agent comprise voice instructions received by a first personal communication member node in the communication group***.

> 9. The non-transitory computer readable storage medium of claim 7 wherein ***the intelligent agent is instantiated through a security handshake procedure to provide secure access to the intelligent agent by the plurality of personal communication node members as a secure communication member node*** in the communication group.

> 10. The non-transitory computer readable storage medium of claim 7 wherein the intelligent agent is instantiated as a virtual assistant communication member node in the communication group ***by a virtual machine in a cloud system***.

> 11. The non-transitory computer readable storage medium of claim 7 wherein ***the intelligent agent is instantiated as a virtual assistant communication node in the communication group by a management system configured to define the communication group based on attribute information transferred to the management system*** from the plurality of personal communication member nodes in the communication group.

> 12. The non-transitory computer readable storage medium of claim 7 wherein ***each personal communication member node*** in the plurality of personal communication member nodes ***comprises a wearable push-to-talk communication device***.

'430 patent at claims 8-12 (emphasis added); *see also* Zatkovich Decl. at ¶.37

48.     The other independent claims (claims 1 and 15) are also directed to subject matter that provided technical solutions to technical problems that existed in May 2015.  These other independent claims claim intelligent agents using electronic communication groups with certain limitations not found in claim 7.  *See* '430 patent at claim 1 (disclosing a method of managing a communication group that receives voice communications); claim 15 (disclosing that each personal communication member node comprises a user node transmitting and receiving communications between the group members and that the virtual assistant member node performs recording and auditing services for the communication group member nodes).  The other dependent claims (2-8 and 14-17) roughly approximate dependent claims 8-12 above.

*Compare* 2 and 14 *with* 8; *compare* 3 and 15 *with* 9; *compare* 4 and 16 *with* 10; *compare* 5 and 17 *with* 11; *compare* 6 *with* 12.  *See* Zatkovich Decl. at ¶38.

49.     Concrete and novel aspects of this invention, as described in the specification in the previous section, are tied directly to the claim limitations in the form of software algorithms and process descriptions.  For example:

- "Each personal communication node 102-104 in FIG. 1 may be configured to obtain (e.g., monitor, collect or receive) attribute information, for example by monitoring one or more attributes from associated positional sensors, audio transducers, GPS receivers, accelerometers, wireless transceivers, environmental sensors, or other devices capable of monitoring the types of attributes discussed herein."

'430 patent at 3:31-38;

- "Personal communication nodes 102-104 can periodically transfer messages for delivery to management system 120 containing or otherwise indicating attribute information (e.g., dynamic changes in one or more attributes)."

'430 patent at 3:49-52;

- "Intelligent agent features may be customized by agent system 130 to meet specific duties, needs, limitations, etc . of a group . For example , in one non - limiting example Group B may comprise a team of firefighters. Intelligent agent features can be adapted by agent system 130 to use a natural language interface via node 106 to provide information about the fire as well as information regarding the actions and locations of other firefighters and other responders. Intelligent agent features provided by node 106 and/or system 130 of FIG. 1 can include recording conversations among users of nodes 102-104, auditing communications exchanged between nodes 102-104, providing voice-based assistance and services to nodes 102-104, and other features."

'430 patent at 4:27-39; *see also* Zatkovich Decl. at ¶39.

50.     The claims of the '430 patent are not directed to any abstract idea.  The claims of the '430 patent, including Claims 1, 7, and 13 are directed to a technical solution to problems that existed in May of 2015.  More specifically, the claimed subject matter overcame the problems that existed in May of 2015 with then-known inter and intra-group communications using the devices of the time.  It does so by removing the human element from such inter and intra-group communications automating the recording and auditing of such group communications through the use of a virtual assistant.  In general, the claims are specific in their boundaries, and those boundaries appear to be directly in accordance with the teachings of the '430 patent.  *See* Zatkovich Decl. at ¶40.

51.     Moreover, the claims are directed to implementation of novel, purpose-built software functionality that does much more than what humans could or can do in urgent, vital, and volatile contexts such as emergencies, natural disaster, and combat.   The software functionality transforms any generic hardware that is used into a special-purpose computing system customized to operate as described herein for a management node, personal communication node, or agent node, among other operations.  '430 patent at 13:30-54.  The claims of the patent, including the independent claims, clearly claim the use of a particular configuration of hardware and software to solve problems with inter and intra-group communications using the communication devices of 2015 by teaching intelligent agents deployed as a virtual assistant in communication groups to, among other things, record and audit group communications.  The dependent claims are further directed to such agents being deployed in virtual machines (claims 5 and 10), as a security agent (claims 3, 9, and 17), as further controlled by a management system that creates communication groups driven by attributes transferred from other member nodes (claims 5, 11, and 14), and where such member nodes form wearable push-to-talk communication devices (claims 6, 12, and 16).  *See* Zatkovich Decl. at ¶41.

52.     The foregoing claim elements are both concrete and specific in what they claim. For instance, these claims are directed to, among other things, the provision of electronic group communications managed by a virtual assistant with recording and auditing services that solved problems in inter and intra-group electronic communications that were the result of the human condition (delay, distractibility, fatigue, lack of focus, and availability, etc.).  *See* Zatkovich Decl. at ¶42.

53.     Additionally, these claims are not directed at subject matter that can be performed by a human, mentally or with pen and paper.  The claims of the '430 patent, including Claim 7, are directed to a specific software that removes the human element from inter and intra-group communications and automates recording and auditing of such group communications through the use of a virtual assistant capable of performing certain other functions (security functions, management operations, and sub-grouping) on communication devices (mobile or otherwise).

The claims here cannot be performed by a human or by pen and paper because the problems that are being solved exist only in the electronic communications realm and are a result of the human condition (delay, distractibility, fatigue, lack of focus, and availability, *etc*.). *See* Zatkovich Decl. at ¶43.

54.    Finally, the claims of the '430 patent do not preempt all the ways of facilitating inter and intra-group electronic communications.  There is a myriad of other ways such systems could be architected, such by using the systems and methods disclosed prior art patents and applications identified on the face of the patent, none of which would not be preempted.  *See* '430 patent at 1, References Cited (disclosing the proposed prior art patents and patent applications cited by the examiner and/or referenced by the patentee during prosecution of the '430 patent).  Also, the public can facilitate electronic inter and inter-group communications without the use of a virtual assistant and without recording and auditing controls in the electronic grouping.  *See* Zatkovich Decl. at ¶44.

55.    Even if the '430 patent claims were directed at an abstract idea (which they are not), the claims capture subject matter that is inventive.  To the extent that the claims employ components and technology that existed at the time, they are employed together here in a way that was new (and certainly would not have been considered conventional, routine, or generic to those skilled in the art).  The use of intelligent agents to manage electronic communication groups and record and audit such communications is inventive.  In fact, a POSITA would understand that each of the claims above provided a specific improvement in inter and intra-group electronic communications that did not exist prior to the priority date of the '430 patent, and more specifically, resulted in a device rooted in computer technology that improved then-existing technology.  *See* Zatkovich Decl. at ¶45.

56.    Even if that were not true, when you look at the elements of each claim as a whole, in ordered combination of their limitations, including (A) independent claim 1, coupled with dependent claims 2-6, (B) independent claim 7, coupled with its various dependent claims 8-12, and (C) independent claim 13, coupled with its various dependent claims 14 to 17 of the '430 patent, as recited and described in detail above, were not well-known in the art.  A POSITA

would not understand these claims to merely employ known generic components in a conventional or routine way. Quite the opposite is true. These claims disclose and claim specific solutions through their claim elements in an inventive and unique way in order to solve problems in inter and intra-group electronic communication technologies that existed in May of 2015 through the disclosure of specific software that removes the human element from inter and intra-group communications and automates recording and auditing of such group communications through the use of a virtual assistant capable of performing certain other functions (security functions, management operations, and sub-grouping) on communication devices. *See* Zatkovich Decl. at ¶46.

57.     The complexity and specificity of the claimed systems and methods disclosed in the '430 patent claims is not equivalent to the defendant's analogy of using a court reporter in a court hearing or deposition. Notably, the examples of communication groups provided in the motion are entirely of calm and orderly contexts (*e.g.*, a court hearing or taking a deposition). A human, of course, can suffice in such contexts. As noted above, the main issue with using the technology existing in 2015 is that the limitations of the human condition (delay, distractibility, fatigue, lack of focus, and availability, etc.) come into play under more extreme/demanding circumstances (*e.g.*, when round the clock instant and accurate responsiveness is required in a situation with distraction). *See* Zatkovich Decl. at ¶47.

58.     For the above reasons, the claims of the '430 patent claim a combination of elements sufficient to ensure that the claims themselves, both in substance and in practice, are directed to concrete and inventive concepts (not an abstract idea). *See* Zatkovich Decl. at ¶48.

### INFRINGEMENT

59.     Defendant has directly infringed infringe one or more claims of the '430 patent by making, using, causing to be used, selling, offering for sale, providing, supplying, distributing, and/or internal and external testing of the TalkDesk CX Cloud and Autopilot Accused Products. For instance, Defendant has directly infringed, either literally or under the doctrine of equivalents, at least claims 1, 5, 13, and 17 of the '430 patent, as detailed in Exhibit A (Evidence of Use of Infringement Regarding U.S. Patent No. 10,110,430).

60.     For example, as detailed in <u>Ex. A</u>, Defendant, using the TalkDesk CX Cloud and Autopilot Accused Products, performs a method of managing a communication group, wherein the communication group comprises a plurality of personal communication member nodes, the method comprising: receiving instructions from at least one of the plurality of personal communication member nodes to instantiate an intelligent agent; instantiating the intelligent agent as a virtual assistant communication member node in the communication group; and the instantiated intelligent agent recording and auditing communications among and between the plurality of personal communication member nodes in the communication group.

61.     For example, as detailed in <u>Ex. A</u>, Defendant, using the TalkDesk CX Cloud and Autopilot Accused Products, performs the method of claim 1 wherein the intelligent agent is instantiated as a virtual assistant communication member node in the communication group by a management system configured to define the communication group based on attribute information transferred to the management system from the plurality of personal communication member nodes in the communication group.

62.     For example, as detailed in <u>Ex. A</u>, Defendant, using the TalkDesk CX Cloud and Autopilot Accused Products, performs a method of operating a group communication system, comprising: managing a communication group comprising a plurality of personal communication member nodes, wherein each personal communication member node comprises a user node transmitting and receiving communications between the group members; instantiating the intelligent agent as a virtual assistant communication member node in the communication group; and the instantiated intelligent agent recording and auditing communications among and between the plurality of personal communication member nodes in the communication group.

63.     For example, as detailed in <u>Ex. A</u>, Defendant, using the TalkDesk CX Cloud and Autopilot Accused Products, performs the method of claim 13 wherein communications between the communication group member nodes are encrypted and further wherein the virtual assistant communication member node is securely linked to the communication group.

64.     Orion Labs or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of one or more claims of the '430 patent.

65.     Since at least the time of receiving the original complaint in this action, Defendant has also indirectly infringed the '430 patent by inducing others to directly infringe the '430 patent.  Defendant has induced distributors and end-users, including, but not limited to, Defendant's employees, partners, contractors, or customers, to directly infringe, either literally or under the doctrine of equivalents, the '430 patent by providing or requiring use of the TalkDesk CX Cloud and Autopilot Accused Products.  Defendant has taken active steps, directly or through contractual relationships with others, with the specific intent to cause them to use the TalkDesk CX Cloud and Autopilot Accused Products in a manner that infringes one or more claims of the '430 patent, including, for example, claims 1, 5, 13, and 17 of the '430 patent.  Such steps by Defendant include, among other things, advising or directing personnel, contractors, or end-users to use the TalkDesk CX Cloud and Autopilot Accused Products in an infringing manner; advertising and promoting the use of the TalkDesk CX Cloud and Autopilot Accused Products in an infringing manner; or distributing instructions that guide users to use the TalkDesk CX Cloud and Autopilot Accused Products in an infringing manner.  Defendant has performed these steps, which constitute induced infringement with the knowledge of the '430 patent and with the knowledge that the induced acts constitute infringement.  Defendant has been aware that the normal and customary use of the TalkDesk CX Cloud and Autopilot Accused Products by others would infringe the '430 patent.

66.     Defendant has also indirectly infringed by contributing to the infringement of the '430 patent.  Defendant has contributed to the direct infringement of the '430 patent by its personnel, contractors, distributors, and customers.  The TalkDesk CX Cloud and Autopilot Accused Products have special features that are specially designed to be used in an infringing way and that have no substantial uses other than ones that infringe one or more claims of the '430 patent, including, for example, claims 1, 5, 13, and 17 of the '430 patent.  The special features

1    constitute a material part of the invention of one or more of the claims of the '430 patent and are

2    not staple articles of commerce suitable for substantial non-infringing use.

3        67.    Defendant had knowledge of the '430 patent at least as of the date when it was

4    notified of the filing of this action.

5        68.    Furthermore, on information and belief, Defendant has a policy or practice of not

6    reviewing the patents of others, including instructing its employees to not review the patents of

7    others, and thus have been willfully blind of Orion Labs' patent rights.

8        69.    Defendant's actions are at least objectively reckless as to the risk of infringing a

9    valid patent and this objective risk was either known or should have been known by Defendant.

10       70.    Defendant's direct infringement of one or more claims of the '430 patent is, has

11   been, and continues to be willful, intentional, deliberate, or in conscious disregard of Orion Labs'

12   rights under the patent.

13       71.    Orion Labs has been damaged as a result of the infringing conduct by Defendant

14   alleged above.  Thus, Defendant is liable to Orion Labs in an amount that compensates it for such

15   infringements, which by law cannot be less than a reasonable royalty, together with interest and

16   costs as fixed by this Court under 35 U.S.C. § 284.

17       72.    Orion Labs has suffered irreparable harm, through its loss of market share and

18   goodwill, for which there is no adequate remedy at law.  Orion Labs has and will continue to

19   suffer this harm by virtue of Defendant's infringement of the '430 patent.  Defendant's actions

20   have interfered with and will interfere with Orion Labs' ability to license technology.  The

21   balance of hardships favors Orion Labs' ability to commercialize its own ideas and technology.

22   The public interest in allowing Orion Labs to enforce its right to exclude outweighs other public

23   interests, which supports injunctive relief in this case.

24       **COUNT II: INFRINGEMENT OF U.S. PATENT NO. 10,462,003**

25       73.    Plaintiff repeats and re-alleges the allegations in the Paragraphs above as though

26   fully set forth in their entirety.

27

28

74. The USPTO duly issued U.S. Patent No. 10,462,003 (hereinafter, the "'003 patent") on October 29, 2019, after full and fair examination of Application No. 16/142,314, which was filed on September 26, 2018, which claims priority to the '430 patent. *See* '003 patent.

75. Orion Labs owns all substantial rights, interest, and title in and to the '003 patent, including the sole and exclusive right to prosecute this action and enforce the '003 patent against infringers and to collect damages for all relevant times.

**SUBJECT MATTER ELIGIBILITY**

76. The claims of the '003 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity. Rather, the claimed inventions include inventive components that improve upon the function and operation of managing communication groups, distributed group communications, and group communication systems.

77. The written description of the '003 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

78. In general, the '003 patent is directed to "communications and, in particular, to intelligent agents usable with communication groups." '003 patent at 1:20-22. The '003 patent describes a system and method for using intelligent agents in personal communication devices, such as cellphones and wearable devices, to provide assistance and improve communication experiences. The intelligent agents can be members of a communication group and can perform various functions, including providing ad hoc services to the group like voice instructions, security functions, management operations, sub-grouping by group-provided attributes, and search, transcription, and annotation functions. The teachings of the '003 patent include a management system and an agent system, and the personal communication devices can operate in groups that are defined by the management system and can provide ad hoc services to the group, including recording, auditing, searching, transcription, and annotation of communications. *See* Zatkovich Decl. at ¶50.

### The Technical Problems That Existed In The Art Of Electronic
### Inter And Intra-Group Communication Systems In May 2015.

79.     The specification of the '003 patent provides detailed information about the problems that existed in the art of inter and intra-group electronic communication systems in May 2015.  '003 patent at 1:27-41; *see also* Zatkovich Decl. at ¶22.

80.     "Telephones, cellphones, smartphones, computers and tablets provide an efficient way for users to communicate without being in the same physical location. However, these devices often require the user to provide multiple inputs and preferences for each of the communications before the communications can take place. Such preferences may include identification of the individuals involved in the communication, a contact identifier for the individuals in the communication, amongst a variety of other preferences. Moreover, when busy performing other tasks, it is often difficult to interface with the device (*e.g.,* in changing environments, locations and conditions) while concurrently holding a communicating phone, computer, or tablet, and may distract the user from a current task or situation."  '003 patent at 1:27-41; *see also* Zatkovich Decl. at ¶23.

81.     There are significant contexts (*e.g.*, emergencies, natural disasters, combat) in which the user distraction cited above could not be tolerated or allowed, In such contexts, the claimed outcomes could not, in 2015 or today, be achieved with only humans in the group, without costly or even catastrophic results.  *See* Zatkovich Decl. at ¶24.

82.     Additionally, there were issues in terms of the availability of persons with certain skillsets and abilities to provide ad hoc services to a group.  Unless the group consisted of individuals that were well and specifically trained in transcription, annotation, providing security, managing, or being able to search for needed information and provide that information immediately, it would take time to get such persons into an active group (if possible at all).  And even if particular mobile phones of individuals in a group had such functionality, it was not guaranteed (nor were individuals necessarily proficient at such skillsets).  *See* Zatkovich Decl. at ¶25.

**The Claimed Advances Of The Intelligent Agent Patents (The '430 Patent, The '003 Patent, And The '339 Patent).**

83.    As taught by the specification, the invention of the '003 patent solved the technical problems that existed prior to the inclusion of intelligent agents in communication groups in which the urgent and volatile nature of the context in which the group is communicating precludes having only humans carry out the claimed outcomes, rendering those outcomes unavailable.  The inventions disclosed in the Intelligent Agent Patents are intelligent agents instantiated as virtual assistants are equipped with the ability to record and audit group communications and can additionally ad hoc services (voice instructions, security functions, management operations, sub-grouping by group-provided attributes, and search, transcription, and annotation functions) to a group.  *See* Zatkovich Decl. at ¶26.

84.    At its most basic, the invention provides "intelligent agent features to personal communication nodes (e.g., wearable personal communication nodes) include systems, methods, and software that receive instructions to instantiate one or more intelligent agent nodes as members of a communication group that includes the personal communication nodes. Each intelligent agent node can be instantiated by a communication group management system, an intelligent agent system and/or by one of the communication group members, for example by executing software on one or more computing systems or devices."  '003 patent at 1:45-55; *see also* Zatkovich Decl. at ¶27.

85.    The advances of the '003 patent in the critical and vital contexts of the sorts listed above include:

- The claimed instantiation is immediate, no matter what the circumstances;
- The instantiated intelligent agent is always fully and immediately functional;
- The capabilities of the intelligent agent are not limited to those of possibly available humans; and
- The intelligent agent is never fatigued or distracted.

*See* Zatkovich Decl. at ¶28.

86.     All of these advances provide the members of a communication group in contexts of the sorts listed above with needed outcomes not available if only humans were in the group. *See* Zatkovich Decl. at ¶29.

87.     Figure 1 of the '003 patent illustrates an exemplary communication system:



**FIGURE 1**

88.     "Node **106** can be executed on a single processing or computing system, such as agent system **130**, or can be executed across multiple processing and/or computing systems. In some implementations, node **106** may be executed as a virtual node comprising software or firmware executed by one or more nodes **102-104** or management system **120** in FIG. 1. In other implementations node **106** can comprise virtualized software executed by a virtual machine that is instantiated upon demand by any of nodes **102-104**. This virtual machine can be executed in one or more of the computing or processing elements of FIG. 1, such as nodes **102-104**, management system **120**, or agent system **130**. In some implementation, a user or node **102-104** can specify where and/or how node **106** is to be executed (e.g., by selecting a specific host node or host computing system, or by specifying a specific physical location, where specified locations

can include a home or business server, a country of execution for distributed computing systems, and others). Moreover, when node **106** generates data and/or other information to be recorded, any of nodes **102-104** or management system **120** can specify where the records and/or data are to be stored (e.g., in a digital storage device, computer-readable medium associated with a particular computing node, a logical location, and/or a physical location)." '003 patent at 5:40-63; *see also* Zatkovich Decl. at ¶31.

89.     Figure 2 of the '003 patent depicts exemplary system **200** implementing intelligent agent features for use by personal communication nodes, such as nodes **102-104** of Figure 1.



**FIGURE 2**

90.     "Intelligent agent system **210** comprises processing system **220** and communication system **221** which are implemented in and/or otherwise provided by one or more computing and communication systems system **220** and system **221** are shown as separate systems, though they may be combined and/or implemented in one or more computing systems. One exemplary implementation node **201** (which may comprise one of nodes **102-104** of FIG. 1) comprises intelligent agent system **210** that includes, implements, deploys or otherwise generates

intelligent agent **230**. . . . In some implementations intelligent agent system **210** is a virtual machine **210** that includes the elements of intelligent agent **230** (e.g., where the virtual machine and intelligent agent system are executed in a distributed computing environment, such as a cloud server or cloud system." '003 patent at 7:25-34, 41-468; *see also* Zatkovich Decl. at ¶33.

91.     "Processing system **220** includes user interface system **222**, processing circuitry **223** and storage system **224**. Storage system **224** stores or otherwise includes software that comprises intelligent agent **230**." '430 patent at 7:42-45; *see also* Zatkovich Decl. at ¶34. Further,

> Processing circuitry **223** can comprise microprocessors, microcontrollers, and/or other circuitry that retrieves and executes software **225** from storage system **224**. Processing circuitry may comprise a single device or can be distributed across multiple devices, including devices in different geographic areas. Processing circuitry **223** may be embedded in various types of equipment.
>
> Storage system **224** comprises a non-transitory computer readable storage medium, such as a disk drive, flash drive, data storage circuity, or some other hardware memory apparatus. . . . Storage system **224** may be embedded in various types of equipment. In some examples, a computer apparatus can comprise processing system **223**, storage system **224** and software **225**.
>
> Software **225** comprises intelligent agent **230** in some implementations. Intelligent agent **230**, as shown in this non-limiting example, includes voice recognition module **231**, assistant module **232**, audit module **233**, recording module **234**, and security module **235**. In addition, software **225** (including intelligent agent **230**) may include operating systems, utilities, drivers, network interfaces, applications, and other software.

'003 patent at 8:12-35.

92.     Ultimately, in general,

> **[S]oftware 403 can**, when loaded into processing circuit **408** and executed, **transform processing circuitry 408 from a general-purpose computing system into a special-purpose computing system customized to operate as described herein for a management node, personal communication node, or agent node, among other operations. Encoding software 403 on storage system 402 can transform the physical structure of storage system 402**. The specific transformation of the physical structure can depend on various factors in different implementations of this description. Examples of such factors can include, but are not limited to the technology used to implement the storage media of storage system

**402** and whether the computer-storage media are characterized as primary or secondary storage. For example, if the computer-storage media are implemented as semiconductor-based memory, software **403** can transform the physical state of the semiconductor memory when the program is encoded therein. For example, software **403** can transform the state of transistors, capacitors, or other discrete circuit elements constituting the semiconductor memory. A similar transformation can occur with respect to magnetic or optical media. Other transformations of physical media are possible without departing from the scope of the present description, with the foregoing examples provided only to facilitate this discussion.

'003 patent at 13:36-60 (emphasis added and discussing FIG. 4); *see also* Zatkovich Decl. at ¶35.

### The Claims Of The '003 Patent Provide Technical Solutions To Problems With Inter And Intra-Group Electronic Communication Systems In May 2015.

93.     The '003 patent contains 23 total claims (three independent and twenty dependent). This disclosure focuses on claim 1, though the same arguments (and more) apply to the other 22 claims in the patent, each of which requires even more specific technical steps than claim 1. Bolding, italics, and underlining are used for emphasis below to highlight where the claims capture the technical solutions taught in the specification. Claim 1 is provided below:

1. A method of ***managing a communication group, wherein the communication group comprises a plurality of personal communication member nodes***, the method comprising:

***receiving instructions from at least one of the plurality of personal communication member nodes to:***
 ***instantiate an intelligent agent***; and
***where to instantiate the intelligent agent***;

***<u>instantiating the intelligent agent as a virtual assistant communication member node</u>*** in the communication group; and

***the instantiated intelligent agent <u>performing a service for one or more personal communication member nodes</u>*** in the communication group.

'003 patent at claim 1 (emphasis added); *see also* Zatkovich Decl. at ¶54.

94.     Several of the dependent claims to the independent claim are also presented below, which provide:

2.     The method of claim **1** wherein receiving ***<u>instructions to instantiate the intelligent agent comprises receiving voice</u>***

---

**FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT**
N.D. Cal. No. 4:25-cv-05045-YGR – Page |28

_instructions through a first personal communication member node in the communication group_.

3.      The method of claim **1** wherein **the intelligent agent is instantiated through a _security handshake procedure to provide secure access_ to the intelligent agent by the plurality of personal communication node members as a secure communication member node** in the communication group.

4.      The method of claim **1** wherein **the service comprises at least one of the following: _recording communications_ among and between the plurality of personal communication nodes; _auditing communications_ among and between the plurality of personal communication nodes; _performing a search_; _performing audio transcription_; and _annotating communications_**.

5.      The method of claim **1** wherein **the intelligent agent is instantiated as a _virtual assistant_ communication member node in the communication group by a _virtual machine in a cloud system_**.

6.      The method of claim **1** wherein **the intelligent agent is instantiated as a virtual assistant communication member node in the communication group by a _management system_ configured to define the communication group _based on attribute information_ transferred to the management system** from the plurality of personal communication member nodes in the communication system.

7.      The method of claim **1** wherein **each personal communication member node** in the plurality of personal communication member nodes **comprises a wearable push-to-talk communication device**.

16. The method of claim 15 wherein **the communication group is defined by a _management system_ based on _attribute information_** transferred to the management system by the member nodes and is **updated based on _changes to the attribute_ information**.

20. The method of claim 15 wherein communications between the communication group member nodes are **_encrypted_ and further wherein the virtual assistant communication member node is _securely linked to the communication group_**.

21.      The method of claim 1, wherein where **to instantize the intelligent agent is at least one of the following: _a specific host node, a specific physical location, a virtual m_achine executed on at least one of: personal communication member nodes, a management system, and an agent system**.

22. The non-transitory computer readable storage medium of claim 8 wherein the received instructions of where to instantiate **an intelligent agent further comprise the intelligent agent to _instantize_ at least one of the following: a specific _host node_, a _specific physical location_, a _virtual machine_ executed on at least**

---

*one of: personal communication member nodes, a management system, and an agent system.*

23. The method of claim 15, wherein where **to instantize the intelligent agent is at least one of the following: _a specific host node, a specific physical location, a virtual machine_ executed on at least one of: personal communication member nodes, a management system, and an agent system.**

'003 patent at claims 2-7, 21 (emphasis added); *see also* Zatkovich Decl. at ¶55.

*95.* The other independent claims (claims 8 and 15) are also directed to subject matter that provided technical solutions to technical problems in inter and intra-group electronic communication that existed in May 2015. Specifically, these other independent claim electronic communication groups managed by intelligent agents with certain limitations not found in claim 1. *See* '003 patent at claim 8 (disclosing that at least one of a plurality of personal communication member nodes operates as a communication group and that the instantiated intelligent agent is configured to record and audit communications among and between the plurality of personal communication member nodes in the communication group); claim 15 (disclosing a method of operating a group communication system, comprising, among other elements, that each personal communication node comprises a user node transmitting and receiving communications between the group members and that the virtual assistant communication member node performs recording and auditing services for the communication group member nodes). The other dependent claims (2-7 and 16-23) roughly approximate dependent claims 1-7 above. *Compare* 9 and 17 *with* 2; *compare* 10 *with* 3; *compare* 11 and 18 *with* 4; *compare* 12 *with* 5; *compare* 13 *with* 6; *compare* 14 and 18 *with* 7. *See* Zatkovich Decl. at ¶56.

96. Concrete and novel aspects of this invention, as described in the specification in the previous section, are tied directly to the claim limitations in the form of software algorithms and process descriptions. For example:

- "Each personal communication node 102-104 in FIG. 1 may be configured to obtain (e.g., monitor, collect or receive) attribute information, for example by monitoring one or more attributes from associated positional sensors, audio transducers, GPS receivers, accelerometers, wireless transceivers, environmental sensors, or other devices capable of monitoring the types of attributes discussed herein."

'003 patent at 3:40-47;

- "Personal communication nodes 102-104 can periodically transfer messages for delivery to management system 120 containing or otherwise indicating attribute information (e.g., dynamic changes in one or more attributes)."

'003 patent at 3:58-61;

- "Intelligent agent features may be customized by agent system 130 to meet specific duties, needs, limitations, etc . of a group . For example , in one non - limiting example Group B may comprise a team of firefighters. Intelligent agent features can be adapted by agent system 130 to use a natural language interface via node 106 to provide information about the fire as well as information regarding the actions and locations of other firefighters and other responders. Intelligent agent features provided by node 106 and/or system 130 of FIG. 1 can include recording conversations among users of nodes 102-104, auditing communications exchanged between nodes 102-104, providing voice-based assistance and services to nodes 102-104, and other features."

'430 patent at 4:36-48; *see also* Zatkovich Decl. at ¶57.

97.     The claims of the '003 patent are not directed to any abstract idea.  The claims of the '003 patent, including Claims 1, 8, and 15 are directed to technical solutions to problems that existed in May of 2015.  More specifically, the claimed subject matter overcame the problems that existed in May of 2015 with then-known inter and intra-group communications using the devices of the time.  It does so by removing the human element and limitations on the availability of trained personnel from such inter and intra-group communications, providing discrete services to such groups (*i.e.*, voice instructions, security functions, management operations, sub-grouping by group-provided attributes, and search, transcription, and annotation functions) on communication devices (mobile or otherwise) and automating the recording and auditing of such group communications through the use of a virtual assistant.  In general, the claims are specific in their boundaries, and those boundaries are directly in accordance with the teachings of the '003 patent.  *See* Zatkovich Decl. at ¶58.

98.     As noted above, the claims are directed to implementation of novel, purpose-built software functionality that does much more than what humans could or can do in urgent, vital, and volatile contexts such as emergencies, natural disaster, and combat.   The software functionality transforms any generic hardware that is used into a special-purpose computing system customized to operate as described herein for a management node, personal communication node, or agent node, among other operations.  '003 patent at 13:30-54.  The claims of the patent, including the independent claims, clearly claim the use of a particular

configuration of hardware and software to solve problems with inter and intra-group communications using the communication devices of 2015 by disclosing and teaching intelligent agents deployed as a virtual assistant in communication groups to provide ad hoc group services in the form of, among other things, voice instructions, security functions, management operations, sub-grouping by group-provided attributes, and search, transcription, and annotation functions to a group.  The dependent claims are further directed to such agents being deployed in virtual machines (claims 5 and 12), as a security agent with a security handshake procedure (claims 3, 10, and 20), as further controlled by a management system that creates communication groups driven by attributes transferred from other member nodes (claims 6 and 13), where such member nodes form wearable push-to-talk communication devices (claims 7, 14, and 19), and where such groups are location specific (claim 21).  *See* Zatkovich Decl. at ¶59.

99.     The foregoing claim elements are both concrete and specific in what they claim. For instance, these claims are directed to, among other things, the provision of discrete ad hoc services in electronic communication groups (*i.e.,* voice, security, management operations, sub-grouping, search, transcription, and annotation functions) that solved problems in inter and intra-group electronic communications that were the result of the human condition (delay, distractibility, fatigue, lack of focus, and availability, *etc*.) and limitations on accessibility and resources to provide ad hoc services due to training or skillset (ability to provide voice instructions, security functions, management operations, sub-grouping by group-provided attributes, and search, transcription, and annotation functions) to a group).  *See* Zatkovich Decl. at ¶60.

100.     Additionally, these claims are not directed at subject matter that can be performed by a human, mentally or with pen and paper.  The claims of the '003 patent, including Claim 1, are directed to a specific software that removes the human element from inter and intra-group communications and automates the provision of group services in the form of, among other things, voice instructions, security functions, management operations, sub-grouping by group-provided attributes, and search, transcription, and annotation functions record and audit group communications on communication devices (mobile or otherwise).  The claims here cannot be

performed by a human or by pen and paper because the problems that are being solved exist only in the electronic communications realm and are a result of the human condition (delay, distractibility, fatigue, lack of focus, and availability, *etc.*) and due to the accessibility of personnel to provide *ad hoc* services (a person that can transcribe, annotate, provide security, manage, or search for information) to a group. *See* Zatkovich Decl. at ¶61

101.    Finally, the claims of the '003 patent do not preempt all the ways of facilitating inter and intra-group electronic communications. There is a myriad of other ways such systems could be architected, such by using the systems and methods disclosed prior art patents and applications identified on the face of the patent, none of which would not be preempted. *See* '003 patent at 1-2, References Cited (disclosing the proposed prior art patents and patent applications cited by the examiner and/or referenced by the patentee during prosecution of the '003 patent). Also, the public can facilitate electronic inter and inter-group communications without providing services of the type listed above (voice, security, management operations, sub-grouping, search, transcription, and annotation functions) and without a virtual assistant. *See* Zatkovich Decl. at ¶62.

102.    Even if the '003 patent claims were directed at an abstract idea (which they are not), the claims capture subject matter that is inventive. To the extent that the claims employ components and technology that existed at the time, they are employed together here in a way that was new (and certainly would not have been considered conventional, routine, or generic to those skilled in the art). The creation and use of electronic communication groups with an intelligent agent(s) and the provision of voice, security, management operations, sub-grouping, search, transcription, and annotation functions is inventive. In fact, A POSITA would understand that each of the claims above provided a specific improvement in inter and intra-group electronic communications that did not exist prior to the priority date of the '003 patent, and more specifically, resulted in a device rooted in computer technology that improved then-existing technology. *See* Zatkovich Decl. at ¶63.

103.    Even if that were not true, when you look at the elements of each claim as a whole, in ordered combination of their limitations, including (A) independent claim 1, coupled with

dependent claims 2-7, (B) independent claim 8, coupled with its various dependent claims 9-14, and (C) independent claim 15, coupled with its various dependent claims 16 to 23 of the '003 patent, as recited and described in detail above, were not well-known in the art. A POSITA would not understand these claims to merely employ known generic components in a conventional or routine way. Quite the opposite is true. These claims disclose and claim specific solutions through their claim elements in an inventive and unique way in order to solve problems in inter and intra-group electronic communication technologies that existed in May of 2015 through the disclosure of specific software that removes the human element and issues with the availability of trained individuals from inter and intra-group communications and automates recording and auditing of such group communications through the use of a virtual assistant capable of performing certain other functions (security functions, management operations, and sub-grouping) on communication devices. *See* Zatkovich Decl. at ¶64.

104.    For the above reasons, the claims of the '003 patent claim a combination of elements sufficient to ensure that the claims themselves, both in substance and in practice, are directed to concrete and inventive concepts (not an abstract idea). *See* Zatkovich Decl. at ¶65.

### INFRINGEMENT

105.    Defendant has directly infringed and continues to infringe one or more claims of the '003 patent by making, using, causing to be used, selling, offering for sale, providing, supplying, distributing, and/or internal and external testing of the TalkDesk CX Cloud and Autopilot Accused Products. For instance, Defendant has directly infringed and continues to infringe, either literally or under the doctrine of equivalents, at least claims 1, 4, 6, and 15 of the '003 patent, as detailed in Exhibit B (Evidence of Use Regarding Infringement of U.S. Patent No. 10,462,003).

106.    For example, as detailed in Ex. B, Defendant's TalkDesk CX Cloud and Autopilot Accused Products perform a method of managing a communication group, wherein the communication group comprises a plurality of personal communication member nodes, the method comprising: receiving instructions from at least one of the plurality of personal communication member nodes to: instantiate an intelligent agent; and where to instantiate the

intelligent agent; instantiating the intelligent agent as a virtual assistant communication member node in the communication group; and the instantiated intelligent agent performing a service for one or more personal communication member nodes in the communication group.

107.    For example, as detailed in Ex. B, Defendant's TalkDesk CX Cloud and Autopilot Accused Products perform the method of claim 1 wherein the service comprises at least one of the following: recording communications among and between the plurality of personal communication nodes; auditing communications among and between the plurality of personal communication nodes; performing a search; performing audio transcription; and annotating communications.

108.    For example, as detailed in Ex. B, Defendant's TalkDesk CX Cloud and Autopilot Accused Products perform the method of claim 1 wherein the intelligent agent is instantiated as a virtual assistant communication member node in the communication group by a management system configured to define the communication group based on attribute information transferred to the management system from the plurality of personal communication member nodes in the communication group.

109.    For example, as detailed in Ex. B, Defendant's TalkDesk CX Cloud and Autopilot Accused Products perform a method of operating a group communication system, comprising: managing a communication group comprising a plurality of personal communication member nodes, wherein each personal communication member node comprises a user node transmitting and receiving communications between the group members; receiving instructions from at least one of the plurality of personal communication member nodes to: instantiate an intelligent agent; and where to instantiate the intelligent agent; instantiating the intelligent agent as a virtual assistant communication member node of the communication group, wherein the virtual assistant communication member node performs recording and auditing services for the communication group member nodes.

110.    Orion Labs or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of one or more claims of the '003 patent.

111.     Since at least the time of receiving the original complaint in this action, Defendant has also indirectly infringed the '003 patent by inducing others to directly infringe the '003 patent.   Defendant has induced distributors and end-users, including, but not limited to, Defendant's employees, partners, contractors, or customers, to directly infringe, either literally or under the doctrine of equivalents, the '003 patent by providing or requiring use of the TalkDesk CX Cloud and Autopilot Accused Products.  Defendant has taken active steps, directly or through contractual relationships with others, with the specific intent to cause them to use the TalkDesk CX Cloud and Autopilot Accused Products in a manner that infringes one or more claims of the '003 patent, including, for example, claims 1, 4, 6, and 15 of the '003 patent.  Such steps by Defendant include, among other things, advising or directing personnel, contractors, or end-users to use the TalkDesk CX Cloud and Autopilot Accused Products in an infringing manner; advertising and promoting the use of the TalkDesk CX Cloud and Autopilot Accused Products in an infringing manner; or distributing instructions that guide users to use the TalkDesk CX Cloud and Autopilot Accused Products in an infringing manner.  Defendant has performed these steps, which constitute induced infringement with the knowledge of the '003 patent and with the knowledge that the induced acts constitute infringement.  Defendant has been aware that the normal and customary use of the TalkDesk CX Cloud and Autopilot Accused Products by others would infringe the '003 patent.

112.     Defendant has also indirectly infringed by contributing to the infringement of the '003 patent.   Defendant has contributed to the direct infringement of the '003 patent by its personnel, contractors, distributors, and customers.   The TalkDesk CX Cloud and Autopilot Accused Products have special features that are specially designed to be used in an infringing way and that have no substantial uses other than ones that infringe one or more claims of the '003 patent, including, for example, claims 1, 4, 6, and 15 of the '003 patent.  The special features constitute a material part of the invention of one or more of the claims of the '003 patent and are not staple articles of commerce suitable for substantial non-infringing use.

113.     Defendant had knowledge of the '003 patent at least as of the date when it was notified of the filing of this action.

114.     Furthermore, on information and belief, Defendant has a policy or practice of not reviewing the patents of others, including instructing its employees to not review the patents of others, and thus have been willfully blind of Orion Labs' patent rights.

115.     Defendant's actions are at least objectively reckless as to the risk of infringing a valid patent and this objective risk was either known or should have been known by Defendant.

116.     Defendant's direct infringement of one or more claims of the '003 patent is, has been, and continues to be willful, intentional, deliberate, or in conscious disregard of Orion Labs' rights under the patent.

117.     Orion Labs has been damaged as a result of the infringing conduct by Defendant alleged above.  Thus, Defendant is liable to Plaintiff in an amount that compensates it for such infringements, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

118.     Orion Labs has suffered irreparable harm, through its loss of market share and goodwill, for which there is no adequate remedy at law.  Orion Labs has and will continue to suffer this harm by virtue of Defendant's infringement of the '003 patent.  Defendant's actions have interfered with and will interfere with Orion Labs' ability to license technology.  The balance of hardships favors Orion Labs' ability to commercialize its own ideas and technology.  The public interest in allowing Orion Labs to enforce its right to exclude outweighs other public interests, which supports injunctive relief in this case.

**COUNT III: INFRINGEMENT OF U.S. PATENT NO. 10,897,433**

119.     Plaintiff repeats and re-alleges the allegations in the Paragraphs above as though fully set forth in their entirety.

120.     The USPTO duly issued U.S. Patent No. 10,897,433 (hereinafter, the "'433 patent") on January 19, 2021 after full and fair examination of Application No. 15/936,941, which was filed on March 27, 2018, which claims priority to provisional application No. 62/477,070, filed on March 27, 2017.  *See* '433 patent.

121.    Orion Labs owns all substantial rights, interest, and title in and to the '433 patent, including the sole and exclusive right to prosecute this action and enforce it against infringers and to collect damages for all relevant times.

**SUBJECT MATTER ELIGIBILITY**

122.    The claims of the '433 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity.  Rather, the claimed inventions include inventive components that improve upon the operation of previous communication devices and systems by using bot messaging.

123.    The written description of the '433 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

124.    In general, the '433 patent is directed to bot group messaging using general voice libraries.  '433 patent at 1:55-57.  The claims of the '433 patent are directed to methods, apparatuses, and computing systems for managing audio messaging between user nodes and bots in a group, utilizing voice libraries for processing recorded audio into enhanced text for bot interaction.  '433 patent at Abstract. The technology focuses on enabling bots to perform tasks over a network, including user-oriented and group-oriented bot functionalities, with applications in automated communication and commercial services. This patent teaches advancements over the bot technologies of March 2017 by introducing group messaging services that allow interaction between user nodes and bots using general voice libraries.  *See* Zatkovich Decl. at ¶84.

**The Technical Problems That Existed In Bot Technology And
Messaging In March 2017.**

125.    The specification of the '433 patent provides detailed information about the problems regarding intelligent agent features for wearable personal communication nodes in March 2017.  '433 patent at 1:51-55; *see also* Zatkovich Decl. at ¶87.

126.     According to the teachings of the '433 patent, "[w]ith the [then] worldwide proliferation of the internet, providing goods and services to users and consumers ha[d] become more commonplace and automated."  '433 patent at 1:14-16.  One way of "automatically providing increased numbers of goods and services [wa]s through bots." '433 patent at 1:16-18; *see also* Zatkovich Decl. at ¶88.

127.     "An internet bot, also known as web robot, WWW robot or simply bot, is a software application that runs automated tasks (scripts) over the internet. Typically, bots perform tasks that are both simple and structurally repetitive, at a much higher rate than would be possible for a human alone." '433 patent at 1:18-23.  In March of 2017, "[t]he largest current use of bots [wa]s in web spidering or web crawling, in which an automated script fetches, analyzes and files information from web servers at many times the speed of a human." '433 patent at 1:23-27.  At that time, "[m]ore than half of all web traffic [wa]s made up of bots." *Id.*; *see also* Zatkovich Decl. at ¶89.

128.     "Some bots communicate with other users of internet-based services, via Instant Messaging (IM), Internet Relay Chat (IRC), or another web interface such as Facebook bots and Twitterbots. These chatterbots may allow people to ask questions in plain English and then formulate a proper response." '433 patent at 1:28-33.  It is also well known in the industry that different types of bots were (and are) used for different applications or tasks. Examples of different types of tasks include: "reporting weather, zip-code information, sports scores, converting currency or other units, etc. … entertainment, such as SmarterChild on AOL Instant Messenger and MSN Messenger."  '433 patent at 1:33-40; *see also* Zatkovich Decl. at ¶90.

129.     Of primary interest in the '433 patent is the use of bots in "voice activated services."  The specification teaches that in March of 2017 there were also "[g]eneral-purpose bots, such as Amazon's Alexa, Microsoft's Cortana, Google's Assistant, and Apple's Siri[.]" '433 patent at 1:42-43.  These general-purpose bots were "digital personal assistants able to provide a wide range of consumer-oriented voice-activated services, including turning lights on/off, controlling appliances, playing requested music from services such as Pandora or Spotify,

providing requested information, or ordering products or services." '433 patent at 1:44-49; *see also* Zatkovich Decl. at ¶91.

130. While the then-current bots were primarily designed to merely provide information back to a requesting user, or in the case of general-purpose bots, sometimes to control devices, like Alexa, Corana, Google's Assistant, and Siri, there was a need "to create a new generation of messaging services that allow groups of users to interact with both user-oriented bots as well as group-oriented bots." '433 patent at 1:14-16. Specifically, there was the need for the provision of different types of bots that could perform different applications into different service message groups that can utilize specialized voice libraries and natural language units. *See* Zatkovich Decl. at ¶92.

131. The '433 Patent in particular discusses the technical problem associated with more sophisticated consumer-oriented voice-activated services that provide enhanced functionality beyond providing information back to a requesting user. For example, "a bot 208 may be associated with one or more commercial services 404 that may allow purchase, sale, or other financial or more complex transactions." '433 patent at 6:42-47; *see also* Zatkovich Decl. at ¶93.

132. The invention is directed to the association of different bots that perform specific applications into different service message groups. The user members of those different groups can perform voice-activated requests to be executed by a particular bot application of that group. The invention improves the technology of sending voice activation requests to bots by enhancing the processing of the voice request. This is done by selectively using different voice libraries, speech-to-text engines, and/or natural language processors best suited for the tasks of a particular bot. *See* Zatkovich Decl. at ¶94.

### The Advances Of The Bot Group Messaging Patents

133. As taught by the specification, the invention of the '433 patent solved the technical problems that existed by providing "advantages for bot environments." '433 patent at 1:55-56. The '433 patent and '636 patent (further explained in Section X, below) are collectively referred to as the "Bot Group Messaging Patents." The specifications are nearly identical for the

Bot Group Messaging Patents, and for ease of reference, citations to only the '433 patent will be used below. *See* Zatkovich Decl. at ¶95.

134.    Overall, the claims are directed at enabling efficient, automated communication between user nodes and bots in group messaging environments, leveraging voice libraries for enhanced functionality. '433 patent at 1:56-57, 3:29-31.  The '433 patent teaches advancements over the bot technologies of March 2017 by introducing group messaging services that allow interaction between user nodes and bots using general voice libraries.   These advancements include:

   a.    **Integration of Bots in Group Messaging**: The patent enables bots to be incorporated into groups, allowing both user-oriented and group-oriented bots to interact with multiple users in a group setting.

   b.    **Use of Voice Libraries**: It introduces the use of voice libraries, which include speech-to-text engines and natural language units, to process recorded audio into enhanced text. This enhanced text is optimized for bot processing, improving the accuracy and efficiency of bot responses.

   c.    **Support for Shared and Per-User Bots**: The patent provides mechanisms for configuring bots as either shared bots (accessible to all members of a group) or per-user bots (dedicated to specific users), offering flexibility in bot functionality.

   d.    **Commercial Service Integration**: Bots can be associated with commercial services, enabling transactions such as purchases or financial operations.  The system supports secure verification processes for such transactions.

   e.    **Automated Messaging Flow**: The patent describes detailed processes for routing messages to bots, processing audio, and managing replies, ensuring seamless communication between user nodes and bots.

These advancements enhance bot functionality, scalability, and integration in group messaging environments, addressing limitations of earlier bot technologies. *See* Zatkovich Decl. at ¶96.

135.    On the other hand, the '636 patent introduces advancements in bot technologies by enabling group messaging services to interact with both user-oriented bots and group-oriented bots using bot-specific voice libraries.  These  advancements include:

a.    **Bot-Specific Voice Libraries**: The patent teaches the use of voice libraries, including speech-to-text engines and natural language units, to process recorded audio into enhanced text for bots to execute commands. This allows bots to perform tasks more effectively by interpreting audio messages in a format suited to their functionality.

b.    **Group and User Bots**: It distinguishes between group bots (responsive to all members of a group) and user bots (responsive to specific user nodes). This differentiation enables tailored bot interactions within group messaging environments.

c.    **Enhanced Text Processing**: The patent describes converting recorded audio into enhanced text, which is clarified and simplified for execution by bots. This improves the accuracy and efficiency of bot responses.

d.    **Integration with Commercial Services**: Bots can interact with commercial services for tasks like order fulfillment or financial transactions. The system supports secure configurations for user or group accounts, enabling bots to handle complex transactions.

e.    **Flexible Voice Library Selection**: The system can select from multiple voice libraries, including general-purpose libraries and format-specific converters (*e.g.*, .PCU to .WAV), based on bot requirements.

f.    **Group Messaging with Bots**: The patent enables bots to be integrated into group messaging systems, allowing users to send messages to bots and receive replies or actions performed by the bots. Bots can also monitor group conversations and act on identified audio patterns.

These advancements collectively enhance the functionality, adaptability, and integration of bots in group messaging environments, surpassing the capabilities of bots available in March 2017.

136.    Figure 2 of the '433 patent depicts a messaging flow for configuring a bot into a group:

1
2
3
4
5
6
7
8
9
10
11



FIGURE 2

12    137.    The system **200** includes one or more groups **120**, each including at least one user

13    node **108**, a group messaging service **104**, and one or more bots **204**. '433 patent at 3:54-56,

14    4:43-45.  "Bots **208** are software applications for performing one or more tasks over the internet.

15    Therefore, bots **208** are internet-connected and in most embodiments are separate from the group

16    messaging service **104**."  *Id.* at 4:45-49; *see also* Zatkovich Decl. at ¶99.

17    23.    Further,

18            Bots **208** may be incorporated into group **120** by configuring each
         bot 208 in the group messaging service **104** . . . . Group messaging
19            service **104** includes data structures **212** for specifying which user
         nodes **108** and bots **208** are in each group **120**.  Each such data
20            structure **212** includes identifiers and addresses for each user node
         **108** and bot **208** entity in the data structure **212**. Group messaging
21            service **104** includes two group data structures **212**, identified as
         group 1 data structure **212A** and group 2 data structure **212B**. Data
22            structure **212A** includes identifiers and addresses for each of the user
         nodes **108** in group 1 **120**. . . . [D]ata structure **212A** includes a user
23            node A **108A** address and identifier, a user node B **108B** address and
         identifier, and a user node C **108C** address and identifier. Data
24            structure **212B** includes a user node A **108A** address and identifier,
         a user node D **108D** address and identifier, and a user node E **108E**
25            address and identifier. Group messaging service **104** may include
         any number of data structures **212**, and a given bot **208** may be
26            included in any number of data structures **212**.

27    '433 patent at 4:50-5:3; *see also* Zatkovich Decl. at ¶100.

28

1    138.    Figure 3 of the '433 patent illustrates a flowchart of a bot messaging process **216**,

2    as seen below:



15    139.    Notably,

At block **312**, the group messaging service **104** has determined that
a bot **208** is not configured in the group **120** corresponding to the
destination group identifier, and therefore sends the received
message **124** to the user nodes **108** within the destination group **120**.
Addresses for the user nodes **108** within the destination group **120**
are determined by reviewing the data structure **212** within the group
messaging service **104** corresponding to the destination group **120**.
Flow ends at block **312**, or the group messaging service **104** returns
to block **304** to wait for a next received message **124**.

At decision block **316**, the group messaging service **104** determines
if the received message **124** should be sent to a specific bot **208**. The
group messaging service **104** reviews the data structure **212**
corresponding to the destination group **120**, and identifies a bot
entry **504** corresponding to the bot identifier in the received message
**124**. A data structure **212** may include any number of bot entries
**504**. If there is a match, and a bot entry **504** in the data structure **212**
matches the bot identifier, then flow proceeds to block **320**. If there
is not a match, and no bot entries **504** in the data structure **212**
matches the bot identifier, then flow instead proceeds to block **312**.

At block **320**, the group messaging service **104** has identified a
match between the received message **124** and the data structure **212**
corresponding to the destination group **120**, and sends the message

**124** to the selected bot **208**. At this point, the message **124** has been delivered to the addressed bot **208**, and the addressed bot **208** carries out one or more functions corresponding to recorded audio within the message **124**.

'433 patent at 5:60-6:23; *see also* Zatkovich Decl. at ¶102.

140.    Figure 5A of the '433 patent illustrates a shared bot entry 503A within a data structure **212A**, while Figure 5B illustrates a per-user bot within a data structure **212A**, as seen below:



141.    Data structure **212** may be configured one of two ways, depending on desired bot performance within a group **120**:

In a first embodiment, data structure **212A** includes a bot entry **504A** that designates bot **208C** as a shared bot **208**. Shared bot entry **504A** includes a bot address **508A** and a bot identifier or ID **512A**. A shared bot **208** is identified by a group **120** designation within the bot entry **504A**. When a group **120** designation appears within a bot entry **504A**, the group messaging service **104** treats the corresponding bot **208** (bot **208C**) as a shared bot within the corresponding group **120** (group 1, as shown).

. . . .

In a second embodiment, data structure **212A** includes a per-user bot entry **504B** that designates bot **208C** as a per-user bot. Per-user bot entry **504B** includes a bot address **508B** and a bot identifier or ID **512B**. A per-user bot **208** is identified by a user or user node **108** designation within the bot entry **504B**. When a user or user node designation appears within a bot entry **504B**, the group messaging service **104** treats the corresponding bot **208** (bot **208C**) as a dedicated bot **208** to a corresponding user or user node **108** (user C, as shown).

'433 patent at 7:27-53; *see also* Zatkovich Decl. at ¶104.

142.    Finally, in a representative computing device **1200**, the computing device 1200 includes memory **1208**. '433 patent at 17:24-26.  The memory includes data **1216** which includes data structures **212** of the present invention.  *Id.* at 17:29-31; *see also* Zatkovich Decl. at ¶105.

143.    It is well known in the industry that different voice libraries (*i.e.*, a set of one or more voice models) can have different vocabularies or dictionaries tailored to different tasks (*e.g.*, medical speech dictionaries, technical dictionaries, and other custom dictionaries tailored to the type of speech and/or task needed).   Both speech recognition (speech-to-text) engines and voice (text-to-speech) engines utilize different "phoneme" dictionaries (defined within a voice library).  Dictionaries are used within the voice models/voice libraries to allow those engines to understand or speak different sets of words or vocabularies.  *See* Zatkovich Decl. at ¶106.

144.    Figure 9 of the '433 patent illustrates how Group messaging services use a selected voice library for a speech-to-text engines. The recognized speech is sent as text to the natural language unit which then produces enhanced text intended for a specific bot.  The problem of performing more complex and specialized "enhance[d] functionality" in bots is solved, and the technology improved, by defining group messaging services where each group can select a specific voice library (as well as a preferred natural language unit) that is best suited for the tasks to be performed by the bot.  *See* Zatkovich Decl. at ¶107.



**FIGURE 9**

145.    As described in Fig. 9 above, each Group messaging service 104 "includes a voice library" and "at least a speech-to-text engine 902 and a natural language unit 903." '433 patent at 12:40-44.  When performing a particular voice activated request "the group messaging service 104 sends the decoded audio to the speech-to-text engine 902 and the speech-to-text engine 902 converts the decoded audio into text 912." '433 patent at 12:55-57.  That text is then sent "to the natural language unit 903, which reviews the text 912 and converts the text 912 into enhanced text 916." '433 patent at 12:60-64.  As indicated above "[e]nhanced text 916 is clarified and simplified from text 912 into a form more suitable for presentation to a bot 208 to execute." '433 patent at 12:62-66; *see also* Zatkovich Decl. at ¶108.

<u>**The Claims Of The '433 Patent Provide Technical Solutions To Problems With Bot Messaging In March 2017.**</u>

146.    The '433 patent contains 20 total claims (three independent and seventeen dependent).  This disclosure focuses on claim 1, though the same arguments (and more) apply to the other 19 claims in the patent, each of which requires even more specific technical steps than claim 1.  Bolding, italics, and underlining are used for emphasis below to highlight where the claims capture the technical solutions taught in the specification.  Claim 1 is provided below:

1.  A method comprising:

a.  ***receiving, by a group messaging service configured to manage audio messaging between a plurality of user nodes in a group*** comprising at least a user node, a second user node, and a bot software application member node, ***a message from the user node comprising recorded audio and including a request***, a user node identifier that identifies the user node, and a group identifier that identifies the group;

b.  ***selecting a selected voice library from a plurality of voice libraries to process the recorded audio, a voice library including both a speech-to-text engine and a natural language unit configured to convert a received message into enhanced text in a format suited to processing by the bot***;

c.  ***processing,*** by the selected voice library, ***the recorded audio to produce the enhanced text comprising the request***;

d.  ***sending, by the group messaging service, the enhanced text to the bot***;

e.  ***receiving, at the group messaging service, a reply from the bot, the reply comprising information indicating completion of the request***; and

f.  ***sending, to the user node and the second user node, a group reply indicating completion of the request***.

'433 patent at claim 1 (emphasis added); *see also* Zatkovich Decl. at ¶109.

147.    Several of the dependent claims to the independent claim are also presented below, which provide:

2. The method of claim **1,** wherein:

the ***message further comprises a bot identifier that identifies the bot***; and

the method further comprises ***selecting the selecting voice library based on the bot identifier***.

3. The method of claim **1**, wherein processing the recorded audio compris[es]:

***decoding the recorded audio to obtain decoded audio***;

***converting***, ***by the speech-to-text engine of the selected voice library, the decoded audio to decoded text***; and

***enhancing, by the natural language unit of the selected voice library, the decoded text to create the enhanced text***.

4. The method of claim **1,** wherein:

the recorded audio comprises *the group identifier, wherein the group messaging service extracts the group identifier from the enhanced text*;

the method further comprises *determining a type of bot the bot is between*:

*a group bot responsive to any member of the group*; and

*a user bot responsive to a selected user node from the group*.

5. The method of claim **1,** further comprising:

*sending the message*, by the group messaging service, *to each of the plurality of user nodes in the group besides the user node* in response to receiving the message.

6. The method of claim **1,** wherein selecting a voice library to process the recorded audio comprises:

*selecting a preferred speech-to-text engine and a preferred natural language unit to produce the enhanced text* to send to the bot.

7. The method of claim **1**, wherein the *group messaging service receives the recorded audio as encoded audio*.

8. The method of claim 1, further comprising *determining that the message identifies the bot and responsively sending the enhanced text to the bot*.

9. The method of claim 1, wherein;

*the bot is identified in the message via a bot identifier*;
the method further comprises:

*comparing the bot identifier to a data structure including a list of members of the group to determine the bot is a group member*; and

*sending the enhanced text to the bot only when the bot identifier matches a data structure entry for the group corresponding to the bot*.

'433 patent at claims 2-9 (emphasis added ; *see also* Zatkovich Decl. at ¶110.

148. The other independent claims (claims 10 and 17) are also directed to subject matter that provided technical solutions to technical problems that existed in March 2017 but claim a memory device (claim 10) and a computing system (claim 17) rather than a method., which also have limitations not included in claim 1. *See* '433 patent at claim 10 (disclosing that

sending a group reply to the user node and the second user node *at least* indicates completion of the request); claim 17 (claiming a memory and a processor operably coupled to the memory, but otherwise similar to claim 1). The dependent claims to these independent claims 10 and 17 roughly approximate the subject matter captured by claims 2 to 9 (above).  *E.g.*, c*ompare* claim 11 *with* claim 2; *compare* claim 12 *with* claim 3; *compare* claim 13 *with* claim 6; *compare* claim 14 *with* claim 7; *compare* claim 15 *with* claim 4; *compare* claim 16 *with* claim 9.  *See* Zatkovich Decl. at ¶111.

149.    Concrete and novel aspects of this invention, as described in the specification in the previous section, are tied directly to the claim limitations in the form of algorithms and process descriptions.  To provide some context, some of the claims are provided below (in gray shading) preceded by an explanation of the language and how it captures the claimed advances taught by the '433 patent.   For instance, with respect to claim 1, the solutions taught in the specification are directly captured by the claims.  Claim limitation 1.a identifies the configuration of a group messaging service to contain users within the group, and a particular bot software application. The bot will receive a voice activation "request" message from a user in that group to be performed by that group's bot software application.

> 1.a    receiving, by a group messaging service configured to manage audio messaging between a plurality of user nodes in a group comprising at least a user node, a second user node, and a bot software application member node, a message from the user node comprising recorded audio and including a request, a user node identifier that identifies the user node, and a group identifier that identifies the group;

Claim limitation 1.b provides the flexibility of selecting a particular voice library to process the audio of the user's request.  The speech-to-text engine, together with the natural language unit will convert the user's audio request to produce the request as "enhanced text" that is best suited for the particular application that the bot performs.

> 1.b    selecting a selected voice library from a plurality of voice libraries to process the recorded audio, a voice library including both a speech-to-text

engine and a natural language unit configured to convert a received message into enhanced text in a format suited to processing by the bot;

In claim element 1.c and 1.d, after selecting the appropriate voice library for the user's bot request, the user's request is processed, and the resulting enhanced text is sent to the bot.

> 1.c    processing, by the selected voice library, the recorded audio to produce the enhanced text comprising the request;

> 1.d    sending, by the group messaging service, the enhanced text to the bot;

In claim elements 1.e and 1.f the bot receives the enhanced text, performs the associated request, and returns the information in the reply to be sent to the user.

> 1.e    receiving, at the group messaging service, a reply from the bot, the reply comprising information indicating completion of the request; and

> 1.f    sending, to the user node and the second user node, a group reply indicating completion of the request.

The dependent claims further refine and enhance this process. For example, in claim 2 the user's request (the message) can identify a particular bot where a particular voice library can be selected based on that identified bot.

> 2.    The method of claim 1, wherein: the message further comprises a bot identifier that identifies the bot; and the method further comprises selecting the selected voice library based on the bot identifier.

Claim 3 identifies the specific role of the natural language unit of "enhancing" the decoded text to produce the enhanced text. The decoded text itself is produced using the selected voice language.

> 3.    The method of claim 1, wherein processing the recorded audio comprising:

decoding the recorded audio to obtain decoded audio;

converting, by the speech-to-text engine of the selected voice library, the decoded audio to decoded text; and

enhancing, by the natural language unit of the selected voice library, the decoded text to create the enhanced text.

Claim 4 provides a feature where the recorded audio of the voice activated request includes a group identifier. Additionally, the method determines if the bot can be used by any member of the group, or if a bot can be used by a particular user of the group.

4.    The method of claim 1, wherein;

the recorded audio comprises the group identifier, wherein the group messaging service extracts the group identifier from the enhanced text;

the method further comprises determining a type of bot the bot is between:

a group bot responsive to any member of the group; and

a user bot responsive to a selected user node from the group.

Claim 5 allow the request message from a particular user in the group to be seen by all users within that group.

5.    The method of claim 1, further comprising:

sending the message, by the group messaging service, to each of the plurality of user nodes in the group besides the user node in response to receiving the message.

Claim 6 provides for further flexibility and specialization, in addition to selecting a particular voice library in claim 1, to select a preferred speech-to-text engine and a preferred natural language unit.

6.    The method of claim 1, wherein selecting a voice library to process the recorded audio comprises:

selecting a preferred speech-to-text engine and a preferred natural language unit to produce the enhanced text to send to the bot.

Claim 8 provides a method where the user's request message identifies the bot used to process the request.

> 8. The method of claim 1, further comprising determining that the message identifies the bot and responsively sending the enhanced text to the bot.

Claim 9 expands the feature where the request message is used to identify a particular bot to process the request using a bot identifier. In addition, the bot identifier is used to determine if the bot is a member of the group, and only sending the enhanced text to the bot if it is a member.

> 9. The method of claim 1, wherein;
>
> the bot is identified in the message via a bot identifier;
>
> the method further comprises:
>
> comparing the bot identifier to a data structure including a list of members of the group to determine the bot is a group member; and
>
> sending the enhanced text to the bot only when the bot identifier matches a data structure entry for the group corresponding to the bot.

*See* Zatkovich Decl. at ¶112.

150. The claims of the '433 patent, including claim 1, are directed to a technical solution to technical problems that existed in March of 2017. In the world of computers and networking (and to POSITAs), there is nothing abstract about these claims. For example, one solution, among others, is to organize different types of bots into different service message groups based on the type of tasks or applications to be performed by the bot ('433 patent at 2:28-35). For each message group, a specific voice library can be selected (*see* '433 claim elements 1.a, 1.b, 1.c), as well as a specific natural language unit (*see* '433 claim 6) that is best suited to the task of the bot for that group. More specifically, a particular voice library can be selected that is best suited to produce "enhanced text" to be sent to a particular bot performing the request ('433 patent at 2:16-23). Enhanced text, produced from the user's request, is "clarified and simplified

from text 912 into a form more suitable for presentation to a bot 208 to execute." '433 patent at 12:64-66; *see also* Zatkovich Decl. at ¶113.

151.    A POSITA would understand that each of the claims above provided a specific improvement in bot technology that did not exist prior to March of 2017. The claims of the '433 patent are directed to enabling bots to perform discrete tasks over a network, including user-oriented and group-oriented bot functionalities, with applications in automated communication and commercial services. Specifically, the claims are directed to processing audio messages in group messaging environments using bots and voice libraries, including by selecting voice libraries, converting recorded audio into enhanced text, and enabling bots to perform designated actions based on the processed text. A POSITA would understand that these claims provide further flexibility to process the voice activated request using a specialized STT engine and/or natural language unit. These steps represent a technological improvement in the field of group messaging and bot interaction, as they address challenges in automating and enhancing communication between users and bots. For example, natural language processors can be configured with specific vocabularies and grammars tailored to handle language for particular applications or tasks. These claims of the patent clearly claim the use of a particular configuration of hardware to solve problems and improve bot technologies that existed in March of 2017, reciting hardware and software components combined in a unique way using novel memory and data structures coupled with general voice libraries. *See* Zatkovich Decl. at ¶114.

152.    Additionally, these claims are not directed at subject matter that can be performed by a human, mentally or with pen and paper. The claims of the '433 patent, including Claim 1, are directed to a specific configuration of hardware capable of performing certain functions; in general, the claims cannot be performed by a human or by pen and paper. In fact, the concepts of bots in general are to bypass the limitations of the human condition. Problems of the type solved by the '433 patent do not exist (and therefore do not need to be addressed) outside the computer realm. *See* Zatkovich Decl. at ¶115.

153.    Finally, the claims of the '433 patent do not preempt all the ways of deploying bot technologies. There are myriad other ways such systems could be architected, such as the

prior art patents and applications identified on the face of the patent, which would not be preempted. *See* '433 patent at 1-2, References Cited (disclosing the proposed prior art patents and patent applications cited by the examiner and/or referenced by the patentee during prosecution of the '433 patent). Moreover, the versions of Alexa, Corana, Google's Assistant, and Siri that existed prior to March of 2017 could still be used without coming within the scope of the claims of the '433 patent. *See* Zatkovich Decl. at ¶116.

154. Even if the '433 patent claims were directed at an abstract idea (which they are not), the claims capture subject matter that is inventive. To the extent that the claims employ components and technology that existed at the time (*e.g.*, nodes, speech engines, bots, messaging, voice libraries), a skilled artisan would have known that are employed together here in a way that was new and was not merely the conventional use of technology that was already well known to the industry. The claims of the '433 patent are generally directed to a specific configuration of software in stand-alone devices with a group message service (configured to service a group of user nodes using a user node and group identifier) that employs voice libraries with speech-to-text and natural language capabilities to generate enhanced text that allows bots to complete more advanced requests/processing tasks than those bots that were available in March of 2017, and the use of this particular combination of components in this way to improve bot technology, as claimed in the various forms in the claims highlighted above, was not known in the art and is inventive. They are directed to novel, purpose-built software functionality that does much more than what any "off the shelf" bot could do. *See* Zatkovich Decl. at ¶117.

155. Even if that were not true, the ordered combination of limitations in claims 1, 10, and 17 of the '433 patent, alone and coupled with the dependent claims described above, was not known in the art. No art, method, or system existed at the time and disclosed all of the limitations of claims 1, 10, and 17 in a way that solved the then-existing problems with the simpler bot technologies of the time. These claims are directed to specific solutions using technology in an inventive and unique way, as described above, to provide bot technologies solve the well-documented problems with bot technologies (*i.e.,* problem of performing more complex and specialized "enhance[d] functionality" in bots) by defining group messaging services where each

group can select a specific voice library (as well as a preferred natural language unit) that is best suited for the tasks to be performed by the bot. *See* Zatkovich Decl. at ¶118.

156. For the above reasons, the claims of the '433 patent claim a combination of elements sufficient to ensure that the claims themselves, both in substance and in practice, are directed to concrete and inventive concepts (not an abstract idea). *See* Zatkovich Decl. at ¶119.

### INFRINGEMENT

157. Defendant has directly infringed one or more claims of the '433 patent by using, providing, supplying, or distributing the TalkDesk CX Cloud and Copilot Accused Products. For instance, Defendant has directly infringed, either literally or under the doctrine of equivalents, at least claim 1 of the '433 patent, as detailed in <u>Exhibit C</u> (Evidence of Use Regarding Infringement of U.S. Patent No. 10,897,433).

158. For example, as detailed in <u>Ex. C</u>, Defendant's TalkDesk CX Cloud and Copilot Accused Products perform a method comprising: receiving, by a group messaging service configured to manage audio messaging between a plurality of user nodes in a group comprising at least a user node, a second user node, and a bot software application member node, a message from the user node comprising recorded audio and including a request, a user node identifier that identifies the user node, and a group identifier that identifies the group; selecting a selected voice library from a plurality of voice libraries to process the recorded audio, a voice library including both a speech-to-text engine and a natural language unit configured to convert a received message into enhanced text in a format suited to processing by the bot; processing, by the selected voice library, the recorded audio to produce the enhanced text comprising the request; sending, by the group messaging service, the enhanced text to the bot; receiving, at the group messaging service, a reply from the bot, the reply comprising information indicating completion of the request; and sending, to the user node and the second user node, a group reply indicating completion of the request.

159. Orion Labs or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of one or more claims of the '433 patent.

160.     Since at least the time of receiving the original complaint in this action, Defendant has also indirectly infringed the '433 patent by inducing others to directly infringe the '433 patent.   Defendant has induced distributors and end-users, including, but not limited to, Defendant's employees, partners, contractors, or customers, to directly infringe, either literally or under the doctrine of equivalents, the '433 patent by providing or requiring use of the TalkDesk CX Cloud and Copilot Accused Products.   Defendant has taken active steps, directly or through contractual relationships with others, with the specific intent to cause them to use the TalkDesk CX Cloud and Copilot Accused Products in a manner that infringes one or more claims of the '433 patent, including, for example, claim 1 of the '433 patent.   Such steps by Defendant include, among other things, advising or directing personnel, contractors, or end-users to use the TalkDesk CX Cloud and Copilot Accused Products in an infringing manner; advertising and promoting the use of the TalkDesk CX Cloud and Copilot Accused Products in an infringing manner; or distributing instructions that guide users to use the TalkDesk CX Cloud and Copilot Accused Products in an infringing manner.   Defendant has performed these steps, which constitute induced infringement with the knowledge of the '433 patent and with the knowledge that the induced acts constitute infringement.   Defendant has been aware that the normal and customary use of the TalkDesk CX Cloud and Copilot Accused Products by others would infringe the '433 patent.

161.     Defendant has also indirectly infringed by contributing to the infringement of the '433 patent.   Defendant has contributed to the direct infringement of the '433 patent by its personnel, contractors, distributors, and customers.   The TalkDesk CX Cloud and Copilot Accused Products have special features that are specially designed to be used in an infringing way and that have no substantial uses other than ones that infringe one or more claims of the '433 patent, including, for example, claim 1 of the '433 patent.   The special features constitute a material part of the invention of one or more of the claims of the '433 patent and are not staple articles of commerce suitable for substantial non-infringing use.

162.     Defendant had knowledge of the '433 patent at least as of the date when it was notified of the filing of this action.

163. Furthermore, on information and belief, Defendant has a policy or practice of not reviewing the patents of others, including instructing its employees to not review the patents of others, and thus have been willfully blind of Orion Labs' patent rights.

164. Defendant's actions are at least objectively reckless as to the risk of infringing a valid patent and this objective risk was either known or should have been known by Defendant.

165. Defendant's direct infringement of one or more claims of the '433 patent is, has been, and continues to be willful, intentional, deliberate, or in conscious disregard of Orion Labs' rights under the patent.

166. Orion Labs has been damaged as a result of the infringing conduct by Defendant alleged above. Thus, Defendant is liable to Plaintiff in an amount that compensates it for such infringements, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

167. Orion Labs has suffered irreparable harm, through its loss of market share and goodwill, for which there is no adequate remedy at law. Orion Labs has and will continue to suffer this harm by virtue of Defendant's infringement of the '433 patent. Defendant's actions have interfered with and will interfere with Orion Labs' ability to license technology. The balance of hardships favors Orion Labs' ability to commercialize its own ideas and technology. The public interest in allowing Orion Labs to enforce its right to exclude outweighs other public interests, which supports injunctive relief in this case.

**COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 10,924,339**

168. Plaintiff repeats and re-alleges the allegations in the Paragraphs above as though fully set forth in their entirety.

*169.* The USPTO duly issued U.S. Patent No. 10,924,339 (hereinafter, the "'339 patent") on February 16, 2021 after full and fair examination of Application No.16/665,866 which was filed on October 28, 2019, which claims priority to the '003 patent, which claims priority to the '430 patent. *See* '339 patent.

170.     Orion Labs owns all substantial rights, interest, and title in and to the '339 patent, including the sole and exclusive right to prosecute this action and enforce the '339 patent against infringers and to collect damages for all relevant times.

**SUBJECT MATTER ELIGIBILITY**

171.     The claims of the '339 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity.  Rather, the claimed inventions include inventive components that improve upon the function and operation of communication groups and personal communication member nodes, distributed group communication applications, and group communication systems.

172.     The written description of the '339 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

173.     In general, the '339 patent is directed to "communications and, in particular, to intelligent agents usable with communication groups." '339 patent at 1:23-25.  The '339 patent describes a system and method for using intelligent agents in personal communication devices, such as cellphones and wearable devices, to provide assistance and improve communication experiences. The intelligent agents are instantiated as a virtual assistant that can transcribe communications in the group. The teachings of the '339 patent include a management system and an agent system, and the personal communication devices can operate in groups that are defined by the management system.  *See* Zatkovich Decl. at ¶67.

**The Technical Problems That Existed In The Art Of Electronic
Inter And Intra-Group Communication Systems In May 2015.**

174.     The specification of the '339 patent provides detailed information about the problems that existed in the art of inter and intra-group electronic communication systems in May 2015. '339 patent at 1:29-42; *see also* Zatkovich Decl. at ¶22.

175.    "Telephones, cellphones, smartphones, computers and tablets provide an efficient way for users to communicate without being in the same physical location. However, these devices often require the user to provide multiple inputs and preferences for each of the communications before the communications can take place. Such preferences may include identification of the individuals involved in the communication, a contact identifier for the individuals in the communication, amongst a variety of other preferences. Moreover, when busy performing other tasks, it is often difficult to interface with the device (*e.g.,* in changing environments, locations and conditions) while concurrently holding a communicating phone, computer, or tablet, and may distract the user from a current task or situation." '339 patent at 1:29-42; *see also* Zatkovich Decl. at ¶23.

176.    There are significant contexts (*e.g.*, emergencies, natural disasters, combat) in which the user distraction cited above could not be tolerated or allowed, In such contexts, the claimed outcomes could not, in 2015 or today, be achieved with only humans in the group, without costly or even catastrophic results.  *See* Zatkovich Decl. at ¶24.

177.    Additionally, there were issues in terms of the availability of persons with certain skillsets and abilities to provide ad hoc services to a group.  Unless the group consisted of individuals that were well and specifically trained in transcription, annotation, providing security, managing, or being able to search for needed information and provide that information immediately, it would take time to get such persons into an active group (if possible at all).  And even if particular mobile phones of individuals in a group had such functionality, it was not guaranteed (nor were individuals necessarily proficient at such skillsets).  *See* Zatkovich Decl. at ¶25.

### The Claimed Advances Of The Intelligent Agent Patents (The '430 Patent, The '003 Patent, And The '339 Patent).

178.    As taught by the specification, the invention of the '339 patent solved the technical problems that existed prior to the inclusion of intelligent agents in communication groups in which the urgent and volatile nature of the context in which the group is communicating precludes having only humans carry out the claimed outcomes, rendering those outcomes

unavailable. The inventions disclosed in the Intelligent Agent Patents are intelligent agents instantiated as virtual assistants are equipped with the ability to record and audit group communications and can additionally ad hoc services (voice instructions, security functions, management operations, sub-grouping by group-provided attributes, and search, transcription, and annotation functions) to a group. *See* Zatkovich Decl. at ¶26.

179. At its most basic, the invention provides "intelligent agent features to personal communication nodes (*e.g.*, wearable personal communication nodes) include systems, methods, and software that receive instructions to instantiate one or more intelligent agent nodes as members of a communication group that includes the personal communication nodes. Each intelligent agent node can be instantiated by a communication group management system, an intelligent agent system and/or by one of the communication group members, for example by executing software on one or more computing systems or devices." '339 patent at 1:46-56; *see also* Zatkovich Decl. at ¶27.

180. The advances of the '339 patent in the critical and vital contexts of the sorts listed above include:

- The claimed instantiation is immediate, no matter what the circumstances;
- The instantiated intelligent agent is always fully and immediately functional;
- The capabilities of the intelligent agent are not limited to those of possibly available humans; and
- The intelligent agent is never fatigued or distracted.

*See* Zatkovich Decl. at ¶28.

181. All of these advances provide the members of a communication group in contexts of the sorts listed above with needed outcomes not available if only humans were in the group. *See* Zatkovich Decl. at ¶29.

182. Figure 1 of the '339 patent illustrates an exemplary communication system:



**FIGURE 1**

183. "Node **106** can be executed on a single processing or computing system, such as agent system **130**, or can be executed across multiple processing and/or computing systems. In some implementations, node **106** may be executed as a virtual node comprising software or firmware executed by one or more nodes **102-104** or management system **120** in FIG. 1. In other implementations node **106** can comprise virtualized software executed by a virtual machine that is instantiated upon demand by any of nodes **102-104**. This virtual machine can be executed in one or more of the computing or processing elements of FIG. 1, such as nodes **102-104**, management system **120**, or agent system **130**. In some implementation, a user or node **102-104** can specify where and/or how node **106** is to be executed (e.g., by selecting a specific host node or host computing system, or by specifying a specific physical location, where specified locations can include a home or business server, a country of execution for distributed computing systems, and others). Moreover, when node **106** generates data and/or other information to be recorded, any of nodes **102-104** or management system **120** can specify where the records and/or data are to be stored (e.g., in a digital storage device, computer-readable medium associated with a

particular computing node, a logical location, and/or a physical location).” ’339 patent at 5:40-63; *see also* Zatkovich Decl. at ¶31.

184.    Figure 2 of the ’339 patent depicts exemplary system **200** implementing intelligent agent features for use by personal communication nodes, such as nodes **102-104** of Figure 1.



**FIGURE 2**

185.    “Intelligent agent system **210** comprises processing system **220** and communication system **221** which are implemented in and/or otherwise provided by one or more computing and communication systems system **220** and system **221** are shown as separate systems, though they may be combined and/or implemented in one or more computing systems. One exemplary implementation node **201** (which may comprise one of nodes **102-104** of FIG. 1) comprises intelligent agent system **210** that includes, implements, deploys or otherwise generates intelligent agent **230**. . . . In some implementations intelligent agent system **210** is a virtual machine **210** that includes the elements of intelligent agent **230** (e.g., where the virtual machine and intelligent agent system are executed in a distributed computing environment, such as a cloud server or cloud system.” ’339 patent at 7:25-34, 41-468; *see also* Zatkovich Decl. at ¶33.

186.     "Processing system **220** includes user interface system **222**, processing circuitry **223** and storage system **224**. Storage system **224** stores or otherwise includes software that comprises intelligent agent **230**." '430 patent at 7:42-45; *see also* Zatkovich Decl. at ¶34. Further,

> Processing circuitry **223** can comprise microprocessors, microcontrollers, and/or other circuitry that retrieves and executes software **225** from storage system **224**. Processing circuitry may comprise a single device or can be distributed across multiple devices, including devices in different geographic areas. Processing circuitry **223** may be embedded in various types of equipment.
>
> Storage system **224** comprises a non-transitory computer readable storage medium, such as a disk drive, flash drive, data storage circuity, or some other hardware memory apparatus. . . . Storage system **224** may be embedded in various types of equipment. In some examples, a computer apparatus can comprise processing system **223**, storage system **224** and software **225**.
>
> Software **225** comprises intelligent agent **230** in some implementations. Intelligent agent **230**, as shown in this non-limiting example, includes voice recognition module **231**, assistant module **232**, audit module **233**, recording module **234**, and security module **235**. In addition, software **225** (including intelligent agent **230**) may include operating systems, utilities, drivers, network interfaces, applications, and other software.

'339 patent at 8:12-35.

187.     Ultimately, in general,

> *[S]oftware 403 can*, when loaded into processing circuit **408** and executed, *transform processing circuitry 408 from a general-purpose computing system into a special-purpose computing system customized to operate as described herein for a management node, personal communication node, or agent node, among other operations. Encoding software 403 on storage system 402 can transform the physical structure of storage system 402.* The specific transformation of the physical structure can depend on various factors in different implementations of this description. Examples of such factors can include, but are not limited to the technology used to implement the storage media of storage system **402** and whether the computer-storage media are characterized as primary or secondary storage. For example, if the computer-storage media are implemented as semiconductor-based memory, software **403** can transform the physical state of the semiconductor memory when the program is encoded therein. For example, software **403** can transform the state of transistors, capacitors, or other discrete circuit elements constituting the semiconductor memory. A similar transformation can occur with respect to magnetic or optical media. Other transformations of physical media are possible without

departing from the scope of the present description, with the foregoing examples provided only to facilitate this discussion.

'339 patent at 13:36-60 (emphasis added and discussing FIG. 4); *see also* Zatkovich Decl. at ¶35.

### The Claims Of The '339 Patent Provide Technical Solutions To Problems With Inter And Intra-Group Electronic Communication Systems In May 2015.

188.    The '339 patent contains 20 total claims (three independent and seventeen dependent).  This disclosure focuses on claim 8, though the same arguments (and more) apply to the other 19 claims in the patent, each of which requires even more specific technical steps than claim 8.  Bolding, italics, and underlining are used for emphasis below to highlight where the claims capture the technical solutions taught in the specification.  Claim 8 is provided below:

> 8.    A *non-transitory computer readable storage medium having a distributed group communications application stored thereon*, the distributed group communication application including instructions, which when executed by one or more processors of a group communication system, cause the group communication system to:
>
> *receive instructions from at least one of a plurality of personal communication member nodes operating as a communication group to instantiate an intelligent agent*; and
>
> *instantiating the intelligent agent as a virtual assistant communication member node* in the communication group; and
>
> *wherein the <u>instantiated intelligent agent is configured to transcribe communications</u> among and between the plurality of personal communication member nodes* in the communication group.

'339 patent at claim 1 (emphasis added); *see also* Zatkovich Decl. at ¶71.

189.    Several of the dependent claims to the independent claim are also presented below, which provide:

> 9. The non-transitory computer readable storage medium of claim 8 wherein *the instructions to instantiate an intelligent agent comprise voice instructions received by a first personal communication member node in the communication group*.
>
> 10. The non-transitory computer readable storage medium of claim 8 wherein *the intelligent agent is instantiated through a <u>security handshake procedure to provide secure access</u> to the intelligent agent by the plurality of personal communication*

*node members as a secure communication member node* in the communication group.

11.   The non-transitory computer readable storage medium of claim 8 wherein *the instantiated intelligent agent transcribing communications among and between the plurality of personal communication member nodes comprises one of the following:*

*audio transcription of non-audio communications; or*

*textual transcription of audio communications*.

12.   The non-transitory computer readable storage medium of claim 8 wherein *the intelligent agent is instantiated as a virtual assistant communication member node in the communication group by a virtual machine in a cloud system*.

13.   The non-transitory computer readable storage medium of claim 8 wherein *the intelligent agent is instantiated as a virtual assistant communication member node in the communication group by a management system configured to define the communication group based on attribute information transferred to the management system* from the plurality of personal communication member nodes in the communication system.

14.   The non-transitory computer readable storage medium of claim 8 wherein *each personal communication member node* in the plurality of personal communication member nodes *comprises a wearable push-to-talk communication device*.

18.   The method of claim 15 further comprising *storing transcribed communications*.

'339 patent at claims 2-7 (emphasis added); *see also* Zatkovich Decl. at ¶72.

190.   The other independent claims (claims 1 and 15) are also directed to subject matter that provided technical solutions to technical problems that existed in May 2015.  These other independent claims are directed to forms of software and systems not found in claim 1.  *See* '339 patent at claim 1 (disclosing that the instantiated intelligent agent is configured to transcribe communications among and between the plurality of personal communication member nodes in the communication group); claim 15 (disclosing that each personal communication member node comprises a user node transmitting and receiving communications between the group members and instantiating the intelligent agent as a virtual assistant communication member code of the communication group, wherein the virtual assistant communication member node performs

1   transcription services for the communication group member nodes). The other dependent claims

2   (2-7 and 15-20) roughly approximate dependent claims 8-12 above.  *Compare* 2 and 17 *with* 9;

3   *compare* 3 and 20 *with* 10; *compare* 4 and 19 *with* 11; *compare* 5 *with* 12; *compare* 6 and 16 *with*

4   13; and *compare* 7 *with* 14.  *See* Zatkovich Decl. at ¶73.

5          191.    Concrete and novel aspects of this invention, as described in the specification in

6   the previous section, are tied directly to the claim limitations in the form of software algorithms

7   and process descriptions.  For example:

8      - "Each personal communication node 102-104 in FIG. 1 may be configured to obtain
         (e.g., monitor, collect or receive) attribute information, for example by monitoring
9        one or more attributes from associated positional sensors, audio transducers, GPS
         receivers, accelerometers, wireless transceivers, environmental sensors, or other
10       devices capable of monitoring the types of attributes discussed herein."

11  '339 patent at 3:40-47;

12     - "Personal communication nodes 102-104 can periodically transfer messages for
         delivery to management system 120 containing or otherwise indicating attribute
13       information (e.g., dynamic changes in one or more attributes)."

14  '339 patent at 3:58-61;

15     - "Intelligent agent features may be customized by agent system 130 to meet specific
         duties, needs, limitations, etc . of a group . For example , in one non - limiting example
16       Group B may comprise a team of firefighters. Intelligent agent features can be adapted
         by agent system 130 to use a natural language interface via node 106 to provide
17       information about the fire as well as information regarding the actions and locations
         of other firefighters and other responders. Intelligent agent features provided by node
18       106 and/or system 130 of FIG. 1 can include recording conversations among users of
         nodes 102-104, auditing communications exchanged between nodes 102-104,
19       providing voice-based assistance and services to nodes 102-104, and other features."

20  '339 patent at 4:36-48; *see also* Zatkovich Decl. at ¶74.

21         192.    The claims of the '339 patent are not directed to any abstract idea.  The claims of

22  the '339 patent, including Claims 1, 8, and 15 are directed to technical solutions to problems that

23  existed in May of 2015.  More specifically, the claimed subject matter overcame the problems

24  that existed in May of 2015 with then-known inter- and intra-group communications using the

25  communication devices that existed at that time.  It does so by removing the human element and

26  limitations on the availability of trained personnel from such inter and intra-group

27  communications, providing discrete transcription services to such groups (on communication

28  devices (mobile or otherwise) through the use of a virtual assistant.  In general, the claims are

specific in their boundaries, and those boundaries are directly in accordance with the teachings of the '339 patent. *See* Zatkovich Decl. at ¶75.

193.    As noted above, the claims are directed to implementation of novel, purpose-built software functionality that does much more than what humans could or can do in urgent, vital, and volatile contexts such as emergencies, natural disaster, and combat. The software functionality transforms any generic hardware that is used into a special-purpose computing system customized to operate as described herein for a management node, personal communication node, or agent node, among other operations. '339 patent at 13:30-54. The claims of the patent, including the independent claims, clearly claim the use of a particular configuration of hardware and software to solve problems with inter and intra-group communications using the communication devices of 2015 by disclosing and teaching intelligent agents deployed as a virtual assistant in communication groups to provide ad hoc group services in the form of, among other things, transcription services to a group. The dependent claims are further directed to such agents being deployed in virtual machines (claims 5 and 12), as a security agent with a security handshake procedure (claims 3, 10, and 20), as further controlled by a management system that creates communication groups driven by attributes transferred from other member nodes (claims 6, 13, and 16), where such member nodes form wearable push-to-talk communication devices (claims 7 and 14), and where such transcription services are one of audio or textual transcription (claims 4, 11, and 19). *See* Zatkovich Decl. at ¶76.

194.    The foregoing claim elements are both concrete and specific in what they claim. For instance, these claims are directed to, among other things, the provision of discrete ad hoc services in electronic communication groups (*i.e.,* transcription, security, command, and management services) that solved problems in inter and intra-group electronic communications that were the result of the human condition (delay, distractibility, fatigue, lack of focus, and availability, etc.) and limitations on accessibility and resources to provide ad hoc services due to training or skillset (ability to provide voice instructions, security functions, management operations, sub-grouping by group-provided attributes, and transcription functions) to a group. *See* Zatkovich Decl. at ¶77.

195.     Additionally, these claims are not directed at subject matter that can be performed by a human, mentally or with pen and paper.  The claims of the '339 patent, including Claim 1, are directed to a specific software that removes the human element from inter and intra-group communications and automates the provision of group services in the form of, among other things, voice instructions, security functions, management operations, sub-grouping by group-provided attributes, and transcription functions for communications on communication devices (mobile or otherwise).  The claims here cannot be performed by a human or by pen and paper because the problems that are being solved exist only in the electronic communications realm and are a result of the human condition (delay, distractibility, fatigue, lack of focus, and availability, *etc*.) and due to the accessibility of personnel to provide ad hoc services (*e.g.*, a person that can transcribe, annotate, provide security, manage) to a group.  *See* Zatkovich Decl. at ¶78.

196.     Finally, the claims of the '339 patent do not preempt all the ways of facilitating inter and intra-group electronic communications.  There is a myriad of other ways such systems could be architected, such by using the systems and methods disclosed prior art patents and applications identified on the face of the patent, none of which would not be preempted.  *See* '339 patent at 1-2, References Cited (disclosing the proposed prior art patents and patent applications cited by the examiner and/or referenced by the patentee during prosecution of the '339 patent).  Also, the public can facilitate electronic inter and inter-group communications without providing services of the type listed above (voice, security, management operations, sub-grouping, and transcription) and without a virtual assistant.  *See* Zatkovich Decl. at ¶79.

197.     Even if the '339 patent claims were directed at an abstract idea (which they are not), the claims capture subject matter that is inventive.  To the extent that the claims employ components and technology that existed at the time, they are employed together here in a way that was new (and would not have been considered conventional, routine, or generic to those skilled in the art).  The creation and use of electronic communication groups with an intelligent agent(s) and the provision of voice, security, management operations, sub-grouping, and transcription functions is inventive.  In fact, A POSITA would understand that each of the claims

above provided a specific improvement in inter and intra-group electronic communications that did not exist prior to the priority date of the '339 patent, and more specifically, resulted in a device rooted in computer technology that improved then-existing technology. *See* Zatkovich Decl. at ¶80.

198. Even if that were not true, when you look at the elements of each claim as a whole, in ordered combination of their limitations, including (A) independent claim 1, coupled with dependent claims 2-7, (B) independent claim 8, coupled with its various dependent claims 9-14, and (C) independent claim 15, coupled with its various dependent claims 16 to 20 of the '339 patent, as recited and described in detail above, were not well-known in the art. A POSITA would not understand these claims to merely employ known generic components in a conventional or routine way. Quite the opposite is true. These claims disclose and claim specific solutions through their claim elements in an inventive and unique way in order to solve problems in inter and intra-group electronic communication technologies that existed in May of 2015 through the disclosure of specific software that removes the human element and issues with the availability of trained individuals to provide ad hoc services to inter and intra-group communications and automates transcription of such group communications through the use of a virtual assistant capable of performing certain other functions (security functions, management operations, and sub-grouping) on communication devices. *See* Zatkovich Decl. at ¶81.

199. For the above reasons, the claims of the '339 patent claim a combination of elements sufficient to ensure that the claims themselves, both in substance and in practice, are directed to concrete and inventive concepts (not an abstract idea). *See* Zatkovich Decl. at ¶82.

### INFRINGEMENT

200. Defendant has directly infringed one or more claims of the '339 patent by using, providing, supplying, or distributing the Accused Products. For instance, Defendant has directly infringed, either literally or under the doctrine of equivalents, at least claims 1, 4, 6, 15, and 18 of the '339 patent, as detailed in <u>Exhibit D</u> (Evidence of Use Regarding Infringement of U.S. Patent No. 10,924,339).

201.     For example, as detailed in <u>Ex. D</u>, Defendant's TalkDesk CX Cloud and Autopilot Accused Products perform a method of managing a communication group, wherein the communication group comprises a plurality of personal communication member nodes, the method comprising: receiving instructions from at least one of the plurality of personal communication member nodes to instantiate an intelligent agent; instantiating the intelligent agent as a virtual assistant communication member node in the communication group; and the instantiated intelligent agent transcribing communications among and between the plurality of personal communication member nodes in the communication group.

202.     For example, as detailed in <u>Ex. D</u>, Defendant's TalkDesk CX Cloud and Autopilot Accused Products perform the method of claim 1 wherein the instantiated intelligent agent transcribing communications among and between the plurality of personal communication member nodes comprises one of the following: audio transcription of non-audio communications; or textual transcription of audio communications

203.     For example, as detailed in <u>Ex. D</u>, Defendant's TalkDesk CX Cloud and Autopilot Accused Products perform the method of claim 1 wherein the intelligent agent is instantiated as a virtual assistant communication member node in the communication group by a management system configured to define the communication group based on attribute information transferred to the management system from the plurality of personal communication member nodes in the communication group.

204.     For example, as detailed in <u>Ex. D</u>, Defendant's TalkDesk CX Cloud and Autopilot Accused Products perform a method of operating a group communication system, comprising: managing a communication group comprising a plurality of personal communication member nodes, wherein each personal communication member node comprises a user node transmitting and receiving communications between the group members; receiving instructions from at least one of the plurality of personal communication member nodes to instantiate an intelligent agent; instantiating the intelligent agent as a virtual assistant communication member node of the communication group, wherein the virtual assistant communication member node performs transcription services for the communication group member nodes.

205. For example, as detailed in Ex. D, Defendant's TalkDesk CX Cloud and Autopilot Accused Products perform the method of claim 15 further comprising storing transcribed communications.

206. Orion Labs or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of one or more claims of the '339 patent.

207. Since at least the time of receiving the original complaint in this action, Defendant has also indirectly infringed the '339 patent by inducing others to directly infringe the '339 patent. Defendant has induced distributors and end-users, including, but not limited to, Defendant's employees, partners, contractors, or customers, to directly infringe, either literally or under the doctrine of equivalents, the '339 patent by providing or requiring use of the TalkDesk CX Cloud and Autopilot Accused Products. Defendant has taken active steps, directly or through contractual relationships with others, with the specific intent to cause them to use the TalkDesk CX Cloud and Autopilot Accused Products in a manner that infringes one or more claims of the '339 patent, including, for example, claims 1, 4, 6, 15, and 18 of the '339 patent. Such steps by Defendant include, among other things, advising or directing personnel, contractors, or end-users to use the TalkDesk CX Cloud and Autopilot Accused Products in an infringing manner; advertising and promoting the use of the TalkDesk CX Cloud and Autopilot Accused Products in an infringing manner; or distributing instructions that guide users to use the TalkDesk CX Cloud and Autopilot Accused Products in an infringing manner. Defendant has performed these steps, which constitute induced infringement with the knowledge of the '339 patent and with the knowledge that the induced acts constitute infringement. Defendant has been aware that the normal and customary use of the TalkDesk CX Cloud and Autopilot Accused Products by others would infringe the '339 patent.

208. Defendant has also indirectly infringed by contributing to the infringement of the '339 patent. Defendant has contributed to the direct infringement of the '339 patent by its personnel, contractors, distributors, and customers. The TalkDesk CX Cloud and Autopilot Accused Products have special features that are specially designed to be used in an infringing

way and that have no substantial uses other than ones that infringe one or more claims of the '339 patent, including, for example, claims 1, 4, 6, 15, and 18 of the '339 patent.  The special features constitute a material part of the invention of one or more of the claims of the '339 patent and are not staple articles of commerce suitable for substantial non-infringing use.

209.    Defendant had knowledge of the '339 patent at least as of the date when it was notified of the filing of this action.

210.    Furthermore, on information and belief, Defendant has a policy or practice of not reviewing the patents of others, including instructing its employees to not review the patents of others, and thus have been willfully blind of Orion Labs' patent rights.

211.    Defendant's actions are at least objectively reckless as to the risk of infringing a valid patent and this objective risk was either known or should have been known by Defendant.

212.    Defendant's direct infringement of one or more claims of the '339 patent is, has been, and continues to be willful, intentional, deliberate, or in conscious disregard of Orion Labs' rights under the patent.

213.    Orion Labs has been damaged as a result of the infringing conduct by Defendant alleged above.  Thus, Defendant is liable to Plaintiff in an amount that compensates it for such infringements, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

214.    Orion Labs has suffered irreparable harm, through its loss of market share and goodwill, for which there is no adequate remedy at law.  Orion Labs has and will continue to suffer this harm by virtue of Defendant's infringement of the '339 patent.  Defendant's actions have interfered with and will interfere with Orion Labs' ability to license technology.  The balance of hardships favors Orion Labs' ability to commercialize its own ideas and technology.  The public interest in allowing Orion Labs to enforce its right to exclude outweighs other public interests, which supports injunctive relief in this case.

## COUNT V: INFRINGEMENT OF U.S. PATENT NO. 11,127,636

215.    Plaintiff repeats and re-alleges the allegations in the Paragraphs above as though fully set forth in their entirety.

216.   The United States Patent and Trademark Office ("USPTO") duly issued U.S. Patent No. 11,127,636 (the "'636 patent") on September 21, 2021, after full and fair examination of Application No. 15/937,035, which was filed on March 27, 2018, which claims priority to provisional application No. 62/477,082, which was filed on March 27, 2017. *See* '636 patent.  A certificate of correction was issued for the '636 patent on February 22, 2022. See id.

217.   Orion Labs owns all substantial rights, interest, and title in and to the '636 patent, including the sole and exclusive right to prosecute this action and enforce the '636 patent against infringers and to collect damages for all relevant times.

### SUBJECT MATTER ELIGIBILITY

218.   The claims of the '636 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity.  Rather, the claimed inventions include inventive components that improve upon the operation of previous communication devices and systems by using bot messaging.

219.   The written description of the '636 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

220.   The claims of the '636 patent enable group messaging services to interact with both user-oriented bots and group-oriented bots using bot-specific voice libraries.  *See* Zatkovich Decl. at ¶124.

### The Technical Problems That Existed In Bot Technology And Messaging In March 2017.

221.   The specification of the '636 patent provides detailed information about the problems regarding intelligent agent features for wearable personal communication nodes in March 2017.  '636 patent at 1:51-55; *see also* Zatkovich Decl. at ¶87.

222.   According to the teachings of the '636 patent, "[w]ith the [then] worldwide proliferation of the internet, providing goods and services to users and consumers ha[d] become

1  more commonplace and automated." '636 patent at 1:14-16.  One way of "automatically

2  providing increased numbers of goods and services [wa]s through bots." '636 patent at 1:16-18;

3  *see also* Zatkovich Decl. at ¶88.

4         223.    "An internet bot, also known as web robot, WWW robot or simply bot, is a

5  software application that runs automated tasks (scripts) over the internet. Typically, bots perform

6  tasks that are both simple and structurally repetitive, at a much higher rate than would be possible

7  for a human alone." '636 patent at 1:18-23.  In March of 2017, "[t]he largest current use of bots

8  [wa]s in web spidering or web crawling, in which an automated script fetches, analyzes and files

9  information from web servers at many times the speed of a human." '636 patent at 1:23-27.  At

10  that time, "[m]ore than half of all web traffic [wa]s made up of bots." *Id.*; *see also* Zatkovich

11  Decl. at ¶89.

12        224.    "Some bots communicate with other users of internet-based services, via Instant

13  Messaging (IM), Internet Relay Chat (IRC), or another web interface such as Facebook bots and

14  Twitterbots. These chatterbots may allow people to ask questions in plain English and then

15  formulate a proper response." '636 patent at 1:28-33.  It is also well known in the industry that

16  different types of bots were (and are) used for different applications or tasks. Examples of

17  different types of tasks include: "reporting weather, zip-code information, sports scores,

18  converting currency or other units, etc. … entertainment, such as SmarterChild on AOL Instant

19  Messenger and MSN Messenger." '636 patent at 1:33-40; *see also* Zatkovich Decl. at ¶90.

20        225.    Of primary interest in the '636 patent is the use of bots in "voice activated

21  services."  The specification teaches that in March of 2017 there were also "[g]eneral-purpose

22  bots, such as Amazon's Alexa, Microsoft's Cortana, Google's Assistant, and Apple's Siri[.]"

23  '636 patent at 1:42-43.  These general-purpose bots were "digital personal assistants able to

24  provide a wide range of consumer-oriented voice-activated services, including turning lights

25  on/off, controlling appliances, playing requested music from services such as Pandora or Spotify,

26  providing requested information, or ordering products or services." '636 patent at 1:44-49; *see*

27  *also* Zatkovich Decl. at ¶91.

28

226.   While the then-current bots were primarily designed to merely provide information back to a requesting user, or in the case of general-purpose bots, sometimes to control devices, like Alexa, Corana, Google's Assistant, and Siri, there was a need "to create a new generation of messaging services that allow groups of users to interact with both user-oriented bots as well as group-oriented bots." '636 patent at 1:14-16.  Specifically, there was the need for the provision of different types of bots that could perform different applications into different service message groups that can utilize specialized voice libraries and natural language units. *See* Zatkovich Decl. at ¶92.

227.   The '636 patent in particular discusses the technical problem associated with more sophisticated consumer-oriented voice-activated services that provide enhanced functionality beyond providing information back to a requesting user.  For example, "a bot 208 may be associated with one or more commercial services 404 that may allow purchase, sale, or other financial or more complex transactions." '636 patent at 6:53-597; *see also* Zatkovich Decl. at ¶93.

228.   The invention is directed to the association of different bots that perform specific applications into different service message groups.  The user members of those different groups can perform voice-activated requests to be executed by a particular bot application of that group. The invention improves the technology of sending voice activation requests to bots by enhancing the processing of the voice request.  This is done by selectively using different voice libraries, speech-to-text engines, and/or natural language processors best suited for the tasks of a particular bot. *See* Zatkovich Decl. at ¶94.

## The Advances Of The Bot Group Messaging Patents

229.   As taught by the specification, the invention of the '636 patent solved the technical problems that existed by providing "advantages for bot environments." '636 patent at 1:55-56.  *See* Zatkovich Decl. at ¶95.

230.   Overall, the claims are directed at enabling efficient, automated communication between user nodes and bots in group messaging environments, leveraging voice libraries for enhanced functionality. '636 patent at 1:56-57, 3:41-43.  The '636 patent teaches advancements

over the bot technologies of March 2017 by introducing group messaging services that allow interaction between user nodes and bots using general voice libraries.   These advancements include:

  a. **Integration of Bots in Group Messaging**: The patent enables bots to be incorporated into groups, allowing both user-oriented and group-oriented bots to interact with multiple users in a group setting.

  b. **Use of Voice Libraries**: It introduces the use of voice libraries, which include speech-to-text engines and natural language units, to process recorded audio into enhanced text.  This enhanced text is optimized for bot processing, improving the accuracy and efficiency of bot responses.

  c. **Support for Shared and Per-User Bots**: The patent provides mechanisms for configuring bots as either shared bots (accessible to all members of a group) or per-user bots (dedicated to specific users), offering flexibility in bot functionality.

  d. **Commercial Service Integration**: Bots can be associated with commercial services, enabling transactions such as purchases or financial operations.  The system supports secure verification processes for such transactions.

  e. **Automated Messaging Flow**: The patent describes detailed processes for routing messages to bots, processing audio, and managing replies, ensuring seamless communication between user nodes and bots.

These advancements enhance bot functionality, scalability, and integration in group messaging environments, addressing limitations of earlier bot technologies.  *See* Zatkovich Decl. at ¶96.

231.    On the other hand, the '636 patent introduces advancements in bot technologies by enabling group messaging services to interact with both user-oriented bots and group-oriented bots using bot-specific voice libraries.  These  advancements include:

  a. **Bot-Specific Voice Libraries**: The patent teaches the use of voice libraries, including speech-to-text engines and natural language units, to process recorded audio into enhanced text for bots to execute commands.  This allows bots to perform tasks more effectively by interpreting audio messages in a format suited to their functionality.

  b. **Group and User Bots**: It distinguishes between group bots (responsive to all members of a group) and user bots (responsive to specific user nodes).  This differentiation enables tailored bot interactions within group messaging environments.

c. **Enhanced Text Processing**: The patent describes converting recorded audio into enhanced text, which is clarified and simplified for execution by bots. This improves the accuracy and efficiency of bot responses.

d. **Integration with Commercial Services**: Bots can interact with commercial services for tasks like order fulfillment or financial transactions. The system supports secure configurations for user or group accounts, enabling bots to handle complex transactions.

e. **Flexible Voice Library Selection**: The system can select from multiple voice libraries, including general-purpose libraries and format-specific converters (e.g., .PCU to .WAV), based on bot requirements.

f. **Group Messaging with Bots**: The patent enables bots to be integrated into group messaging systems, allowing users to send messages to bots and receive replies or actions performed by the bots. Bots can also monitor group conversations and act on identified audio patterns.

These advancements collectively enhance the functionality, adaptability, and integration of bots in group messaging environments, surpassing the capabilities of bots available in March 2017.

232.    Figure 2 of the '636 patent depicts a messaging flow for configuring a bot into a group:



233.    The system **200** includes one or more groups **120**, each including at least one user node **108**, a group messaging service **104**, and one or more bots **204**. '636 patent at 3:41-43, 4:55-57. "Bots **208** are software applications for performing one or more tasks over the internet.

Therefore, bots **208** are internet-connected and in most embodiments are separate from the group messaging service **104**." *Id.* at 4:57-619; *see also* Zatkovich Decl. at ¶99.

24. Further,

> Bots **208** may be incorporated into group **120** by configuring each bot 208 in the group messaging service **104** . . . . Group messaging service **104** includes data structures **212** for specifying which user nodes **108** and bots **208** are in each group **120**. Each such data structure **212** includes identifiers and addresses for each user node **108** and bot **208** entity in the data structure **212**. Group messaging service **104** includes two group data structures **212**, identified as group 1 data structure **212A** and group 2 data structure **212B**. Data structure **212A** includes identifiers and addresses for each of the user nodes **108** in group 1 **120**. . . . [D]ata structure **212A** includes a user node A **108A** address and identifier, a user node B **108B** address and identifier, and a user node C **108C** address and identifier. Data structure **212B** includes a user node A **108A** address and identifier, a user node D **108D** address and identifier, and a user node E **108E** address and identifier. Group messaging service **104** may include any number of data structures **212**, and a given bot **208** may be included in any number of data structures **212**.

'636 patent at 4:62-5:15; *see also* Zatkovich Decl. at ¶100.

234. Figure 3 of the '636 patent illustrates a flowchart of a bot messaging process **216**, as seen below:



235. Notably,

> At block **312**, the group messaging service **104** has determined that a bot **208** is not configured in the group **120** corresponding to the destination group identifier, and therefore sends the received message **124** to the user nodes **108** within the destination group **120**. Addresses for the user nodes **108** within the destination group **120** are determined by reviewing the data structure **212** within the group messaging service **104** corresponding to the destination group **120**. Flow ends at block **312**, or the group messaging service **104** returns to block **304** to wait for a next received message **124**.
>
> At decision block **316**, the group messaging service **104** determines if the received message **124** should be sent to a specific bot **208**. The group messaging service **104** reviews the data structure **212** corresponding to the destination group **120**, and identifies a bot entry **504** corresponding to the bot identifier in the received message **124**. A data structure **212** may include any number of bot entries **504**. If there is a match, and a bot entry **504** in the data structure **212** matches the bot identifier, then flow proceeds to block **320**. If there is not a match, and no bot entries **504** in the data structure **212** matches the bot identifier, then flow instead proceeds to block **312**.
>
> At block **320**, the group messaging service **104** has identified a match between the received message **124** and the data structure **212** corresponding to the destination group **120**, and sends the message **124** to the selected bot **208**. At this point, the message **124** has been delivered to the addressed bot **208**, and the addressed bot **208** carries out one or more functions corresponding to recorded audio within the message **124**.

'636 patent at 6:5-34; *see also* Zatkovich Decl. at ¶102.

236. Figure 5A of the '636 patent illustrates a shared bot entry **503A** within a data structure **212A**, while Figure 5B illustrates a per-user bot within a data structure **212A**, as seen below:



237.    Data structure **212** may be configured one of two ways, depending on desired bot performance within a group **120**:

> In a first embodiment, data structure **212A** includes a bot entry **504A** that designates bot **208C** as a shared bot **208**. Shared bot entry **504A** includes a bot address **508A** and a bot identifier or ID **512A**. A shared bot **208** is identified by a group **120** designation within the bot entry **504A**. When a group **120** designation appears within a bot entry **504A**, the group messaging service **104** treats the corresponding bot **208** (bot **208C**) as a shared bot within the corresponding group **120** (group 1, as shown).
>
> . . . .
>
> In a second embodiment, data structure **212A** includes a per-user bot entry **504B** that designates bot **208C** as a per-user bot. Per-user bot entry **504B** includes a bot address **508B** and a bot identifier or ID **512B**. A per-user bot **208** is identified by a user or user node **108** designation within the bot entry **504B**. When a user or user node designation appears within a bot entry **504B**, the group messaging service **104** treats the corresponding bot **208** (bot **208C**) as a dedicated bot **208** to a corresponding user or user node **108** (user C, as shown).

'636 patent at 7:38-64; *see also* Zatkovich Decl. at ¶104.

238.    Finally, in a representative computing device **1200**, the computing device 1200 includes memory **1208**. '636 patent at 17:36-38.  The memory includes data **1216** which includes data structures **212** of the present invention.  *Id.* at 17:41-43; *see also* Zatkovich Decl. at ¶105.

239.    It is well known in the industry that different voice libraries (*i.e.*, a set of one or more voice models) can have different vocabularies or dictionaries tailored to different tasks (*e.g.*, medical speech dictionaries, technical dictionaries, and other custom dictionaries tailored to the type of speech and/or task needed).   Both speech recognition (speech-to-text) engines and voice (text-to-speech) engines utilize different "phoneme" dictionaries (defined within a voice library).  Dictionaries are used within the voice models/voice libraries to allow those engines to understand or speak different sets of words or vocabularies.  *See* Zatkovich Decl. at ¶106.

240.    Figure 9 of the '636 patent illustrates how Group messaging services use a selected voice library for a speech-to-text engines. The recognized speech is sent as text to the natural language unit which then produces enhanced text intended for a specific bot.  The problem of performing more complex and specialized "enhance[d] functionality" in bots is solved, and

the technology improved, by defining group messaging services where each group can select a specific voice library (as well as a preferred natural language unit) that is best suited for the tasks to be performed by the bot. *See* Zatkovich Decl. at ¶107.



**FIGURE 9**

241.    As described in Fig. 9 above, each Group messaging service 104 "includes a voice library" and "at least a speech-to-text engine 902 and a natural language unit 903." '636 patent at 12:51-55.  When performing a particular voice activated request "the group messaging service 104 sends the decoded audio to the speech-to-text engine 902 and the speech-to-text engine 902 converts the decoded audio into text 912." '636 patent at 12:66-13:1.  That text is then sent "to the natural language unit 903, which reviews the text 912 and converts the text 912 into enhanced text 916." '636 patent at 13:6-10.  As indicated above "[e]nhanced text 916 is clarified and simplified from text 912 into a form more suitable for presentation to a bot 208 to execute." '636 patent at 13:6-10; *see also* Zatkovich Decl. at ¶108.

<u>**The Claims Of The '636 Patent Provide Technical Solutions To**</u>
<u>**Problems With Bot Messaging In March 2017.**</u>

242.    The '636 patent contains 20 total claims (three independent and seventeen dependent).  This disclosure focuses on claim 1, though the same arguments (and more) apply to the other 19 claims in the patent, each of which requires even more specific technical steps than

claim 1.  Bolding, italics, and underlining are used for emphasis below to highlight where the claims capture the technical solutions taught in the specification.  Claim 1 is provided below:

> 1.    A method comprising:
>
> *receiving, by a group messaging service configured to manage messaging between a plurality of user nodes in a group, a message comprising recorded audio and a bot identifier for a bot member of the group, a bot comprising a software application for performing a task over the internet*;
>
> in response to receiving the message, *searching a data structure of the group, maintained by the group messaging service, based on the bot identifier to determine that the bot member is a member of the group*;
>
> in response to determining the bot member is a member of the group, *accessing a bot entry in the data structure corresponding to the bot identifier, the bot entry including an indicator of a voice library corresponding to the bot member, voice libraries including a set of processing elements configured to convert an audio message into a target format*;
>
> *selecting which of a plurality of available voice libraries to use to process the recorded audio based on the indicator in the bot entry*;
>
> *processing, by a selected voice library, the recorded audio to produce a modified message in the target format suited to the bot member*; and
>
> *sending, by the group messaging service, the modified message to the bot member*.

'636 patent at claim 1 (emphasis added); *see also* Zatkovich Decl. at ¶125.

243.    Several of the dependent claims to the independent claim are also presented below, which provide:

> 2.    The method of claim 1, further comprising:
>
> *determining a type of bot the bot member is between:*
> *a group bot responsive to any member of the group*; and
>
> *a user bot responsive to a selected user node from the group*;
>
> *receiving*, by the group messaging service, *a reply from the bot member in response to sending the modified message*; and
>
> *sending the reply to the selected user node when the bot member is a user bot, and to the plurality of user nodes when the bot member is a group bot*.

3.      The method of claim 1, wherein processing the recorded audio comprises:

*converting, by a speech-to-text engine of the selected voice library, the recorded audio to text data*; and

*converting, by a natural language unit of the selected voice library, the text data to create enhanced text*, wherein enhanced text *comprises a command specially formatted for execution by the bot member*.

4.      The method of claim 3, *wherein the message further includes a message address, wherein the group messaging service extracts the message address from the enhanced text*.

5.      The method of claim 1, further comprising:

*sending the message*, by the group messaging service, *to the plurality of user nodes in response to receiving the message*.

6.      The method of claim 1, wherein selecting which of the plurality of voice libraries to use comprises:

*selecting between:*

*a voice library including a preferred speech-to-text unit and a preferred natural language unit*; and

*a voice library including a .PCU to .WAV format converter*.

7.      The method of claim 1, wherein:

*the group messaging service receives the recorded audio as encoded audio*;

*processing the recorded audio includes decoding the recorded audio* to obtain decoded audio; and

*processing the recorded audio includes processing the decoded audio*.

8.      The method of claim 1, wherein:

*the group messaging service comprises a plurality of data structures for a plurality of groups, the plurality of data structures each comprising a unique group identifier*;

*searching the data structure of the group for the bot entry* comprises:

*selecting a data structure* from the plurality of data structures *matching a target group identifier from the message*;

*reviewing the selected data structure for bot entries comprising an identifier and a bot address*; and

---

*determining the selected data structure comprises at least the bot entry*.

9.    The method of claim 2, wherein determining the type of bot the bot member is further comprises:

*reviewing the bot entry for the type of bot*;

*determining the bot entry corresponds to a user bot when the bot entry includes a user node identifier*; and

*determining the bot entry corresponds to a group bot when the bot entry includes a group identifier*.

'636 patent at claims 2-9 (emphasis added); *see also* Zatkovich Decl. at ¶126.

244.    The other independent claims (claims 10 and 16) are also directed to subject matter that provided technical solutions to technical problems that existed in March 2017. Specifically, many, if not all, of these other independent claims claim image capturing devices with certain limitations not found in claim 1.  *See* '636 patent at claim 10 (disclosing that "accessing for a bot entry in the data structure corresponding to the bot identifier for an indicator of a voice library" corresponds to the bot member); claim 16 (disclosing that a selected voice library from a plurality of available voice libraries is selected to use to process the recorded audio based on the indicator in the bot entry and that the selected voice library processes the encoded recorded audio to produce a modified message in the target format suited to the bot member). The dependent claims to these independent claims 10 and 16 are directed to similar subject matter as dependent claims 2 to 9 (above).  *E.g.*, c*ompare* claim 13 *with* claim 2; *compare* claim 12 *with* claim 3; *compare* claim 18 *with* claim 5; *compare* claim 20 *with* claim 6; *compare* claim 19 *with* claim 8; *compare* claim 19 *with* claim 8.  *See* Zatkovich Decl. at ¶127.

245.    Concrete and novel aspects of this invention, as described in the specification in the previous section, are tied directly to the claim limitations in the form of algorithms and process descriptions.  To provide some context, some of the claims are provided below (in gray shading) preceded by an explanation of the language and how it captures the claimed advances taught by the '636 patent.   For instance, claim 1 focuses on the interaction between a group messaging service and bots, leveraging bot-specific voice libraries to process audio messages for enhanced bot functionality (*e.g.*, integration with commercial services).  Claim limitation 1.a

identifies the configuration of a group messaging service to contain users within the group, and a particular bot software application. The bot will receive a recorded voice audio "request" message from a user in that group to be performed by that group's bot software application.

> 1.a receiving, by a group messaging service configured to manage messaging between a plurality of user nodes in a group, a message comprising recorded audio and a bot identifier for a bot member of the group, a bot comprising a software application for performing a task over the internet;

Claim limitation 1.b determines if the message group has a bot associated with the group using the bot identifier.

> 1.b    in response to receiving the message, searching a data structure of the group, maintained by the group messaging service, based on the bot identifier to determine that the bot member is a member of the group;

If a bot is a member of that group, claim element 1.c. identifies a voice library associated to that bot to be used to convert an audio message to a target format.

> 1.c    in response to determining the bot member is a member of the group, accessing a bot entry in the data structure corresponding to the bot identifier, the bot entry including an indicator of a voice library corresponding to the bot member, voice libraries including a set of processing elements configured to convert an audio message into a target format;

Claim elements 1.d and 1.e selects the particular voice library associated with the Bot for that group, then uses that voice library to process the user's recorded audio request to produce a modified message (*e.g.* enhanced text).

> 1.d    selecting which of a plurality of available voice libraries to use to process the recorded audio based on the indicator in the bot entry;

> 1.e    processing, by a selected voice library, the recorded audio to produce a modified message in the target format suited to the bot member; and

In Claim element 1.f, The modified message (*e.g.* enhanced text) is sent to the bot application to process the user's request.

> 1.f    sending, by the group messaging service, the modified message to the bot member.

The dependent claims further refine and enhance this process. For example, claim 2 provides a feature where the type of bot can either be a group bot or a single user bot. Then, based on that type of bot, sending a reply to the either the single user or to the whole group.

> 2.    The method of claim 1, further comprising:
>
> determining a type of bot the bot member is between:
> a group bot responsive to any member of the group; and
> a user bot responsive to a selected user node from the group;
>
> receiving, by the group messaging service, a reply from the bot member in response to sending the modified message; and
>
> sending the reply to the selected user node when the bot member is a user bot, and to the plurality of user nodes when the bot member is a group bot.

In claim 3, the selected voice library will produce a command formatted for that particular bot (*see* '636 claim 3). More specifically, the speech-to-text engine and natural language unit uses the selected voice library to produce specifically formatted text (enhanced text) for the designated bot of that group. ['636 1:67-2:8].

> 3.    The method of claim 1, wherein processing the recorded audio comprises:
>
> converting, by a speech-to-text engine of the selected voice library, the recorded audio to text data; and
>
> converting, by a natural language unit of the selected voice library, the text data to create enhanced text, wherein enhanced text comprises a command specially formatted for execution by the bot member.

Claim 6 provides for further flexibility and specialization, in addition to selecting a particular voice library in claim 1, to select a preferred speech-to-text engine and a preferred natural language unit.

> 6.  The method of claim 1, wherein selecting which of the plurality of voice libraries to use comprises:
>
> selecting between:
> a voice library including a preferred speech-to-text unit and a preferred natural language unit; and
>
> a voice library including a .PCU to .WAV format converter.

*See* Zatkovich Decl. at ¶128.

246.    The claims of the '636 patent, including claims 1, 10, and 17, are directed to methods, systems, and devices for managing group messaging services that incorporate bots with bot-specific voice libraries to solve limitations that existed with bot technology in March of 2017. There would have been nothing abstract about the claims of the '636 patent to a POSITA.  The claims disclose specific implementations of a group messaging service that integrates bots with bot-specific voice libraries to process audio messages and perform designated actions.  This involves tangible components like speech-to-text engines, natural language units, and data structures, which are technical in nature.  In particular, one solution, among others, is to organize different types of bots into different service message groups based on the type of tasks or applications to be performed by using bot specific voice libraries ('636 patent at 2:28-35).  For each message group, a specific voice library can be selected (*see* '636 claim elements 1.c, 1.d, 1.e). The selected voice library will produce a command formatted for that particular bot (*see* '636 claim 3).  In addition, to selecting a particular bot-specific voice library, the bot can also select a particular speech-to-text engine and natural language unit that is best suited to produce "enhanced text" to provide designated actions to be performed by that particular bot. *See* '636 claim 6, and '636 patent at 1:67-2:8.  Enhanced text, produced from the user's request, is "clarified and simplified from text 912 into a form more suitable for presentation to a bot 208 to execute." '636 patent at 13:8-10; *see also* Zatkovich Decl. at ¶129.

247.    A POSITA would understand that each of the claims above provided a specific improvement in bot technology that did not exist prior to March of 2017.  The claims of the '636 patent are directed advancements in bot technologies by enabling group messaging services to interact with both user-oriented bots and group-oriented bots using bot-specific voice libraries.  These advancements collectively enhance the functionality, adaptability, and integration of bots in group messaging environments, surpassing the capabilities of bots available in March 2017.  For example, natural language processors can be configured with specific vocabularies and grammars tailored to handle language for particular applications or tasks that are controlled by specific bots.   These claims disclose a particular configuration of hardware and software components combined in a unique way using novel memory and data structures coupled with bot specific voice libraries.  *See* Zatkovich Decl. at ¶130.

248.    Additionally, these claims are not directed at subject matter that can be performed by a human, mentally or with pen and paper.  The claims of the '636 patent, including claim 1, 10, and 16, are directed to a specific configuration of hardware capable of performing certain functions; in general, the claims cannot be performed by a human or by pen and paper.  In fact, the concepts of bots in general are to bypass the limitations of the human condition.  Problems of the type solved by the '636 patent do not exist (and therefore do not need to be addressed) outside the computer realm.  *See* Zatkovich Decl. at ¶131.

249.    Finally, the claims of the '636 patent do not preempt all the ways of providing bot communication.  There is a myriad of other ways such systems could be architected, such as the prior art patents and applications identified on the face of the patent, which would not be preempted.  *See* '636 patent at 1-2, References Cited (disclosing the proposed prior art patents and patent applications cited by the examiner and/or referenced by the patentee during prosecution of the '636 patent).  Moreover, the versions of Alexa, Corana, Google's Assistant, and Siri that existed prior to March of 2017 could still be used without coming within the scope of the claims of the '636 patent.  *See* Zatkovich Decl. at ¶132.

250.    Even if the '636 patent claims were directed at an abstract idea (which they are not), the claims capture subject matter that is inventive.  To the extent that the claims employ

components and technology that existed at the time *(e.g.*, user nodes, bots, voice libraries, and commercial services), a skilled artisan would have known that they are integrated into a cohesive system that goes beyond any generic computer implementation and demonstrates a novel arrangement of components to achieve a specific result and was not merely the conventional use of technology that was already well known to the industry. The use of this particular combination of components in this way to improve bot technology, as disclosed in the claims highlighted above, was not known in the art and is inventive. The claims are not directed to "off the shelf" bot technology—they are directed to novel, purpose-built software functionality to address the limitations of the bot technologies that existed in March of 2017. *See* Zatkovich Decl. at ¶133.

251.    Even if that were not true, the ordered combination of limitations in claims 1, 10, and 16 of the '636 patent, alone and coupled with the dependent claims described above, was not known in the art. No art, method, or system existed at the time that disclosed all of the limitations of claims 1, 10, and 16 in a way that solved the then-existing problems with the simpler bot technologies of the time. These claims are directed to specific solutions using technology in an inventive and unique way, as described above, to provide bot technologies solve the well-documented problems with bot technologies (*i.e.,* problem of performing more complex and specialized "enhance[d] functionality" in bots) by defining group messaging services where each group can select a specific voice library (as well as a preferred natural language unit) that is best suited for the tasks to be performed by the bot. *See* Zatkovich Decl. at ¶134.

252.    For the above reasons, the claims of the '636 patent claim a combination of elements sufficient to ensure that the claims themselves, both in substance and in practice, are directed to concrete and inventive concepts (not an abstract idea). *See* Zatkovich Decl. at ¶135.

### INFRINGEMENT

253.    Defendant has directly infringed one or more claims of the '636 patent by using, providing, supplying, or distributing the TalkDesk CX Cloud and Copilot Accused Products. For instance, Defendant has directly infringed, either literally or under the doctrine of equivalents, at least claims 1, 5, and 16-18 of the '636 patent, as detailed in <u>Exhibit E</u> (Evidence of Use Regarding Infringement of U.S. Patent No. 11,127,636).

254.     For example, as detailed in <u>Ex. E</u>, Defendant, using the TalkDesk CX Cloud and Copilot Accused Products, performs a method comprising: receiving, by a group messaging service configured to manage messaging between a plurality of user nodes in a group, a message comprising recorded audio and a bot identifier for a bot member of the group, a bot comprising a software application for performing a task over the internet; in response to receiving the message, searching a data structure of the group, maintained by the group messaging service, based on the bot identifier to determine that the bot member is a member of the group; ) in response to determining the bot member is a member of the group, accessing a bot entry in the data structure corresponding to the bot identifier, the bot entry including an indicator of a voice library corresponding to the bot member, voice libraries including a set of processing elements configured to convert an audio message into a target format; selecting which of a plurality of available voice libraries to use to process the recorded audio based on the indicator in the bot entry; processing, by a selected voice library, the recorded audio to produce a modified message in the target format suited to the bot member; and sending, by the group messaging service, the modified message to the bot member.

255.     For example, as detailed in <u>Ex. E</u>, Defendant, using the TalkDesk CX Cloud and Copilot Accused Products, performs the method of claim 1 further comprising: sending the message, by the group messaging service, to the plurality of user nodes in response to receiving the message.

256.     For example, as detailed in <u>Ex. E</u>, Defendant's TalkDesk CX Cloud and Copilot Accused Products comprise a computing system, comprising: a storage system comprising program instructions; and a processor, operably coupled to the storage system, which executes the program instructions to operate a group messaging service configured to manage messaging between a plurality of user nodes in a group, including: receive a message comprising recorded audio and a bot identifier for a bot member of the group, a bot comprising a software application for performing a task over the internet; in response to receiving the message, search a data structure of the group, maintained by the group messaging service, based on the bot identifier to determine that the bot member is a member of the group; in response to determining the bot

member is a member of the group, accessing for a bot entry in the data structure corresponding to the bot identifier, the bot entry including an indicator of a voice library corresponding to the bot member, voice libraries including a set of processing elements configured to convert an audio message into a target format; select a selected voice library from a plurality of available voice libraries to use to process the recorded audio based on the indicator in the bot entry; process, by the selected voice library, the encoded recorded audio to produce a modified message in the target format suited to the bot member; and send, by the group messaging service, the modified message to the bot member.

257.    For example, as detailed in Ex. E, Defendant's TalkDesk CX Cloud and Copilot Accused Products comprise the computing system of claim 16, wherein the processor operates the group messaging service, further including: receive the message as encoded audio; decode the encoded recorded audio to obtain decoded audio; send a request to convert, by a speech-to-text engine of the selected voice library, the decoded audio to decoded text; and send a request to enhance, by a natural language unit of the selected voice library, the decoded text to create enhanced text, wherein enhanced text comprises a command specially formatted for execution by the bot member.

258.    For example, as detailed in Ex. E, Defendant's TalkDesk CX Cloud and Copilot Accused Products comprise the computing system of claim 16, wherein the processor operates the group messaging service, further including: send the message to the plurality of user nodes in response to receiving the message.

259.    Orion Labs or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of one or more claims of the '636 patent.

260.    Since at least the time of receiving the original complaint in this action, Defendant has also indirectly infringed the '636 patent by inducing others to directly infringe the '636 patent.  Defendant has induced distributors and end-users, including, but not limited to, Defendant's employees, partners, contractors, or customers, to directly infringe, either literally or under the doctrine of equivalents, the '636 patent by providing or requiring use of the

TalkDesk CX Cloud and Copilot Accused Products.  Defendant has taken active steps, directly or through contractual relationships with others, with the specific intent to cause them to use the TalkDesk CX Cloud and Copilot Accused Products in a manner that infringes one or more claims of the '636 patent, including, for example, claims 1, 5, and 16-18 of the '636 patent.  Such steps by Defendant include, among other things, advising or directing personnel, contractors, or end-users to use the TalkDesk CX Cloud and Copilot Accused Products in an infringing manner; advertising and promoting the use of the TalkDesk CX Cloud and Copilot Accused Products in an infringing manner; or distributing instructions that guide users to use the TalkDesk CX Cloud and Copilot Accused Products in an infringing manner.  Defendant has performed these steps, which constitute induced infringement with the knowledge of the '636 patent and with the knowledge that the induced acts constitute infringement.  Defendant has been aware that the normal and customary use of the TalkDesk CX Cloud and Copilot Accused Products by others would infringe the '636 patent.

261.    Defendant has also indirectly infringed by contributing to the infringement of the '636 patent.  Defendant has contributed to the direct infringement of the '636 patent by its personnel, contractors, distributors, and customers.  The TalkDesk CX Cloud and Copilot Accused Products have special features that are specially designed to be used in an infringing way and that have no substantial uses other than ones that infringe one or more claims of the '636 patent, including, for example, claims 1, 5, and 16-18 of the '636 patent.  The special features constitute a material part of the invention of one or more of the claims of the '636 patent and are not staple articles of commerce suitable for substantial non-infringing use.

262.    Defendant had knowledge of the '636 patent at least as of the date when it was notified of the filing of this action.

263.    Furthermore, on information and belief, Defendant has a policy or practice of not reviewing the patents of others, including instructing its employees to not review the patents of others, and thus have been willfully blind of Orion Labs' patent rights.

264.    Defendant's actions are at least objectively reckless as to the risk of infringing a valid patent and this objective risk was either known or should have been known by Defendant.

265.    Defendant's direct infringement of one or more claims of the '636 patent is, has been, and continues to be willful, intentional, deliberate, or in conscious disregard of Orion Labs' rights under the patent.

266.    Orion Labs has been damaged as a result of the infringing conduct by Defendant alleged above.  Thus, Defendant is liable to Plaintiff in an amount that compensates it for such infringements, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

267.    Orion Labs has suffered irreparable harm, through its loss of market share and goodwill, for which there is no adequate remedy at law.  Orion Labs has and will continue to suffer this harm by virtue of Defendant's infringement of the '636 patent.  Defendant's actions have interfered with and will interfere with Orion Labs' ability to license technology.  The balance of hardships favors Orion Labs' ability to commercialize its own ideas and technology. The public interest in allowing Orion Labs to enforce its right to exclude outweighs other public interests, which supports injunctive relief in this case.

### COUNT VI: INFRINGEMENT OF U.S. PATENT NO. 11,258,733

268.    Plaintiff repeats and re-alleges the allegations in the Paragraphs above as though fully set forth in their entirety.

269.    The USPTO duly issued U.S. Patent No. 11,258,733 (hereinafter, the "'733 patent") on February 22, 2022, after full and fair examination of Application No. 17/096,200, which was filed on November 12, 2020, and which claims priority to Application No. 16/149,692, filed on October 2, 2018, which claims priority to provisional application No. 62.567,338, which was filed on October 3, 2017.  *See* '733 patent.

270.    Orion Labs owns all substantial rights, interest, and title in and to the '733 patent, including the sole and exclusive right to prosecute this action and enforce the '733 patent against infringers and to collect damages for all relevant times.

### SUBJECT MATTER ELIGIBILITY

271.    The claims of the '733 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity.  Rather, the claimed inventions

include inventive components that improve upon audio message transcription to destination services.

272.    The written description of the '733 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

273.    In general, the '733 patent is directed to technology that "improves audio message transcription to destination services. In various implementations, a group communication system receives user node communications from and distributes user node communications to members of a communication group, wherein the communication group members comprise a plurality of user nodes." '733 patent at 1:58-64; *see also* Zatkovich Decl. at ¶137.

### The Technical Problems That Existed In Distributed Voice Communication Systems In October 2017.

274.    In October of 2017, "[p]ublishing content on media services ha[d] become commonplace. A user communicating with members of a group may [have] be[en] interested in distributing audio communications to additional end users in the form of written communication. For instance, employees who are members of a communication group may [have] want[ed] to post comments or document events in a digital workspace environment where the audio recordings from the members are published in group collaboration applications." '733 patent at 1:32-40; *see also* Zatkovich Decl. at ¶140.

275.    At that time, there existed distributed voice communication systems that were designed to "facilitate secure communications between multiple user nodes in a distributed communication environment." '733 patent at 1:17-19.  These systems enabled members of a defined group to communicate using devices connected to a network, such as smartphones, tablets, or other intermediate communication devices.  '733 patent at 1:19-31.  These systems were essential for managing communication channels, user identities, and group membership. *Id.*; *see also* Zatkovich Decl. at ¶141.

276.    Then existing solutions did not allow for direct integration between group communication systems and destination services, making it difficult to deliver transcribed messages automatically.  In October of 2017, "[a] variety of solutions ha[d] been tried with respect to simplifying the delivery of an audio transcription to a destination service. However, [then-]current solutions d[id] not allow users to directly publish audio content to destination services when the audio content is received from a user node associated with a group in a group communication service." '733 patent at 1:49-54; *see also* Zatkovich Decl. at ¶142.

277.    "While users [could] publish context using various destination service applications," the distributed voice communication systems of the time were constrained and problematic in this context. '733 patent at 1:40-46.  This resulted in unnecessary complexity and inefficient workflow in transcription and publishing content (members of a group faced challenges in transcribing and publishing these messages to external destination services, requiring additional steps, other services, and manual intervention). '733 patent at 1:40-48.   It also resulted in identity mismatch, creating confusion and hindering seamless integration (with no direct correlation between the identity of a group member in the communication system and the identity used for publishing transcribed messages in destination services).  *Id.*; *see also* Zatkovich Decl. at ¶143.

278.    The system facilitates secure group communication and enables transcription of audio messages into text for delivery to destination services in distributed voice communications.  This is particularly useful for emergency responders who need to share critical information quickly and efficiently in noisy or chaotic environments.  These problems were particularly important to certain types of groups, including, "for instance, a group of emergency responders communicating about a natural disaster, or any other type of organization that may be audio data may be connected for group communications." '733 patent at 3:20-27.  Other groups where the then-current limitations were particularly problematic were for firefighters dealing with a complex configuration, law enforcement personnel in a SWAT or hostage rescue situation, military personnel in live combat, and other communication groups that require clear transcripts and whose voice traffic must be accurately associated with individual members and available

1  substantially in real time to supervisory personnel to facilitate actions to be taken in support of

2  that group. When used in mission critical business systems, any such breakdown or flow and

3  speed of group conversations in distributed group voice communication systems are likewise not

4  tolerable because it can result in loss of business and reputation to the company.  *See* Zatkovich

5  Decl. at ¶144.

6      279.    Depending on the urgency and importance of the group communications, the

7  inability to transcribe in real time and accurately associate the audio messages with their source

8  node (group member) could be catastrophic to the active communication group (and the people

9  or property that group with whom that group is dealing).  This was a serious problem in electronic

10  group communications in October of 2017. *See* Zatkovich Decl. at ¶145.

**The Claimed Advances Of The '733 Patent**

12      280.    The technical advancements taught in the '733 patent allow audio messages to be

13  transcribed and published directly to external platforms (*e.g.*, collaborative applications, social

14  media) while maintaining the identity of the user or group.   In doing so, the '733 patent provides

15  a way to efficiently transcribe and deliver audio messages from group communication systems

16  to external destination services, such as collaborative applications or social media platforms, by

17  providing for real-time transcription and delivery processes, enabling efficient communication

18  and collaboration among group members.  *See* Zatkovich Decl. at ¶146.

19      281.    As taught by the specification, the invention of the '733 patent solved the

20  technical problems that existed pertaining to electronic group communications, and specifically,

21  where real time audio message transcription and association was required "by launching a bot

22  node to deliver a transcribed audio message to the destination services, so that a recorded audio

23  message from a user node can be published on the destination services in the transcription

24  process." '733 patent at 2:66-3:4; *see also id.* at 1:58-59; *see also* Zatkovich Decl. at ¶147.

25      282.    "With the user nodes distributing audio communications between one another

26  within their associated communication groups, the group communication service may then

27  receive a request or otherwise determine that an audio message needs to be transcribed and

28  delivered to a destination service. The request may be received from one or more user nodes

based on a member operating the user node interacting with the end- user device using a button, a key, a gesture, a voice command, and the like. The request may also be determined based on an instruction from an administrator or leader of the communication group." '733 patent at 3:65-4:8; *see also* Zatkovich Decl. at ¶148.

283.    "In operation, group communication service 101 receives an audio transcription request from one or more of user nodes 111-112 (step 201). The audio transcription request may be provided by one member of the group, multiple members in the communication group, or specific members in the group, such as an administrator or group leader." '733 patent at 4:61-66.  "The program instructions direct the underlying physical or virtual computing system or systems that provide group communication service 101 to operate[.]"  '733 patent at 4:57-60. By provisioning these functions in suitably constructed and programmed bots, the resulting system enables clear, accurate delivery in real time of transcripts associated with users to monitoring and supervisory personnel for correct and timely action in support of the current situation of the communication group.  *See* Zatkovich Decl. at ¶149.

284.    Figure 3 of the '733 patent depicts a publishing process employed by a bot node in embodiments of enhanced audio message transcription to destination services.



285.    "As part of publishing process **300**, bot node **120** is launched by group communication service **101** (step **301**). Bot node **120** may be launched for a specific group of user nodes **111-112**, or be launched on behalf of group communication service **101** or destination service **130**." '733 patent at 6:38-43.  Further,

> Bot node **120** may receive instructions to locate required destination service **130** as determined by data stored in group communication service **101** associating the identity of user node **111** initiating the transcription request (step **302**). Bot **120** can be instantiated (physically and/or virtually) inside group communication service **101**, instantiated (physically and/or virtually) inside destination service **130**, or can be configured as a bot node in some other way. Bot node **120** locates the subscribed destination service **130** (step **303**).

'733 patent at 6:44-53 (emphasis added); *see also* Zatkovich Decl. at ¶151.

286.    Figure 7 of the '733 patent depicts a computing system suitable for implementing the group communication technology:



**FIGURE 7**

287.    The disclosure in Figure 7 is tied to physical components for several reasons, as discussed below:

> Computing system **701** includes, but is not limited to, processing system **702**, storage system **704**, software **705**, communication interface **707**, and user interface system **709**. Processing system **702** is operatively coupled with storage system **703**, communication interface system **707**, and user interface system **709** (optional).

1
2
3
4

Processing system **702** loads and executes software **705** from storage system **703**. Software **705** includes process **706**, which is representative of the processes discussed with respect to the preceding [Figures], including transcribing process **200** and publishing process **300**. When executed by processing system **702** to enhance audio message transcription to destination services, software **705** directs processing **702** to operate as described herein. . . .

5
6
7
8

Referring still to FIG. 7, processing system **702** may comprise a micro-processor and other circuitry that retrieves and executes software **705** from storage system **703**. Processing system **702** may be implemented within a single processing device, but may also be distributed across multiple processing devices or sub-systems that cooperate in executing program instructions.

'733 patent at 11:32-56.   Ultimately,

9
10
11
12
13
14
15

*[S]oftware 705 may*, when loaded into processing system **702** and executed, ***transform a suitable apparatus, system, or device (of which computing system 701 is representative) overall from a general-purpose computing system into a special-purpose computing system to enhance audio message transcription to destination services. Indeed, encoding software 705 on storage system 703 may transform the physical structure of storage system 703***. The specific transformation of the physical structure may depend on various factors in different implementations of this description.

. . . .

16
17
18
19
20
21

For example, if the computer-readable storage media are implemented as semiconductor-based memory, ***software 705 may transform the physical state of the semiconductor memory when the program instructions are encoded therein, such as by transforming the state of transistors, capacitors, or other discrete circuit elements constituting the semiconductor memory. A similar transformation may occur with respect to magnetic or optical media***. Other transformations of physical media are possible without departing from the scope of the present description, with the foregoing examples provided only to facilitate the present discussion.

22
23

'733 patent at 12:38-63 (emphasis added); *see also* Zatkovich Decl. at ¶153.

### <ins>The Claims Of The '733 Patent Provide Technical Solutions To Problems With Group Communications In October 2017.</ins>

24
25
26
27
28

288.    The '733 patent contains 20 total claims (three independent and seventeen dependent).  This disclosure focuses on claim 1, though the same arguments (and more) apply to the other 19 claims in the patent, each of which requires even more specific technical steps than claim 1. Bolding, italics, and underlining are used for emphasis below to highlight where the claims capture the technical solutions taught in the specification.  Claim 1 is provided below:

1.      A method comprising:

operating a group communication service, including:

*receiving user node communications from and distributing user node communications to members of a communication group, wherein the members comprise a plurality of user nodes*;

*receiving an audio transcription request from a selected user node* of the communication group;

*determining a bot node member of the communication group to launch based on an identifier of the communication group*;

*launching the bot node member to deliver transcribed content messages to a destination service*;

*receiving an audio content message from the one of the plurality of user nodes*; and

*delivering a transcribed content message of the audio content message to the destination service via the bot node member*.

'733 patent at claim 1 (emphasis added); *see also* Zatkovich Decl. at ¶154.

289.    Several of the dependent claims to the independent claim are also presented below, which provide:

2.      The method of claim 1 further comprising:

*determining an IP address associated with the bot node member based on an IP address associated with the selected user node and the identifier of the communication group*; and

wherein *the transcribed content message is delivered to the destination service using the IP address associated with the bot node member*.

3.      The method of claim 1 comprising operating the group communication service further includes:

*facilitating communications of multiple user node groups, including the communication group*;

*maintaining a database including associations between identifiers for user nodes, identifiers for user node groups, and bot nodes*;

*determining an identifier associated with the selected user node based on the audio transcription request*;

*determining a user node group associated with the audio transcription request from the multiple user node groups using the database*; and

*determining the bot node member to launch* for the audio transcription request using the database.

4. The method of claim 3 further comprising:

*determining the destination service based on an association between the destination service and the communication group* in the database.

5. The method of claim 1 comprising operating the group communication service further includes:

*delivering a plurality of transcribed audio content messages* from a plurality of user nodes of the communication group to the destination service, *via the bot node member, for publication on the destination service*.

6. The method of claim 1 comprising operating the group communication service further includes:

*receiving the audio transcription request as an audio voice message*; and

*broadcasting the audio transcription request to the members of the communication group*.

7. The method of claim 1 comprising operating the group communication service further includes:

*receiving a transcribed message from the destination service via the bot member*; and

*converting the transcribed message into an audio message*; and

*broadcasting the audio message to the members of the communication group*.

'733 patent at claims 2-7 (emphasis added); *see also* Zatkovich Decl. at ¶155.

290.    The other independent claims (claims 8 and 15) are also directed to subject matter that provided technical solutions to technical problems that existed in distributed voice communications in October of 2017. While claim 1 describes a method for operating a group communication service and the steps involved in receiving user communications, launching a bot node, transcribing audio messages, and delivering transcribed content to a destination service while keeping track of the source of the messages, claim 8 is directed to an apparatus (a computing system) configured to perform the same operations as described in claim 1, the

apparatus including a processor that executes the necessary operations, such as receiving communications, launching a bot node, transcribing audio messages, and delivering transcribed content. Claim 15 is directed to a memory device that stores instructions to cause the system to perform the operations described in claim 1. Dependent claims 9 to 14 and 16 to 20 roughly approximate the additional limitations claimed in dependent claims 2 to 8. *Compare* 16 and 2; *compare* 17 *with* 3; *compare* 11 and *with* 4; *compare* 12 and 18 *with* 5; *compare* 19 *with* 6; *compare* 14 and 20 *with* 7. *See* Zatkovich Decl. at ¶156.

291.    Concrete and novel aspects of this invention, as described in the specification in the previous section, are tied directly to the claim limitations in the form of software algorithms and process descriptions. For example:

- Technology is disclosed herein that improves audio message transcription to destination services. In various implementations, a group communication system receives user node communications from and distributes user node communications to members of a communication group, wherein the communication group members comprise a plurality of user nodes. The group communication system receives an audio transcription request from one or more of the plurality of user nodes and launches a bot node member of the communication group configured to deliver transcribed content messages to one or more destination services. An audio content message is then received from one or more of the plurality of user nodes and a transcribed content message of the audio content message is delivered to the one or more destination services over the bot node member of the communication group.

'733 patent at 1:58-2:6;

- In some implementations, for the audio content message to be converted to the transcribed content message, the group communication service is paired with a transcription service to perform the conversion. The transcribed content message is then sent to a bot node member. In other cases, the audio content message is sent to the bot node member for transcription. In either case, the bot node member delivers the transcribed content message to the destination services for publication on behalf of the user node and/or communication group.

'733 patent at 2:7-16;

- In still other implementations, the group communication service receives a transcribed content message from the one or more destination services over the bot node member of the communication group. The group communication service then delivers an audio content message of the transcribed content message to the one or more of the plurality of user nodes in the communication group.

'733 patent at 2:17-23;

- In some implementations, the group communication service determines an Internet Protocol (IP) address associated with the bot node member based on an IP address associated with the user node member. In this implementation, the transcribed content

message is delivered to the one or more destination services using an IP address associated with the bot node member.

'733 patent at 2:24-30; *see also* Zatkovich Decl. at ¶157.

292.   These claims are not directed to any abstract idea.  The claims in this patent are directed to a specific technological solution to a practical problem in distributed voice communication systems.  Specifically, the invention addresses the challenge of transcribing audio messages in a group communication system and delivering them to destination services in a seamless and automated manner.  This is not merely an abstract idea but a specific implementation of a communication system that involves, among other specific requirements, launching a bot node to deliver transcribed messages, associating IP addresses of user nodes and bot nodes to ensure proper delivery, transcribing audio content into text using internal or external transcription services and delivering transcribed messages to destination services for publication. *See* Zatkovich Decl. at ¶158.

293.   A POSITA would understand that each of the claims above provided a specific improvement in distributed voice communications that did not exist prior to the October of 2017. The claims of the patent, including the independent claims, clearly claim the use of a particular configuration of software and hardware to solve problems with distributed voice communication systems that existed in October of 2017.  These steps involve specific technical processes that improve the functionality of distributed voice communications, making them more efficient and capable of handling transcription and delivery tasks without manual intervention.  The inventions of the '733 patent enables bidirectional communication, where transcribed messages can be sent to destination services and incoming messages can be received, converted, and delivered back to the communication group.   To accomplish this, the '733 patent recites a special purpose method/system/device composed of software and hardware components combined in a unique way to keep track of, transcribe, and maintain source identification for audio messages received in a group communication system using a bot node and a specific transcription process.  The claims are rooted in computer technology and solve a problem specific to distributed communication environments, which is far removed from any abstract idea. *See* Zatkovich Decl. at ¶159.

294.     Nor are these claims directed at subject matter that can be performed by a human, mentally or with pen and paper.  The claims of the '733 patent, including claims 1, 8, and 15, involve automated processes that require the use of computing systems, communication networks, and software to perform tasks that are beyond the capabilities of a human, whether mentally or with pen and paper. The claims describe the process of launching a bot node within a group communication system to deliver transcribed messages to destination services.  This involves real-time integration of the bot node into the communication group, which requires interaction with networked systems, IP address associations, and automated instructions. Humans cannot dynamically launch a bot node or manage IP address associations manually in real time. This process requires computing infrastructure and software to execute.  *See* Zatkovich Decl. at ¶160.

295.     Moreover, the claims of the '733 patent do not preempt all the ways of communicating electronically in a group environment, and in fact, does not even pre-empt all ways of transcribing messages in an electronic group setting.  There are countless other ways such systems could be architected, such as by using those systems described in the ten prior art patents and applications identified on the face of the patent.  *See* '733 patent at 1-2, References Cited (disclosing the proposed prior art patents and patent applications cited by the examiner and/or referenced by the patentee during prosecution of the '733 patent).  You could also do this without employing a bot and would avoid coming within the scope of the patent.  *See* Zatkovich Decl. at ¶161.

296.     Even if the '733 patent claims were directed at an abstract idea, which no POSITA would reasonably believe, the claims capture subject matter that is inventive.  To the extent that the claims employ components and technology that existed at the time (bots, nodes, processors, communication groups, messages, and audio content), they are employed together here in a way that was new and certainly would not have been considered conventional, routine, or generic to those skilled in the art).  The use of this particular combination of hardware and software components in this way to improve distributed voice communication systems that existed in October of 2017 by launching a bot node to deliver messages, associating IP addresses of user

nodes and bot nodes to ensure proper delivery, transcribing audio content into text using internal or external transcription services, and delivering transcribed messages to destination services for publication, as claimed in the various forms in the claims highlighted above, was inventive and not previously known in the art. *See* Zatkovich Decl. at ¶162.

297. Even if that were not true, when you look at the elements of each claim as a whole, in ordered combination of their limitations, including (A) independent claim 1, coupled with dependent claims 2-7, (B) independent claim 8, coupled with its various dependent claims 9-14, and (C) independent claim 15, coupled with its various dependent claims 16-20, of the '733 patent, as recited and described in detail above, were not well-known in the art. No art or system existed at the time that disclosed all of these limitations in a way that solved the then-existing problems with distributed voice communication systems where there was a need for transcription services. These claims do not merely employ known generic components in a conventional or routine way, but instead, they are directed to specific solutions using technology in an inventive and unique way, as described above, to improve the functionality of distributed voice communication systems by enabling bidirectional communication with real-time integration of a bot node, where transcribed messages can be sent to destination services and incoming messages can be received, converted, and delivered back to the communication group and accurately maintaining the identity of the source of the messages. *See* Zatkovich Decl. at ¶163.

298. For the above reasons, the claims of the '733 patent claim a combination of elements sufficient to ensure that the claims themselves, both in substance and in practice, are directed to concrete and inventive concepts (not an abstract idea). *See* Zatkovich Decl. at ¶164.

### INFRINGEMENT

299. Defendant has directly infringed one or more claims of the '733 patent by making, using, selling, offering for sale, providing, supplying, distributing, and/or internal and external testing the TalkDesk CX Cloud, TalkDesk Studio, and Voice IVR Accused Products. For instance, Defendant has directly infringed and continues to infringe, either literally or under the doctrine of equivalents, at least claims 1 and 5 of the '733 patent, as detailed in **Exhibit F** (Evidence of Use Regarding Infringement of U.S. Patent No. 11,258,733).

300.   For example, as detailed in <u>Ex. F</u>, Defendant using the TalkDesk CX Cloud, TalkDesk Studio, and Voice IVR Accused Products, performs a method comprising: operating a group communication service, including: receiving user node communications from and distributing user node communications to members of a communication group, wherein the members comprise a plurality of user nodes; receiving an audio transcription request from a selected user node of the communication group; determining a bot node member of the communication group to launch based on an identifier of the communication group; launching the bot node member to deliver transcribed content messages to a destination service; receiving an audio content message from the one of the plurality of user nodes; and delivering a transcribed content message of the audio content message to the destination service via the bot node member.

301.   For example, as detailed in <u>Ex. F</u>, Defendant using the TalkDesk CX Cloud, TalkDesk Studio, and Voice IVR Accused Products, performs the method of claim 1 comprising operating the group communication service further includes: delivering a plurality of transcribed audio content messages from a plurality of user nodes of the communication group to the destination service, via the bot node member, for publication on the destination service.

302.   Orion Labs or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of one or more claims of the '733 patent.

303.   Since at least the time of receiving the original complaint in this action, Defendant has also indirectly infringed the '733 patent by inducing others to directly infringe the '733 patent.   Defendant has induced distributors and end-users, including, but not limited to, Defendant's employees, partners, contractors, or customers, to directly infringe, either literally or under the doctrine of equivalents, the '733 patent by providing or requiring use of the TalkDesk CX Cloud, TalkDesk Studio, and Voice IVR Accused Products.   Defendant has taken active steps, directly or through contractual relationships with others, with the specific intent to cause them to use the TalkDesk CX Cloud, TalkDesk Studio, and Voice IVR Accused Products in a manner that infringes one or more claims of the '733 patent, including, for example, claims 1 and 5 of the '733 patent.   Such steps by Defendant include, among other things, advising or

directing personnel, contractors, or end-users to use the TalkDesk CX Cloud, TalkDesk Studio, and Voice IVR Accused Products in an infringing manner; advertising and promoting the use of the TalkDesk CX Cloud, TalkDesk Studio, and Voice IVR Accused Products in an infringing manner; or distributing instructions that guide users to use the TalkDesk CX Cloud, TalkDesk Studio, and Voice IVR Accused Products in an infringing manner.  Defendant has performed these steps, which constitute induced infringement with the knowledge of the '733 patent and with the knowledge that the induced acts constitute infringement.  Defendant has been aware that the normal and customary use of the TalkDesk CX Cloud, TalkDesk Studio, and Voice IVR Accused Products by others would infringe the '733 patent.

304.    Defendant has also indirectly infringed by contributing to the infringement of the '733 patent.  Defendant has contributed to the direct infringement of the '733 patent by its personnel, contractors, distributors, and customers.  The TalkDesk CX Cloud, TalkDesk Studio, and Voice IVR Accused Products have special features that are specially designed to be used in an infringing way and that have no substantial uses other than ones that infringe one or more claims of the '733 patent, including, for example, claims 1 and 5 of the '733 patent.  The special features constitute a material part of the invention of one or more of the claims of the '733 patent and are not staple articles of commerce suitable for substantial non-infringing use.

305.    Defendant had knowledge of the '733 patent at least as of the date when it was notified of the filing of this action.

306.    Furthermore, on information and belief, Defendant has a policy or practice of not reviewing the patents of others, including instructing its employees to not review the patents of others, and thus have been willfully blind of Orion Labs' patent rights.

307.    Defendant's actions are at least objectively reckless as to the risk of infringing a valid patent and this objective risk was either known or should have been known by Defendant.

308.    Defendant's direct infringement of one or more claims of the '733 patent is, has been, and continues to be willful, intentional, deliberate, or in conscious disregard of Orion Labs' rights under the patent.

309.     Orion Labs has been damaged as a result of the infringing conduct by Defendant alleged above.  Thus, Defendant is liable to Plaintiff in an amount that compensates it for such infringements, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

310.     Orion Labs has suffered irreparable harm, through its loss of market share and goodwill, for which there is no adequate remedy at law.  Orion Labs has and will continue to suffer this harm by virtue of Defendant's infringement of the '733 patent.  Defendant's actions have interfered with and will interfere with Orion Labs' ability to license technology.  The balance of hardships favors Orion Labs' ability to commercialize its own ideas and technology. The public interest in allowing Orion Labs to enforce its right to exclude outweighs other public interests, which supports injunctive relief in this case.

## COUNT VII: INFRINGEMENT OF U.S. PATENT NO. 11,328,130

311.     Plaintiff repeats and re-alleges the allegations in the Paragraphs above as though fully set forth in their entirety.

312.     The USPTO duly issued U.S. Patent No. 11,328,130 (hereinafter, the "'130 patent") on May 10, 2022 after full and fair examination of Application No. 16/182,474 which was filed on November 6, 2018, which claims priority to provisional application No. 62/582,000, which was filed on November 6, 2017.  *See* '130 patent.

313.     Orion Labs owns all substantial rights, interest, and title in and to the '130 patent, including the sole and exclusive right to prosecute this action and enforce it against infringers and to collect damages for all relevant times.

### SUBJECT MATTER ELIGIBILITY

314.     The claims of the '130 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity.  Rather, the claimed inventions include inventive components and functionalities improve upon the function, operation, and security of communications devices and networks by providing real-time translation for group communications.

---

315.    The written description of the '130 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

316.    In general, the '130 patent is directed to "systems, methods, and devices for providing real-time translation for group communications." '130 patent at 1:43-45. This patent is directed to technology for real-time translation in distributed voice communications, and it involves systems, methods, and devices that enable speech input from one communication device in a specific language to be translated into different languages for other devices in a group. *See* Zatkovich Decl. at ¶166.

**The Technical Problems That Existed In Distributed Voice
Communication Systems In November 2017.**

317.    The specification of the '130 patent provides detailed information about the problems that existed in distributed voice communication in November of 2017. '130 patent at 1:19-26; *see also* Zatkovich Decl. at ¶169.

318.    This patent is directed to technology for real-time translation in group communications. It involves systems, methods, and devices that enable speech input from one communication device in a specific language to be translated into different languages for other devices in a group. *See* Zatkovich Decl. at ¶170.

319.    In November of 2017, technologies such as Voice over IP (VoIP) had made it possible for users to communicate across vast distances without needing to be physically near one another. '130 patent at 1:15-20. These advancements allowed for distributed voice communication systems. *Id.* In multilingual group communication scenarios, human translators were often required to enable conversations. Despite the ability to overcome physical distance, it remained difficult to facilitate conversations in scenarios where users spoke different languages. "While distance amongst users has become increasingly easy to overcome using [group voice communication technology], it remain[s] difficult to have conversations over distributed voice

communication systems in scenarios where users attempting to converse in more than one language. In such scenarios it is often necessary to have translators present, **which can break down the flow and speed in which group conversations take place**.'' '130 patent at 1:19-26 (emphasis). This was a significant limitation in distributed voice communication systems. *See* Zatkovich Decl. at ¶171.

320. Moreover, in complex and volatile situations such as firefighters fighting a complex conflagration, first responders dealing with a natural disaster, law enforcement personnel dealing with a SWAT or hostage rescue situation, or military personnel in live combat, the "breakdown of flow and speed of group conversations" referred to in the above citation cannot be tolerated. Human translators cannot always be on standby, and available translators may not know the jargon, or understand the dialect, used by active personnel. Likewise, when used in mission critical business systems, any such breakdown or flow and speed of group conversations in distributed group voice communication systems are likewise not tolerable because it can result in loss of business and reputation to the company. *See* Zatkovich Decl. at ¶172.

321. There was a need for systems, methods, and devices that could facilitate real-time translation for group communications across multiple languages in order to overcome language barriers, eliminate dependence on human translators, and to provide for real-time communications in electronic group communications by providing efficient, real-time translation in group communication scenarios, where users might have different language preferences. *See* '130 patent, at 1:19-26-2:43-3:11; *see also* Zatkovich Decl. at ¶173.

### The Claimed Advances Of The '130 Patent

322. As taught by the specification, the invention described in the patent provide systems, methods, and devices for real-time speech translation, enabling users to communicate effectively in their preferred languages without delays or interruptions, thereby addressing the need to overcome language barriers, eliminating dependence on human translators, and to provide real-time communications in electronic group communications. '130 patent at 1:43-45, 2:43-45; *see also* Zatkovich Decl. at ¶174.

323.     The advances of the '130 patent in the critical and vital contexts of the sorts listed above (i.e., emergency and missional critical scenarios) are beneficial and include:

- The claimed sequence of operations is immediate, no matter what the circumstances;

- The claimed translation functions are always fully and immediately functional;

- The capabilities of the claimed translation functions are not limited to those of possibly available humans; and

- The claimed translation functions are never fatigued or distracted.

All of these advances provide the members of a communication group in contexts of the sorts listed above with needed outcomes not available if only humans were in the group.  *See* Zatkovich Decl. at ¶175.

324.     The patent describes systems, methods, and devices for translating speech input into preferred languages for group communication devices in real-time.  '130 patent at Abstract.  The remote management platform can identify the preferred language for each communication device in the distribution group and translates the speech input accordingly. '130 patent at 13:1-5.  The system allows users to register devices with primary and secondary group communication settings, enabling speech input to be distributed to specific groups. '130 patent at 2:49-54. The systems, methods, and devices use translation engines or bots to translate speech input into the preferred language for each group communication device. '130 patent at 1:35-40; 2:1-5.  The system processes speech input by identifying the originating device, determining the distribution group, and translating the speech input as needed. '130 patent at 1:30; 2:1-45; claim 1.  The system can detect the language of the speech input using natural language processing or machine learning. '130 patent at Abstract; 7:50-60; claims 5, 6; *see also* Zatkovich Decl. at ¶176.

325.     The systems, methods, and devices ensure that speech input is translated and distributed to devices in the preferred language of each user, enabling seamless communication. '130 patent at Abstract; 7:50-60; claim 1.  The system encodes speech input into audio packets for secure transmission and playback on receiving devices. '130 patent at 5:10-22; claim 7.  The

1  systems, methods, and devices further support communication between users with different

2  language preferences by grouping devices based on their preferred languages. '130 patent at

3  Abstract; 1:45-53; claim 1.  This ensures efficient distribution of translated speech input to all

4  devices in the group, maintaining real-time communication. '130 patent at Abstract; claims 1 and

5  11; *see also* Zatkovich Decl. at ¶177..

6  326.  These solutions collectively address the challenges of multilingual group

7  communication by automating translation, managing group settings, and ensuring real-time

8  delivery of translated speech inputs.  Figure 1 of the '130 patent depicts a schematic diagram of

9  an exemplary environment **100** for providing real-time translation for group communications

10  amongst a plurality of group communication devices and users by having one or more different

11  language preferences:



*FIG. 1*

*See* Zatkovich Decl. at ¶178.

327.     The exemplary environment **100** comprises a first communication environment **102**, second communication environment **108**, third communication environment **124**, fourth communication environment **130**, and network communication and processing environment **118**. '130 patent at 4:2-6. "First communication environment **102** includes user **104** and group communication computing device **106**. Second communication environment **108** includes user **110**, group communication computing device **112**, and LTE-enabled computing device **114**, which may communicate one or more recorded audio packets with one another via BLE network **116**. Third communication environment **124** includes user **126** and group communication computing device **128**. Fourth communication environment **130** includes user **132** and group computing device **134**." *Id.* at 4:6-16. Further,

> Each of the group communication computing devices in exemplary environment **100** typically include at least some form of computer readable media. . . . By way of example, computer readable media includes computer readable storage media and computer readable communication media.

> Computer readable storage media includes volatile and nonvolatile, removable and non-removable media implemented in any device configured to store information such as computer readable instructions, data structures, program modules or other data. . . .

> Computer readable communication media typically embodies computer readable instructions, data structures, program modules or other data in a modulated data signal; such as a carrier wave or other transport mechanism and includes any information delivery media. The term "modulated data signal" refers to a signal that has one or more of its characteristics set or changed in such a manner as to encode information in the signal.

'130 patent at 4:17-47; *see also* Zatkovich Decl. at ¶179.

328.     User **104** may provide an audio input to a microphone integrated with group communication computing device **106**. '130 patent at 4:53-55. "Upon receiving the audio input from user **104**, an audio encryption and/or encoding engine may process the received audio into one or more packets in a secure operating environment of group communication device **106** and transfer those packets to a normal operating environment of group communication device **106** for LTE transmission and processing at a remote management platform via network **120**." *Id.* at 5:11-18; *see also* Zatkovich Decl. at ¶180.

329.   "In some examples, the processing of the received audio content by an audio encryption and/or encoding engine may comprise analyzing the audio content and parsing it into one or more messaging packets in a format such as one or more Opus codec packets, each of which may comprise N audio packet fragments. Additionally, the processing of the received audio content from user **104** may comprise packaging the audio content from its native format, into one or more formats that may be transferred from group communication computing device **106** to one or more additional group communication computing devices, via a network, such as network **120**." '130 patent at 5:32-44; *see also* Zatkovich Decl. at ¶181.

330.   Upon receiving the processed audio content, group communication computing device **106** may send one or more encoded packets, via an LTE modem and network **120**, comprising the processed audio content to one or more server computing devices, such as server computing device **122**, comprising a remote management platform and one or more translation bots for translating the audio content from a first language into one or more additional languages corresponding to user preferences of one or more group communication computing devices that the audio content is to be distributed to." '130 patent at 5:45-55; *see also* Zatkovich Decl. at ¶182.

331.   According to some examples,

> [G]roup communication device **106** may include a transport layer security (TLS) layer comprising one or more of: an encryption engine for obfuscating the encoded audio communication received from user **104** to server computing device **122**; an authentication engine for authenticating the identity of group communication computing device **106** to server computing device **122** and/or authenticating the identity of server computing device **122**; and a communication integrity engine for preventing message loss and/or alteration during transfer of the audio communication to server computing device **122**.
>
> In exemplary environment **100**, the audio communication received from user **104** may be sent, via network **120**, to each of the group communication devices in second communication environment **108**, third communication environment **124**, and fourth communication environment **130**. Specifically, an LTE communication comprising the audio content from group communication computing device **106** may be received by LTE-enabled computing device **114** in second communication environment **108**, and subsequently transferred to group communication computing device **112**, via BLE network **116**. If encrypted, the audio content may then be decrypted by group

communication device **112** and an associated decryption engine. The audio content may similarly be decoded for audio playback by group communication computing device **112** and an associated decoding engine, and played back via a speaker associated with group communication computing device **112** such that user **110** receives the audio that was received and sent from group communication computing device **106**.

'130 patent at 6:34-64.

<u>**The Claims Of The '130 Patent Provide Technical Solutions To Problems With Distributed Voice Communication Systems In November 2017.**</u>

332.    The '130 patent contains 20 total claims (three independent and seventeen dependent).  This disclosure focuses on claim 1, though the same arguments (and more) apply to the other 19 claims in the patent, each of which requires even more specific technical steps than claim 1. Bolding, italics, and underlining are used for emphasis below to highlight where the claims capture the technical solutions taught in the specification.   Claim 1 is provided below:

> 1.   A method comprising:
>
> *performing, at a remote management server configured for managing group communications between multiple communication devices, a process for providing real-time translation for group communications*, including:
>
> *registering a first communication device with the remote management server*, including associating the first communication device with:
>
> a first language preference,
>
> *a primary group communication setting identifying a first set of communication devices*, and
>
> *a secondary group communication setting identifying a second set of communication devices*;
>
> *receiving, from the first communication device, a speech input and a first device identifier* for the first communication device;
>
> *accessing an account log associated with the first communication device based on the first device identifier*;
>
> *determining a plurality of communication devices to distribute the speech input to based on the primary group communications setting from the account log*;
>
> *determining a preferred language associated with each of the plurality of group communication devices*;

*grouping each of the plurality of communication devices into one or more groups based on corresponding preferred languages,* each group associated with a separate language;

*for languages different from the first language preference, translating the speech input into a translated speech input corresponding to the preferred languages* for each of the one or more groups *prior to sending the speech input*; and

*sending the translated speech input to each communication device* of the one or more groups.

'130 patent at claim 1 (emphasis added); *see also* Zatkovich Decl. at ¶184.

333.    Several of the dependent claims to the independent claim are also presented below, which provide:

2.    The method of claim 1, wherein the first communication device is associated with the first language preference based on a user-provided language setting.

3.    The method of claim 2, wherein:

*the first device identifier includes an IP address associated with the first communication device*; and
*the remote management server determines the first language preference based on the IP address*.

4.    The method of claim 3, wherein *the remote management server comprises a list of a plurality of IP addresses, and wherein each of the plurality of IP addresses is associated with a unique communication device and a corresponding user-provided language setting*.

5.    The method of claim 1, further comprising:

*performing natural language processing on the speech input*; and

*detecting*, based on the natural language processing, *a language that the speech input corresponds to*.

6.    The method of claim 5, further comprising:

*receiving separate speech inputs* from each of the plurality of communication devices,
*performing natural language processing on the separate speech inputs* from each of the plurality of communication devices; and

*detecting*, based on the natural language processing, *language corresponding to each of the separate speech inputs* from each of the plurality of communication devices.

7.    The method of claim 1, further comprising:

*parsing, by a voice messaging application, the speech input into one or more audio messaging packets*; and

*encoding the one or more audio messaging packets with an identification key for determining the one or more groups to distribute the speech input to*.

8. The method of claim 7, wherein *the one or more audio messaging packets are Opus audio codec packets and wherein each Opus audio packet includes N audio data packet fragments*.

9. The method of claim 7, wherein the first communication device, and the plurality of communication devices associated with a language that is different than the first language preference, *each comprise a push-to-talk audio transmission interface*.

10. The method of claim 7, wherein the sending of the translated speech input in a language corresponding to each of the one or more groups *comprises sending the one or more audio messaging packets to a remote management platform for distribution to the one or more groups*.

'130 patent at claims 2-10 (emphasis added); *see also* Zatkovich Decl. at ¶185.

334.    The other independent claims (claims 11 and 16) are also directed to subject matter that provided technical solutions to technical problems that existed in November 2017. Specifically, these other independent claims claim real-time translation for group communications with certain limitations not found in claim 1.  *See* '130 patent at claim 11 (disclosing determining at least one communication device to distribute the speech input to based on the first device identifier and that each group of the one or more groups of communication devices is associated with a separate language different from the first language preference); claim 16 (disclosing, at the remote management server, determining at least one communication device to distribute the speech input to based on the first device identifier and determining a preferred language associated with corresponding each of the at least one communication; further disclosing sending, from the remote management server to the at least one group communication device, the translated speech input in a language corresponding to the at least one communication device). The dependent claims to these roughly mirror the other dependents claims reproduced above. *See* Zatkovich Decl. at ¶186.

335.     Concrete and novel aspects of this invention, as described in the specification in the previous section, are tied directly to the claim limitations in the form of software algorithms and process descriptions.  For example:

- Non-limiting examples of the present disclosure describe systems, methods, and devices for providing real-time translation for group communications. Aspects described herein provide mechanisms for determining a language that a speech input received from a first group communication is received in and further determining whether one or more group communication devices that the received speech input is to be sent to have a language preference associated with them that is different from the determined language for the speech input.

'130 patent at 1:43-52;

- In some examples, the one or more group communication devices that the received speech input is to be sent to may be identified based on a group communication service account associated with the group communication device that sent the speech input. The group communication service account may include a plurality of IP addresses and/or other group communication device identifiers (e.g., MAC addresses, device serial numbers, Bluetooth addresses, IMEI numbers, etc.) corresponding to one or more group communication devices of a distribution group (e.g., the group communication devices that the received speech input is to be sent to).

'130 patent at 1:53-64;

- A group communication service account for each group communication device in the distribution group may also be identified and, based on each corresponding account, a preferred language may be identified for each group communication device of the distribution group.

'130 patent at 1:64-2:1;

- A translation engine, or translation bot, may translate the received speech input into a language for each group communication device of the distribution group that has a preferred language that is determined to be different than the language in which the speech input was received in.

'130 patent at 2:1-6;

- The translated speech input may then be sent to each group communication device of the distribution group for which a translation was required to match the language of the speech input to a preferred language setting.

'130 patent at 2:6-10; *see also* Zatkovich Decl. at ¶187.

336.     These claims are not directed to any abstract idea.  The claims in this patent are directed to a specific technological solution to a practical problem in distributed voice communication systems.  Specifically, the claims of the '130 patent address the need to overcome language barriers, eliminate dependence on human translators, and enhance communications in

electronic group communications. This is not merely an abstract idea but a specific implementation of a communication system that involves, among other specific requirements, the provision of a remote management server to provide real-time translation for group communications by registering devices with language preferences and group settings, determining distribution groups, translating speech input into preferred languages, and sending the translated speech to the appropriate devices. *See* Zatkovich Decl. at ¶188.

337. A POSITA would understand that each of the claims above provided a specific improvement in distributed voice communications that did not exist prior to the November of 2017. The claims of the patent, including the independent claims, clearly claim the use of a particular configuration of software and hardware to solve problems with distributed voice communication systems that existed in November of 2017. These steps involve specific technical processes that improve the functionality of distributed voice communications, making them capable of overcoming language barriers, eliminating dependence on human translators, and allowing real-time communications in electronic group communications. The inventions of the '130 patent enables real-time bidirectional, multi-language communication. To accomplish this, the '130 patent recites a special purpose method/system/device composed of software and hardware components combined in a unique way to perform novel operations, such as identifying device preferences, grouping devices by language, translating speech inputs, and distributing them efficiently using speech input from a group communication setting in an account log, which are not abstract ideas but concrete technological improvements to communication systems to solve a specific problem in distributed voice communication—real-time translation across devices with different language preferences. *See* Zatkovich Decl. at ¶189.

338. Nor are these claims directed at subject matter that can be performed by a human, mentally or with pen and paper. The claims of the '130 patent, including claims 1, 11, and 16, require the use of specific technological components, such as remote management servers, group communication devices, translation engines, and network communication systems, to execute operations like speech input processing, language determination, translation, and distribution in a way that no human could address and more than just abstract mental processes. In fact, some

1    of the solutions provided in the claims of the '130 patent are designed to eliminate issues that

2    come with the human condition (*e.g.*, delays due to human availability/fatigue/distraction or

3    limited language skills).  *See* Zatkovich Decl. at ¶190.

4         339.    Moreover, the claims of the '130 patent do not preempt all the ways of

5    communicating electronically in a group environment, and in fact, does not even pre-empt all

6    ways of translating voice communications in an electronic group setting.  There are countless

7    other ways such systems could be architected, such as by using those systems described in the

8    eighteen (18) prior art patents and applications identified on the face of the patent.  *See* '130

9    patent at 1-2, References Cited (disclosing the proposed prior art patents and patent applications

10   cited by the examiner and/or referenced by the patentee during prosecution of the '130 patent).

11   You could also do this without grouping based on language preference or would avoid coming

12   within the scope of the patent.  *See* Zatkovich Decl. at ¶191.

13        340.    Even if the '130 patent claims were directed at an abstract idea, which no POSITA

14   would reasonably believe, the claims capture subject matter that is inventive.  To the extent that

15   the claims employ components and technology that existed at the time (servers, communication

16   devices, account logs, speech translation), they are employed together here in a way that was

17   novel and that a POSITA would not consider conventional, routine, or generic.  The use of this

18   particular combination of hardware and software components in this way to improve distributed

19   voice communication systems that existed in November of 2017 by disclosing a remote

20   management server that provides real-time translation for group communications by registering

21   devices with language preferences and group settings, determining distribution groups,

22   translating speech input into preferred languages, and sending the translated speech to the

23   appropriate devices, as claimed in the various forms in the claims highlighted above, was

24   inventive and not previously known in the art.  *See* Zatkovich Decl. at ¶192.

25        341.    Even if that were not true, when you look at the elements of each claim as a whole,

26   in ordered combination of their limitations, including (A) independent claim 1, coupled with

27   dependent claims 2-10, (B) independent claim 11, coupled with its various dependent claims 12-

28   15, and (C) independent claim 16, coupled with its various dependent claims 17-20, of the '130

patent, as recited and described in detail above, were not well-known in the art. No art or system existed at the time that disclosed all of these limitations in a way that solved the then-existing problems with distributed voice communication systems where there was a need for real-time translational services in distributed group communications. These claims do not merely employ known generic components in a conventional or routine way, but instead, they are directed to specific solutions using technology in an inventive and unique way, as described above, to facilitate real-time translation for group communications across multiple languages in a way that overcame language barriers, eliminated dependence on human translators, and to provided for real-time communications in electronic group communications, and these methods, systems, and devices were not before known in the art. *See* Zatkovich Decl. at ¶193.

342.   For the above reasons, the claims of the '130 patent claim a combination of elements sufficient to ensure that the claims themselves, both in substance and in practice, are directed to concrete and inventive concepts (not an abstract idea). *See* Zatkovich Decl. at ¶194.

### INFRINGEMENT

343.   Defendant has directly infringed one or more claims of the '130 patent by making, using, selling, offering for sale, providing, supplying, distributing, and/or internal and external testing the TalkDesk CX Cloud and Copilot Accused Products. For instance, Defendant has directly infringed, either literally or under the doctrine of equivalents, at least claim 1 of the '130 patent as detailed in <u>Exhibit G</u> (Evidence of Use Regarding Infringement of U.S. Patent No. 11,328,130).

344.   For example, as illustrated in <u>Ex. G</u>, Defendant, using the TalkDesk CX Cloud and Copilot Accused Products, performs a method comprising: performing, at a remote management server configured for managing group communications between multiple communication devices, a process for providing real-time translation for group communications, including: registering a first communication device with the remote management server, including associating the first communication device with: a first language preference, a primary group communication setting identifying a first set of communication devices, and a secondary group communication setting identifying a second set of communication devices; receiving, from

the first communication device, a speech input and a first device identifier for the first communication device; accessing an account log associated with the first communication device based on the first device identifier; determining a plurality of communication devices to distribute the speech input to based on the primary group communications setting from the account log; determining a preferred language associated with each of the plurality of group communication devices; grouping each of the plurality of communication devices into one or more groups based on corresponding preferred languages, each group associated with a separate language; for languages different from the first language preference, translating the speech input into a translated speech input corresponding to the preferred languages for each of the one or more groups prior to sending the speech input; and sending the translated speech input to each communication device of the one or more groups.

345.    Orion Labs or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of one or more claims of the '130 patent.

346.    Since at least the time of receiving the original complaint in this action, Defendant has also indirectly infringed the '130 patent by inducing others to directly infringe the '130 patent.    Defendant has induced distributors and end-users, including, but not limited to, Defendant's employees, partners, contractors, or customers, to directly infringe, either literally or under the doctrine of equivalents, the '130 patent by providing or requiring use of the TalkDesk CX Cloud and Copilot Accused Products.    Defendant has taken active steps, directly or through contractual relationships with others, with the specific intent to cause them to use the TalkDesk CX Cloud and Copilot Accused Products in a manner that infringes one or more claims of the '130 patent, including, for example, claim 1 of the '130 patent.    Such steps by Defendant include, among other things, advising or directing personnel, contractors, or end-users to use the TalkDesk CX Cloud and Copilot Accused Products in an infringing manner; advertising and promoting the use of the TalkDesk CX Cloud and Copilot Accused Products in an infringing manner; or distributing instructions that guide users to use the TalkDesk CX Cloud and Copilot Accused Products in an infringing manner.    Defendant has performed these steps, which

1    constitute induced infringement with the knowledge of the '130 patent and with the knowledge

2    that the induced acts constitute infringement.  Defendant has been aware that the normal and

3    customary use of the TalkDesk CX Cloud and Copilot Accused Products by others would infringe

4    the '130 patent.

5        347.    Defendant has also indirectly infringed by contributing to the infringement of the

6    '130 patent.  Defendant has contributed to the direct infringement of the '130 patent by its

7    personnel, contractors, distributors, and customers.  The TalkDesk CX Cloud and Copilot

8    Accused Products have special features that are specially designed to be used in an infringing

9    way and that have no substantial uses other than ones that infringe one or more claims of the '130

10    patent, including, for example, claim 1 of the '130 patent.  The special features constitute a

11    material part of the invention of one or more of the claims of the '130 patent and are not staple

12    articles of commerce suitable for substantial non-infringing use.

13        348.    Defendant had knowledge of the '130 patent at least as of the date when it was

14    notified of the filing of this action.

15        349.    Furthermore, on information and belief, Defendant has a policy or practice of not

16    reviewing the patents of others, including instructing its employees to not review the patents of

17    others, and thus have been willfully blind of Orion Labs' patent rights.

18        350.    Defendant's actions are at least objectively reckless as to the risk of infringing a

19    valid patent and this objective risk was either known or should have been known by Defendant.

20        351.    Defendant's direct infringement of one or more claims of the '130 patent is, has

21    been, and continues to be willful, intentional, deliberate, or in conscious disregard of Orion Labs'

22    rights under the patent.

23        352.    Orion Labs has been damaged as a result of the infringing conduct by Defendant

24    alleged above.  Thus, Defendant is liable to Plaintiff in an amount that compensates it for such

25    infringements, which by law cannot be less than a reasonable royalty, together with interest and

26    costs as fixed by this Court under 35 U.S.C. § 284.

27        353.    Orion Labs has suffered irreparable harm, through its loss of market share and

28    goodwill, for which there is no adequate remedy at law.  Orion Labs has and will continue to

1    suffer this harm by virtue of Defendant's infringement of the '130 patent. Defendant's actions

2    have interfered with and will interfere with Orion Labs' ability to license technology. The

3    balance of hardships favors Orion Labs' ability to commercialize its own ideas and technology.

4    The public interest in allowing Orion Labs to enforce its right to exclude outweighs other public

5    interests, which supports injunctive relief in this case.

**JURY DEMAND**

6

7    354.    Orion Labs hereby requests a trial by jury on all issues so triable by right.

**PRAYER FOR RELIEF**

8

9    355.    Orion Labs requests that the Court find in its favor and against Defendant, and

10    that the Court grant Orion Labs the following relief:

11    (a) Judgment that one or more claims of each of the Asserted Patents has been

12    infringed, either literally or under the doctrine of equivalents, by Defendant

13    or others acting in concert therewith;

14    (b) A permanent injunction enjoining Defendant and its officers, directors, agents,

15    servants, affiliates, employees, divisions, branches, subsidiaries, parents, and

16    all others acting in concert therewith from infringement of the Asserted

17    Patents; or, in the alternative, an award of a reasonable ongoing royalty for

18    future infringement of said patents by such entities;

19    (c) Judgment that Defendant accounts for and pays to Orion Labs all damages to

20    and costs incurred by Orion Labs because of Defendant's infringing activities

21    and other conduct complained of herein;

22    (d) Judgment that Defendant's infringements of the Asserted Patents be found

23    willful, and that the Court award treble damages for the period of such willful

24    infringement pursuant to 35 U.S.C. § 284;

25    (e) Pre-judgment and post-judgment interest on the damages caused by

26    Defendant's infringing activities and other conduct complained of herein;

27    (f) That this Court declare this an exceptional case and award Orion Labs its

28    reasonable attorneys' fees and costs in accordance with 35 U.S.C. § 285; and

1      (g) All other and further relief as the Court may deem just and proper under the

2          circumstances.

Dated: <u>July 14, 2025</u>          Respectfully submitted,

*/s/ James F. McDonough, III*

James F. McDonough, III (GA 117088) *
**ROZIER HARDT MCDONOUGH PLLC**
659 Auburn Avenue NE, Unit 254
Atlanta, Georgia 30312
Telephone: (404) 564-1866
Email: jim@rhmtrial.com

Ryan E. Hatch (SBN 235577)
**HATCH LAW P.C.**
13323 W. Washington Blvd., Suite 302
Los Angeles, CA 90066-5164
Telephone: (310) 279-5076
Facsimile: (310) 693-5328
Email: ryan@hatchlaw.com

Attorneys for **Plaintiff ORION LABS TECH, LLC**

\* Admitted *pro hac vice*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this day a true and correct copy of the foregoing document was filed electronically using the Court's ECF system.  As such, this document was served on all counsel who are deemed to have consented to electronic service.

Dated: <u>July 14, 2025</u>

By: */s/ James F. McDonough, III*

James F. McDonough, III

## **List of Exhibits**

A.  Evidence of Use of Infringement Regarding U.S. Patent No. 10,110,430

B.  Evidence of Use of Infringement Regarding U.S. Patent No. 10,462,003

C.  Evidence of Use of Infringement Regarding U.S. Patent No. 10,897,433

D.  Evidence of Use of Infringement Regarding U.S. Patent No. 10,924,339

E.  Evidence of Use of Infringement Regarding U.S. Patent No. 11,127,636

F.  Evidence of Use of Infringement Regarding U.S. Patent No. 11,258,733

G.  Evidence of Use of Infringement Regarding U.S. Patent No. 11,328,130