**EXHIBIT15**

1                    UNITED STATES DISTRICT COURT

2                    NORTHERN DISTRICT OF CALIFORNIA

3       Before The Honorable Virginia K. DeMarchi, Magistrate Judge

4

5   ORION LABS TECH, LLC,            )
                                     )
6            Plaintiff,              )
                                     )
7   vs.                             )   Case No. C 25-05045-VKD
                                     )
8   TALKDESK, INC.,                  )
                                     )
9            Defendant.              )
    _____)

10

11                                  San Jose, California
                                    Tuesday, December 9, 2025

12

13      TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
              RECORDING 9:58 - 11:32 = 1 HOUR, 34 MINUTES

14

15  APPEARANCES:

16  For Plaintiff:
                                Rozier Hardt McDonough PLLC
17                              659 Auburn Avenue, Northeast
                                Unit 254
18                              Atlanta, Georgia 30312
                            BY: JAMES F. MCDONOUGH III, ESQ.
19

20  For Defendant:
                                Fish & Richardson
21                              222 Delaware Avenue
                                17th Floor
22                              Wilmington, Delaware 19801
                            BY: TAYLOR M. REEVES, ESQ.
23

24           (APPEARANCES CONTINUED ON THE NEXT PAGE.)

25

2

APPEARANCES:  (Cont'd.)

For Defendant:
                              Fish and Richardson PC
                              1717 Main Street
                              Suite 5000
                              Dallas, Texas 75201
                         BY:  DAVID B. CONRAD, ESQ.

Transcribed by:          Echo Reporting, Inc.
                         Contracted Court Reporter/
                         Transcriber
                         echoreporting@yahoo.com

3

1  <u>Tuesday, December 9, 2025</u>                                    <u>9:58 a.m.</u>

2                          P-R-O-C-E-E-D-I-N-G-S

3                              --oOo--

4       (Call to order of the Court.)

5          THE CLERK:  Calling Case 25-CV-05045-VKD, Orion

6  Labs Tech, LLC versus TalkDesk, Inc.

7       Counsel, if I can have you please state your

8  appearances for the record, beginning with the Plaintiff.

9          MR. MCDONOUGH:  Good morning, your Honor.  My name

10 is James McDonough, on behalf of the Plaintiff.

11         THE COURT:  Okay.  Good morning.

12         MS. REEVES:  Good morning, your Honor.  My name is

13 Taylor Reeves.  I'm here with my colleague, David Conrad,

14 and we represent the Defendant.

15         THE COURT:  Okay.  Good morning.  And you'll see

16 we have no court reporter in the courtroom, so it's

17 important that you stay seated at counsel table in order to

18 argue, and speak into the microphone so we can make a good

19 recording.

20      All right.  So this is a hearing on the Defendant's

21 motion to dismiss on the ground that all seven patents are

22 ineligible for patenting, and so I will hear from TalkDesk

23 first.  I understand everybody has some presentations that

24 they would like to share with me.  That's fine, but I do

25 have some questions at the outset that I'd like to highlight

4

1  for you all, and so you might want to tailor your

2  presentation to the things that -- at least that I'm

3  flagging I'm interested in.

4      So, first, for TalkDesk, I'm interested in the issue of

5  the representative claims.  I feel like that's kind of a

6  threshold issue we need to deal with, and, as I read the

7  papers, I read the motion as challenging all claims and all

8  patents.  Is that correct?

9          MS. REEVES:  Yes, your Honor.

10         THE COURT:  Okay.  And so the argument is, is that

11 all claims in all patents are directed to an intelligent

12 agent or a bot that can perform services within group

13 communications, and there are some different formulations of

14 that, but that's essentially what the argument is, that

15 that's the abstract idea.  These are all -- in all of the

16 patents, they're all essentially method claims.  Some are

17 computer-readable storage, but essentially method claims,

18 and so the formulation at this highest level, for lack of a

19 better word, does not sound very "method-y."

20     And so one of the challenges I have is, I'm worried

21 that the formulation of the abstract idea and the focus on

22 claim one of the '430 patent -- it's a bit of a stretch to

23 say that claim one of the '430 patent is representative of

24 what is essentially 140 claims across seven patents, with

25 five different patent families.  I mean, that's sort of -- I

5

1  mean, I know you have a structure, right, claim one, '430,

2  and then here are the differences, but it's sort of

3  challenging to apply that framework, I think, under the case

4  law.

5      So I'd like you to address the representative claim

6  issue, and, of course, the Plaintiff pushes back on the

7  representativeness of claim one of the '430 patent.  So

8  that's kind of my -- I'm sort of laying it out, like, what

9  my concern is.  So, if you could start there, I'd appreciate

10  it.

11         MS. REEVES:  Yes, your Honor.  May it please the

12  Court.  We did submit, and we do believe, that claim one of

13  the '430 patent is the representative claim, because, when

14  claims are substantially similar and linked to each other

15  for the same abstract idea, analyzing representative claims

16  is proper, and we see this in the federal circuit, <u>Cleveland</u>

17  <u>Clinic Foundation</u> and <u>Contact Extraction</u> (phonetic).  <u>Alice</u>

18  (phonetic), too, had -- if I remember correctly, invalidated

19  over 200 claims, with just two representative claims across

20  four patents.

21      So it is certainly possible to look over multiple

22  families and at this, you know, level of claims, and as long

23  as they are substantially similar to one another, you can

24  view them as representative, and they're all directed to the

25  same general field of adding, the method of adding an

6

1  intelligent software agent or bot into the communication

2  groups.  Really it's just adding a computer to a group chat,

3  so that humans aren't there anymore, and a computer can

4  perform these mundane tasks.

5      Now, Orion does try and group them into four different

6  categories.  We can see this on slide five, that they have

7  this breakdown of intelligent agents, and then the rest of

8  the patents are relating to bots, right?  And the bot

9  messaging patents, those bots will do various tasks, and

10 then the bot for the '733 patent will to transcription.  The

11 bot for the '130 patent will do translation.

12     And if we look to slide six, we see in the '430 patent

13 that, whether you call it an "intelligent agent" or a "bot"

14 or "robotic assistant," they're all similar terms that are

15 used herein.  So, with the --

16         THE COURT:  I agree.  I agree, "intelligent

17 agent," "bot."  You know, you've made the case.  Like, okay.

18 Maybe I can consider those substantially similar.  But, if

19 we look at what's called the "bot messaging patents"

20 category, these are the not related in the patent

21 prosecution sense, but they're related in their subject

22 matter sense, I grant you.  So that's the '433 and the '636.

23     Here Orion says what these are focused on are technical

24 improvements to bot technology.  Okay?  At least that's how

25 I understand their papers.  I'll let Mr. McDonough

7

1  elaborate.  But one improvement is enabling interaction

2  between user nodes and bots using general voice libraries,

3  and the other is enabling group messaging services to

4  interact with both user-oriented bots and group-oriented

5  bots using bot-specific voice libraries.

6      So it's not enough to just say, "Well, they both have

7  things like an intelligent agent, which is like a bot."

8  Okay.  Yes, they do but then I think the argument against

9  the representative claim issue is this alleged improvement

10 in bot technology in these bot messaging patents.

11          MS. REEVES:  Okay.  To that, your Honor, we would

12 say that they are not improvements to the bot technologies

13 themselves.  They are referencing, you know, these black box

14 modules, and a specification does not go into detail on how

15 there is an improvement to the bot technology.  So let's

16 look at the -- you know, the '433 patent, one of these bot

17 technologies.  If we look at -- I believe it's figure 10,

18 right?

19          THE COURT:  Okay.

20          MS. REEVES:  It's going to talk about the --

21          THE COURT:  Let me get there.  Let me get there.

22          MS. REEVES:  Sure.  Sorry.

23          THE COURT:  Hang on.  You're ahead of me.  Okay.

24 Figure 10.  Yes.

25          MS. REEVES:  So we see the user nodes, and we see,

8

1  okay, that it's using the group messaging service.  We're

2  talking to a voice library, speech to text, natural language

3  unit.  But then, if we actually look at the specification,

4  we don't get a lot of clarity on what these are, and it's

5  because, you know, they don't really need it.  It's just the

6  bot being able to translate something, and being able -- or

7  to get something through translation and then translate

8  something back.  It's just a way to speak to the bot that

9  you added to the group messaging service.

10       So, if we look at, for example, this enhanced text,

11 right, this way of communicating with the bot, if we look at

12 12, 64 through 67 --

13            THE COURT:  I'm sorry.  Line -- column 12, line --

14            MS. REEVES:  Column 12, and then 64 through 67.

15 Right?  The definition we have here for "enhanced text" is

16 "Clarified and simplified from text 912 into a form more

17 suitable for presentation to a bot to execute."

18            THE COURT:  Okay.  So, you know, it may be that

19 you have a good argument that this is an abstract idea, et

20 cetera, et cetera, but, focusing on the representative claim

21 issue, can I really properly consider claim one of the '430

22 patent essentially a representative claim for whatever

23 claims appear in the '433 and '636, or should I be looking

24 at a claim or claims of each those patents as representative

25 of each of those patents?

9

1    So that's really the focus that I'm -- the sort of

2  threshold issue that I'm sort of harking on at the outset,

3  and in the Plaintiff's opposition, the argument essentially

4  is, is like "All claims are patentably distinct.  Therefore,

5  all of them -- none of them are representative.  All of them

6  are, you know, unique."

7    So what is the counter to that, if you have one?  In

8  other words, are there independent claims of each of the

9  '433 and '636 that I should be looking at if I find that

10  it's not sufficient to just rely on claim one of the '430 as

11  essentially the, like, mother representative claim?

12        MS. REEVES:  Yes.  So, when it comes to the

13  representative claim, I think we would still say, you know,

14  even if it is describing more of the mundane tasks that the

15  bot does, we still believe that it's -- you've added the

16  bot.  However -- and, you know, our briefing does go through

17  claim one of the '433 patent.  You can also look to that as

18  a representative claim of the bot messaging patents.  We

19  believe that you would come to the same conclusion, that

20  it's the abstract idea of translating to a bot, and the bot

21  translating back the response.

22        THE COURT:  Okay.  So claim one of the '433, and

23  then, if I look at the '636, is there a representative claim

24  of this patent that you would call my attention to if I find

25  that the claim one of the '430 is not really sufficiently

10

1  representative?

2        MS. REEVES:  We would argue the bot messaging

3  patents can be certainly viewed in the same way.  Even

4  Orion's briefing discusses them in the same way, and they

5  make the same citations.  So, for the '636 patent, we would

6  again argue, like, the '433 patent would be certainly

7  sufficient.  However, if -- claim one, I believe, is the one

8  that they reference in their complaint.  That would also be

9  one that you could look at, and then, you know, we could

10 discuss the other claims.  But the independent claims are

11 not, you know, remarkably different from one another, and

12 claim one would be sufficient there.

13        THE COURT:  Okay.  The parties -- and I see how

14 this could happen -- sometimes confuse, I think, '430 and

15 '433.  I think I figured out what you actually mean, but

16 sometimes there's a transposition of the numbers in the

17 briefing.  So I think I got it.

18    So, okay.  Thank you for that.  I didn't want to

19 interrupt the flow of your argument, but, if you'd like to

20 address the representative claim issue for the other two

21 patents that are kind of on their own, the transcription bot

22 patent and the translation bot patent, '733 and '130, I'm

23 happy to hear about those, as well.

24        MS. REEVES:  So, for the '733 and the '130, we do

25 submit that the '430 patent, claim one, because it's also

1  still talking about adding bots for group messaging -- and,

2  actually, there's a slide, and I wish I put the numbers, but

3  slide 12.

4          THE COURT:  Okay.

5          MS. REEVES:  The complaint itself admits that the

6  focus of the claims are the same.  So, if you look to

7  paragraph 38, it says the advances of the '430 patent in

8  these critical and vital contexts are that the addition of

9  the bot is immediate, fully functional, not limited to

10 the availability of humans, and it doesn't get tired, and

11 those are the same advances that they list for the '130

12 patent.

13         THE COURT:  I see.  Okay.  And similarly for the

14 '733?

15         MS. REEVES:  Right.  For the '733 patent, that's

16 discussing the use of bots for transcription, specifically,

17 but, still, the focus of these is the benefit over having a

18 human do it.

19         THE COURT:  Okay.  All right.  Thank you.  I'm

20 going to just flag some of my other questions, and then I'm

21 going to let you do what you want to do with the rest of

22 your presentation.

23     The expert declaration which is attached to the first

24 amended complaint, may I consider it, and, if so, for what

25 purpose?  In my experience, at least in patent cases, this

12

1  is somewhat unusual.  Maybe it's a new trend to have an

2  expert declaration attached to a complaint, and I know you

3  argue about the conclusory nature of the declaration, but am

4  I permitted to consider it under Rule 12 in the first

5  instance?

6       Ordinarily I wouldn't -- so here's my thinking, to not

7  be opaque about it, is ordinarily I get a motion to dismiss,

8  and I wouldn't look at any declarations of any kind, but

9  this declaration is an attachment to the complaint.  So,

10  okay.  Must I consider it?  Do I have to consider it?

11  Should I consider it?

12            MS. REEVES:  One moment, your Honor.

13            THE COURT:  No, it's okay.  Take your time.

14            MS. REEVES:  So, in our briefing, at 21, we argue

15  that it shouldn't be considered, because it's not really a

16  proper written instrument, and, you know, the motion, the

17  complaint, should be able to stand on its own without expert

18  testimony.

19       However, you know, what we're finding more and more

20  is -- you know, this case was filed in the Eastern District

21  of Virginia, and we filed, you know, the motion to dismiss

22  under 101, or, in the alternative, we said that it was an

23  improper venue, and then there was the transfer, which meant

24  that TalkDesk knew that we were making this argument, and

25  so, in its amendment, it also included the declaration.

13

1    When reviewing the declaration, you know, all of these

2 new facts are, we would argue, conclusory, that they go

3 towards novelty, which is not the argument here for

4 eligibility.  So our argument is that it shouldn't be

5 considered.  It's not a proper written instrument under

6 12(c).  But, even if your Honor does consider it, which

7 judges have in the past, it shouldn't change the analysis,

8 because there's nothing here that gets to the technical

9 advances that are made in the patents themselves.

10        THE COURT:  What do you mean, there's nothing that

11 "gets to the technical advances"?

12        MS. REEVES:  The advances that the declaration

13 discusses about the patents similar recite that it's -- the

14 benefit of the patents is having a robot do something

15 instead of a human.  So we find, when going through the

16 declaration, that they're reciting a lot of what is in the

17 complaint, that they are reciting a lot of what is in the

18 patent specifications themselves, and we don't hear about

19 how difficult it is to add bots on the back end.

20    We don't hear about the telecommunications.  We don't

21 hear about the difference between having, like, cellular

22 AT&T conversion versus something like legacy.  That's not

23 something that the declaration gets into, and for that

24 reason, whether your Honor chooses to consider it or not, it

25 doesn't get to the part of the 101 argument, which is, what

14

1 technical improvements themselves were made?

2        THE COURT:  I see.  Okay.  Thank you for that

3 clarification.  Now I'll let you argue whatever you'd like

4 to argue in support of the motion.

5        MS. REEVES:  Okay.  The last thing I'll say, too,

6 about the representative claims is, we've made our argument

7 in our briefing that the '430, claim one, talks about the

8 addition of a patent to group messaging, and that's what all

9 of the patents get to.

10    Once we make that argument, the federal circuit, <u>Mobile</u>

11 <u>Acuity</u>, says that the burden shifts to the plaintiff owner

12 to present non-frivolous arguments as to why the eligibility

13 of the identified representative claim cannot be fairly

14 treated as decisive, and we'll note that specifically, with

15 the dependent claims, there's no real argument in their

16 briefing to that effect.

17    They'll make a, you know, statement that also dependent

18 claims have additional limitations, and then, in a footnote,

19 they'll recite the dependent claims and what they do.  So we

20 would submit that, with the burden shift, Orion failed to

21 make a proper argument, and specifically with the dependent

22 claims.

23        THE COURT:  So what is the consequence of that for

24 the Court?  Because I've been wondering about this issue,

25 not just in this case but in another case I have.  So one

15

1 party makes an argument for representativeness.  The other

2 party maybe doesn't address it.  I'm not saying this is what

3 Orion has done, necessarily, but the other party doesn't

4 really address it, doesn't make the showing, and yet it's a

5 question of law, presumably, for the Court.

6      I look at it.  If I don't think it's representative, or

7 representative to the extent the party is arguing for, must

8 I nevertheless find in that party's favor, or do I have the

9 authority to say, "Look.  X is not representative of Y in

10 this respect," even if the patent owner has not made that

11 argument?  I suspect that the answer is yes, I can, but the

12 patent owner will have forfeited whatever argument it might

13 otherwise have made.  So, anyway, up to me.

14           MS. REEVES:  Yes.

15           THE COURT:  I'd like to know your views, because I

16 haven't seen a case that really addresses that issue.

17           MS. REEVES:  I think we would view it as the

18 patent owner waives that argument, and that would be the way

19 that we would look at it.

20           THE COURT:  Okay.  That was my take, as well.

21 Thank you.  Okay.  Please continue.

22           MS. REEVES:  So I'll just -- I'll go through,

23 quickly, the Alice steps, if that works for your Honor.

24           THE COURT:  Please.  Yes.

25           MS. REEVES:  So what we look at is what the claim

16

1  is directed to, and we evaluate the focus of the claimed
2  advance of the prior art to determine whether the character
3  is patent eligible, so that's going to be <u>Trinity Info</u>
4  <u>Media</u>, at Fed. Cir. 2023, and what these are talking
5  about -- and we'll talk about the '430 patent.  We can talk
6  about the '433, but it's talking about replacing a human,
7  right?  Claim one automates well-known human activity with a
8  human assistant.
9      We can look at slide 13.  This is in our briefing, as
10 well, but this is what is, you know, really claimed, so this
11 is the '430 patent, and it talks about, you know, method of
12 having a group communication.  Let's say we're all in a
13 group communication, and we would like to have a court
14 reporter, right?  And so, you know, we ask -- I'm not sure
15 what this is being done through, but it may be Skype or
16 something, and we say that we would like to add the court
17 reporter.  So the service technician adds one.  The court
18 reporter gets on the call, and then it transcribes our
19 conversations, and in those cases, that's a human doing it.
20     Actually, in this case here, and then what the patents
21 are claiming, it would be a robot doing it, but it's
22 something that humans can and historically have done, and,
23 again, the focus that they're making is that having
24 something like this is easier because maybe a court reporter
25 wasn't available today.  Maybe a court reporter did a trial

17

yesterday, and so they might be mistyping things because

they're tired, and this is the alleged benefit over that,

and Orion itself admits that the prior art -- the advance

over the prior art is the removal of the labor.

The patents also mention that as well, if you look at

slide 14, when it talks about the technical background in

the '430 patent.  You know, when people are busy performing

other tasks, and currently holding a phone at the same time,

they're just not as good at doing these mundane tasks.

And then slide 15, this is from their -- from Orion's

complaint, that, you know, the problem that's being solved

were the problems that were the result of the human

condition.  So that's the focus over the prior art claims,

and that's why we can confidently say that it's directed to

an abstract idea.

So, then, if we turn to step two, the inventive concept

under Alice, there is nothing in the claims understood in

light of the specification that requires anything more than

off-the-shelf convention technology, and that's going to be

Electric Power Group, Fed. Cir. 2016.

So, if we look at figure two of the '430 patent, which

I believe I also have here on the last slide -- or the

second-to-last slide -- okay.  Different black boxes.  So

the intelligent agent that we're talking about here, 230,

just has these collection of modules, things that the

18

1  intelligent agent can do, whether it audits, records, has a

2  security model or an assistant module.  There's no

3  indication of the internal workings here.  It just say that

4  that a bot is able to hold and be able to do these certain

5  things.

6       And then we can go through, if we look at voice

7  recognition module, assistant module.  It's not the patent's

8  claims or Orion's claims that they invented these modules.

9  These are modules that have existed that a person of

10 ordinary skill would understand.

11          THE COURT:  And I get that from the specification,

12 right?

13          MS. REEVES:  Yes.

14          THE COURT:  Okay.

15          MS. REEVES:  Yes.  So, if we look at, you know,

16 for example -- I think it's at the '430 patent, eight, 28

17 through 31 -- that's going to talk about the voice

18 recognition module, and it's not very long.  It just says,

19 you know, essentially, that if you can talk to it, it talks

20 back.

21      Now, Orion, when it points to the specification, it

22 points to how software can transform a general computer to a

23 special-purpose computing system, but that's not enough.  It

24 doesn't show us how it's able to do that.  And in <u>Electric</u>

25 <u>Power</u>, you know, the claims called for the performance of

19

1  this information collection and analysis, and it was on a
2  set of generic computer components.  The same is true here,
3  right?  Orion itself admits in its opposition -- on page
4  five, it will say:
5          "The intelligent agent systems disclosed
6          by the patents comprise a processing
7          system and a communications system."
8      And it's citing to the '430 patent, seven, 17 through
9  18, and then it will say:
10          "The processing system includes a user
11          interface system, process circuitry, and
12          a storage system."
13      This is a recitation of generic conventional computer
14  components, and that's what we get about the internal
15  workings.  Now, Orion, in its responsive brief, argues that
16  the critical and vital advances of the patents are that the
17  addition is immediate, no matter the circumstances, that
18  it's always functional, that the capability is not limited
19  to available humans, and they're never fatigued or
20  distracted.  These are not the technical improvements that
21  we need to be looking for, as told by Alice and by Electric
22  Power Group.  It just explains that adding a computer is
23  using that computer as a tool.
24      Now, Orion did not come up with bots or intelligent
25  agents.  They don't claim to, and that's clear in the

20

1  specification.  If we look at, for example, the '433 patent,

2  at one, 14 -- starting at one, 14, that's the technical

3  background, talking about Amazon's Alexa and Google's

4  Cortana, right, well-known bots that did things like

5  transcription and looking things up for us on the Internet,

6  and telling us what the weather is when we ask.

7      So, you know, the takeaway here is the alleged

8  advancement is not the improvement to bot technologies.  The

9  claims are directed to using a bot to perform a task that,

10  if we take their complaint as true, had maybe not been

11  automated prior to March of 2015, but, even assuming that

12  that's true, being the first to use a computer as a tool to

13  automate something is not patent eligible.

14          THE COURT:  So let me just pause you there.  So I

15  think the arguments that you've made are persuasive on the

16  family of patents that includes the three related to the

17  '430 patent.  I got you.  The ones where it's, I think, a

18  little bit harder are the other two, '433 and '636, where

19  there is an argument, at least, that there is an improvement

20  to the kind of interaction between bots, general-purpose

21  bots, user-specific bots, doing this in a group

22  communication, that that's the advance.

23      I'm with you that, like, having an intelligent agent

24  immediately available who doesn't get tired just sounds

25  like, well, a computer can do things better than a human,

21

1 just the same things that humans do, but better.  Okay.  Got

2 you there on that argument, but if you could focus your

3 argument about the -- you know, the whole <u>Alice</u> analysis, on

4 the '433 and '636 and the alleged advances there, that would

5 be most helpful for me.

6          MS. REEVES:  Okay.

7          THE COURT:  So I just wanted to clue you in to

8 that, that concern.

9          MS. REEVES:  Sure.  So our argument there is, you

10 know, the '433 patent and the '636 patent walk us through

11 how to translate between a human and a bot, and that's still

12 an abstract idea.  Even if they're taking more steps to say,

13 "We would like the bot to do something," and it's not using,

14 maybe, the more general language that we find in the

15 intelligent agent patents, they're still incredibly --

16 they're still logical steps that are not an improvement to

17 the technology itself.

18      So this is just how translation works, right?  We're in

19 a group communication, and then some of us speak German and

20 some of us speak English, we'll say, and, you know, I want

21 to -- "Receiving the group-managed plurality."  Yes.  So

22 we're receiving a question.  We're selecting the voice

23 library that's appropriate.  So, if I'm speaking English,

24 we're going to pick the voice library that's English to

25 German.

22

1    We're going to process my question through that library

2    to say -- to see what I was saying, and then we're going to

3    send, quote, that "enhanced text" to the bot.  So, whether

4    the bot is speaking enhanced text or whether I'm talking to

5    someone else who speaks German, now they're getting my

6    question, but we've translated it through the voice library,

7    so now they're getting that question in German, and then we

8    will receive the response from the bot, or for the person

9    that's speaking German.  I mean, these -- this is how

10   translation has to happen.  My voice, my question, needs to

11   be translated in a way that the person that I'm asking can

12   be understood, and then --

13           THE COURT:  Let's assume a group with multiple

14   different languages, right?  That's what the premise of the

15   patent is, is they are -- in this example, there's multiple

16   different languages being spoken.  So, yes, we've had Google

17   Translate for a while, but this is a particular context

18   where it has to be done in real time, and you have to deal

19   with multiple different languages being spoken by different

20   people in the group, and needing to be understood by the

21   group collectively.  So novelty may be, in some ways,

22   neither here nor there at this first step.  Is it abstract?

23   Is it an abstract idea, is what I'm concerned about.

24           MS. REEVES:  Yes, your Honor, because the --

25           THE COURT:  Okay.  And how is it abstract?

23

1        MS. REEVES:  The solution there would be a

2 translator that speaks German and Spanish and English, and,

3 agreed, they would be harder to find, but they would still

4 be able --

5        THE COURT:  But to coordinate -- the method is --

6 I'm sorry to interrupt you, but it's a method of doing this

7 all kind of in real time, right?  That's -- it's not just

8 translation.  It's an alleged method that's claimed, so

9 different steps, right?

10       And so this is where I reacted somewhat skeptically to

11 the idea that saying all claims and all patents are directed

12 to the use of a virtual agent, a virtual intelligent agent

13 or bot, in group communications.  It didn't really do

14 justice to kind of the distinctions between and among the

15 patents, and didn't really capture the methodness of, say,

16 for example, claim one of the '433.  It's not really

17 describing the method at all.  It's just "Here's a scenario

18 where we have intelligent agents or bots in a group

19 communication."

20       So I'm looking for the formulation of how -- what is

21 the alleged abstract idea of this claimed method?  How would

22 you formulate it?  Does that make any sense?

23       MS. REEVES:  Yes, your Honor.

24       THE COURT:  I mean, I'm sorry to ask you that on

25 the fly, but that was the -- that's the challenge I have.  I

24

1  need to have that first, before I can make an assessment of

2  the Alice step one, step two.

3          MS. REEVES:  So, in our brief -- I think it's page

4  14 -- we have a collection of cases that talk about how

5  translation, on its own, is a tale as old as time, and just

6  the method of translation, the -- my voice needing to go

7  through a translator, to be spoken in a different language,

8  and then having, you know, the answer, whatever, translated

9  back to me is an abstract idea.

10      So we reference Novo Transforma Technologies, so, you

11  know, holding that the patent translated between two

12  different computer formats for electronic delivery.  That

13  was the abstract idea of translation.  The same for

14  Messaging Gateways, holding that translated messages between

15  SMS text format and Internet protocol format was also the

16  abstract idea of translation.

17      Yes, it is harder to translate with a group.  The UN

18  has been doing it for a long time, and a lot of that is, you

19  know, real-time translation, and, you know, my understanding

20  is that there are different translators that have different

21  abilities that, you know, translate in real time as quickly

22  as they can and back, and I'm sure that they are very hard

23  to find, and I'm sure that they get very tired, but that

24  practice of translating in a group of people that speak

25  multiple languages, and they make these same steps that the

1   '433 patent, claim one, is talking about.

2         THE COURT:  So the argument really is, even in

3   these two bot messaging patents, '433 and '636, it's really

4   just a computer is better than a human at doing these basic

5   things like translation -- not basic, but human things like

6   translation, or transcription, or whatever you may have?

7         MS. REEVES:  Yes.  So the voice library to

8   enhanced text is translation to a bot and back, but it's

9   still the abstract idea of translation, and yes, there is

10   availability with a voice library that it can quickly sift

11   through, "This person is speaking Spanish.  We'll get the

12   Spanish translator, and, you know, we'll make sure that

13   everyone can hear it in their own languages."  It is

14   automated.  It is faster.  Maybe it's novel, but it's still

15   the abstract idea of people have been speaking different

16   languages for a long time, and they need to communicate with

17   each other sometimes in one room.

18         THE COURT:  So doing the --

19         MS. REEVES:  These are the steps --

20         THE COURT:  Doing the UN on computer.  Okay?

21         MS. REEVES:  Yes.

22         THE COURT:  Okay.  Got it.  Thank you.

23         MS. REEVES:  And I'm happy to answer any other

24   questions that your Honor has, but I would say, you know,

25   the patents all get to adding a robot to do things better

26

 1  than humans.  The specification doesn't give us an inventive

 2  step, and, for these reasons, we ask that you grant the

 3  motion for 101.

 4          THE COURT:  Okay.  Thank you very much.

 5      Let me turn to Orion, and I'm happy to let you respond

 6  to any argument that you heard from TalkDesk, but I do have

 7  a couple questions that I'd like to raise, which I hope will

 8  be helpful in guiding the argument.

 9      If we focus on the intelligent agent patents, the '430,

10  the '003, and the '339, that first group, it does appear to

11  the Court that all of them seem to have the same three

12  pieces in all of the claims.  They receive instruction, the

13  intelligent agent receives instructions.  There's an

14  instantiation of the intelligent agent.  It's configured to

15  perform various services, and those are described as

16  "Auditing, recording, transcription, and other."

17      And if I look at -- you know, that's pretty functional

18  claiming, if I may, and if I look at the description in your

19  brief about what you think is the advance being claimed on

20  behalf of Orion, it's the instantiation -- I'm looking at

21  page nine of the opposition:

22              "The claims of the intelligent agent

23              patents are directed to a specific

24              improvement in computer functionality,

25              namely, the instantiation of an

1                intelligent agent to provide specific

2                services to a communication group,

3                pursuant to software algorithms and

4                process descriptions described in the

5                specification, et cetera, et cetera."

6        But, when I look at the description of what is actually

7    those advances, at page five, those are pretty consistent

8    with the argument that the TalkDesk folks have made, namely,

9    it's immediately available, it's always fully and

10   immediately functional -- this is the intelligent agent.

11   The capabilities aren't limited by human -- you know, human

12   constraints, and it's never tired or distracted.  That, to

13   me, reads very clearly like "Do stuff that a human can do,

14   with a computer which is better."

15       So, I mean, even the argument Orion makes on its own

16   behalf in the papers, I think, supports the argument that

17   these are abstract ideas, or an abstract idea claimed across

18   these three patents.  So that's -- you know, that's really

19   my principal concern about those three patents, and it would

20   be helpful if you could address that issue first.

21            MR. MCDONOUGH:  Sure, your Honor.  I appreciate

22   your time this morning.  So I think, if we could --

23            THE COURT:  I know you have a presentation, as

24   well.  If you need to refer me to it --

25            MR. MCDONOUGH:  Yes.  I'm trying to see if I -- I

28

1  think I have a slide that may help me speak to this, and

2  that would be 26 -- 27, slide 27.

3          THE COURT:  Okay.

4          MR. MCDONOUGH:  Okay.  And so I think -- so, as --

5  a threshold point I'd like to make is, just because

6  something can be done by a human, or is designed to address

7  issues with the human condition, does not make it abstract,

8  right, because --

9          THE COURT:  Of course.

10          MR. MCDONOUGH:  -- if that were the case, I could

11  say that a lightbulb is abstract as an invention, because I

12  could have lit a candle instead, which was a way of manually

13  doing it.  Instead, I've automated it, and now I'm doing

14  it --

15          THE COURT:  I mean, look.  A sewing machine.  A

16  human can sew, but a sewing machine does it better.  Okay.

17  So a sewing machine is not an abstract idea.  Got it.  But I

18  think that there's -- the human brain is limited, and a

19  computer is better at computing, doing the things that are

20  needed to be done by the human brain.  That's where we are

21  right now, is when it's "Do these things on a computer."

22  That's the classic abstract idea problem.  And so your

23  papers seem to suggest that yes, that's what these patents

24  are about, these three.  So I'm sorry.  I interrupted you.

25  I'm on page -- or slide 27.

29

1          MR. MCDONOUGH:  Sure.  No problem.  So I
2    understand that.  So I guess I was taking it from one level.
3    That's an extreme example, the lightbulb, right?  I agree.
4    And then there's the example of an actual physical robot,
5    right, which, under the reasoning, if you were to say,
6    "Well, you know, a computer can do it better.  This robot
7    can work 24 hours a day, doesn't need food, doesn't need
8    sleep, just needs power," again, while an extreme example, I
9    think no one would say that robotic technologies are not
10   patentable.
11       If you draw down to where we are now, we're talking
12   about bots, right?  We're talking about virtual bots, and at
13   the time -- so we've heard a lot about -- and I'm just --
14   this is the precursor to answering your question directly.
15   I'm not trying to avoid it.  The '433 patent is being used
16   here as -- it mentions, I don't know, 300 times the word
17   "bot."  This is the second set of patents in the --
18          THE COURT:  Okay.  Just to be clear, I was asking
19   about the first three.
20          MR. MCDONOUGH:  Yes, yes, yes.
21          THE COURT:  Okay.  All right.  Got it.
22          MR. MCDONOUGH:  And I'm just -- and this is where
23   I'm going.  So, as of 2017, I don't think I could argue
24   credibly that bot technology was not convention, because I
25   think it describes it in the spec as conventional, talks

30

1  about Alexa, you know, the different things that were out

2  there at the time.  However, when the first three patents

3  were -- the prior date for the first three patents that

4  we're talking about now, that was in 2015, two years before.

5      Two years in the technology realm is a lifetime, and if

6  you look closely at the specification of the first three

7  patents, the ones we're talking about here, the intelligent

8  agent patents, they don't describe -- they use the word

9  "bot" one time, "the bot," and a "virtual bot," talks about

10 "virtual robots."  At this time, this technology was not

11 conventional by any means.  It was new, right?

12          THE COURT:  And I even, too -- the conventional,

13 not conventional -- I'm at the abstract idea stage, all step

14 one, so, looking at what's being claimed, right, and looking

15 at the language in the opposition about what the advance is,

16 and the specification makes clear that it's any networking

17 technology, any computer system.  You know, all of the stuff

18 that can be used to implement the method is conventional

19 computer technology.

20     So that's like the foundation, and then there's a

21 method that's claimed, just looking at claim one of the

22 '430, and the argument that's being made, even in the

23 opposition, is just the kind of argument that would be made

24 for any computer program doing something that a human could

25 do.  Like, a calculator can do math faster than a human.

1    So how is this not a calculator or, you know, a program

2  that is doing what a human could do in terms of coordinating

3  calls, or the court reporter example that the TalkDesk folks

4  have offered me?  You know, how is it any different than

5  just saying a computer is faster, doesn't get tired, is

6  always there, always on?  Like, what's the advance?

7            MR. MCDONOUGH:  Understood.  And so that brings

8  me, finally, to slide 27, and I was just trying to lay a

9  little bit of groundwork.

10           THE COURT:  Okay.

11           MR. MCDONOUGH:  And so I think -- you know, I

12  don't think it's just a human condition.  I think it's

13  limitations on what humans can do entirely, right?  And so

14  the way we described it -- and this is in the FAC and

15  referenced in the briefing.  I think part of this was

16  excerpted from the brief.  We talk about -- basically, we

17  argue that these claims are directed to, among other things,

18  the provision of discrete ad hoc services in electronic

19  communication groups, i.e. -- and some examples, and this is

20  what I put in here, one:

21           "That solve problems in intergroup

22           electronic communications that were a

23           result of the human condition, delay,

24           distractibility, fatigue, lack of

25           focus."

32

1      I think these may be some of the things you're talking

2 about, and, two, "Limitations on accessibility and resources

3 to provide ad hoc services due to training or skill set,"

4 and that would be, like, ability to provide voice

5 instructions, security functions, management operations.

6           THE COURT:  What do you mean by "ability," like,

7 competence ability, or what?

8           MR. MCDONOUGH:  Yes.  I mean, I would think it

9 would be competence ability.  It could be someone is not

10 educated to do that.  Certainly, with all these services,

11 there would not be one person that would ever be educated to

12 all these things that --

13           THE COURT:  But that would be like saying there's

14 not one person who speaks, like, all 150 languages that

15 would be necessary to know in order to service a group like

16 the UN, and, I mean --

17           MR. MCDONOUGH:  Right.  I just think, at some

18 point, we can talk about the human -- you know, limitations

19 on humans.  I understand, like, a calculator can add up or,

20 you know, perform some complex calculations much faster than

21 I can, probably.  I can't, probably, do it at all, in my

22 case.

23           THE COURT:  And the person who invented the

24 calculator, that would be great, but, once the calculator is

25 kind of like the background of our world, then you can't

33

1 just say, "We'll do it on a calculator," just like you can't

2 just say, "We'll do it on a computer," right?  So how are we

3 not saying -- how is Orion not saying, for these three

4 intelligent agent patents, "Just do it on a computer"?

5          MR. MCDONOUGH:  Yes.  So, again, I think because

6 it involves what were, I think, at the time just being

7 considered, invented, and used in 2015, and maybe my

8 argument is more focused on step two.

9          THE COURT:  Okay.

10          MR. MCDONOUGH:  Maybe I keep letting it bleed into

11 that.  I apologize.

12          THE COURT:  Actually, before I lose my train of

13 thought on this one, though, you're focusing on the

14 intelligent agent itself, like that was a novel thing, that

15 was something that wasn't conventional.  Is that -- am I --

16          MR. MCDONOUGH:  That's correct.

17          THE COURT:  Okay.  But doesn't the specification

18 describe the intelligent agent as a piece of software,

19 without more?

20          MR. MCDONOUGH:  I mean, it actually says -- it has

21 it somewhere in my briefing.  I'm sure I'm not going to be

22 able to put my finger on it, but it does say exactly what

23 the intelligent agent does.  It's a piece of software

24 that -- I may have to take a second to find that, but

25 there's a cite in the spec on that.

34

1          THE COURT:  So let me --

2          MR. MCDONOUGH:  But it's fairly basic.

3          THE COURT:  Okay.  Yes.  That was my impression,

4   but let me kind of go down this road, also, a little bit

5   more, because one of the arguments that's made at a pretty

6   high level -- it's in your introduction, but not really

7   revisited -- is it would be wrong for the Court to grant

8   this motion without having done claim construction, and

9   without having permitted and received fact discovery.

10      So fill this in on the claim construction piece.  There

11  is no claim construction offered in the opposition for

12  "intelligent agent" or "instantiate" or any of these other

13  terms.  So I just want to make sure I'm really clear on what

14  the argument is.  Is there a construction of "intelligent

15  agent" that you think needs to be addressed regarding the

16  '430 family that matters for the 101 analysis, and, if so,

17  where is that in your papers?

18          MR. MCDONOUGH:  No, I'm not making that argument,

19  your Honor.

20          THE COURT:  Okay.  So --

21          MR. MCDONOUGH:  I don't think there is one for

22  that particular term.

23          THE COURT:  Okay.

24          MR. MCDONOUGH:  I think we focused -- given page

25  limits and a lot of other issues, knowing that this

35

1 particular district is not very favorable to the, you know,

2 "We need claim construction" argument, to be fair, at least

3 based on the case law we've done, it's really -- unless

4 there's something very specific, and there's already a

5 dispute that's been created between the parties, and that

6 wasn't the case here.

7            THE COURT:  I mean, whether it's this district or

8 not, I mean, the Ninth Circuit -- I mean, not Ninth

9 Circuit -- Federal Circuit basically says you have to have

10 articulated a claim construction if you're going to use that

11 as a basis to argue against a 101 decision at the motion to

12 dismiss stage.  So I was looking for that in your papers.

13           MR. MCDONOUGH:  We didn't make a specific argument

14 on that.

15           THE COURT:  Okay.  All right.

16           MR. MCDONOUGH:  Yes.

17           THE COURT:  I appreciate that.

18           MR. MCDONOUGH:  Yes.

19           THE COURT:  Thank you for that clarification.

20           MR. MCDONOUGH:  No problem.

21           THE COURT:  Okay.  So, then, back to the

22 intelligent agent.  It's basic software that is functionally

23 claimed.  Is that --

24           MR. MCDONOUGH:  I wouldn't say it's functionally

25 claimed.

36

1          THE COURT:  You probably don't want to say it's

2 functionally claimed, but what are its particulars?

3          MR. MCDONOUGH:  Again, I guess we're -- it feels

4 like we're walking into claim construction arguments, which

5 we haven't done in this court yet.  I'm not making the

6 argument that claim construction is a precursor for you to

7 make a decision at this point --

8          THE COURT:  Yes.  Okay.

9          MR. MCDONOUGH:  -- but, you know, I wouldn't want

10 to put forth a claim construction on that on the fly, when

11 we haven't briefed it.

12          THE COURT:  Sure.  I understand.

13          MR. MCDONOUGH:  So I apologize.

14          THE COURT:  But is that the -- I'm sorry.  Again,

15 I keep interrupting you, but I'm just trying to focus on --

16 understand your argument.  Is the intelligent agent -- you

17 made this distinction between 2015 and 2017.  Is the

18 intelligent agent the advance?  And, if so, I need to

19 understand what it is.

20          MR. MCDONOUGH:  Sure.  So I think, if we were to

21 look at claim one, for instance, slide 23, I have a -- is

22 that claim one?  I'm sorry, claim seven of the '430 patent.

23          THE COURT:  I'm sorry.  Claim seven?

24          MR. MCDONOUGH:  Yes, it's claim --

25          THE COURT:  Not claim one.  Okay.

37

1            MR. MCDONOUGH:  It's on page 23.

2            THE COURT:  Got it.

3            MR. MCDONOUGH:  So I think, you know, what it's

4   directed to -- again, as a counter to the idea that it's an

5   abstract idea, it is the use of an intelligent agent, which

6   I think we can call it a "bot" now, right?  I think, at the

7   time that these patents were filed, that was not necessarily

8   the name for them, but later, and just for sake of argument

9   here, let's just refer to it as a "bot."  It's basically

10  using the bot in a communication group, right, in electronic

11  group communications, to configure and record and audit

12  those communications on the fly, in real time, and that's

13  really the focus of this independent claim.

14      Now, I do think there's dependent claims that add onto

15  that, you know, including how the agent instantiated, type

16  of member nodes in the communication group, et cetera, et

17  cetera, I think, but, in terms of our argument, it is that

18  this focus of this particular claim is the use of an

19  intelligent agent operating as a -- you know, within a

20  communication group, that instantiates one of those

21  intelligent agent as basically a virtual assistant that can

22  then -- or that then configures -- records and audits the

23  communications that are going on so there's a record of that

24  for later.

25            THE COURT:  So, if we look at claim seven,

38

1 which -- this is the computer-readable storage medium claim.

2 What it's -- what it does -- so there are instructions that

3 cause the thing to receive instructions, instantiate the

4 agent, where the agent is configured to record and audit

5 communications.

6       So, you know, the TalkDesk people say there's not

7 even -- I mean, this one implies a computer, because it's

8 computer-readable medium, but claim one doesn't even imply a

9 computer or specifically claim a computer, but here, is --

10 I'm just trying to get my head around your argument that

11 there's anything more than a computer that receives

12 instructions, instantiates a piece of software -- I'm not

13 even sure I know what that means, except loads the

14 software -- and where the software is configured to record

15 and audit communications.  Like, that's it.

16             MR. MCDONOUGH:  Yes.  No, I agree.  That is it,

17 and I think, again, when "instantiating" means -- at least

18 my understanding of it, from working in the computer space,

19 is just to start running, right, to basically start running

20 a process on the --

21             THE COURT:  Yes, execute, start --

22             MR. MCDONOUGH:  -- yes, on the --

23             THE COURT:  -- fire it up.

24             MR. MCDONOUGH:  Right.

25             THE COURT:  Yes.  Okay.

1          MR. MCDONOUGH:  Yes.  And I agree.  That is what
2  that claim claims, and I think, at the time, right, when
3  bots were not conventional -- I would say the record, I
4  think, demonstrates that it was not conventional at that
5  time.  Certainly there's no evidence that, as of 2015, bots
6  were conventional technology.  I think, at that time, I
7  think this was more than an abstract idea to someone who was
8  skilled in the art.  I guess that's our argument.

9          THE COURT:  But what does claim seven claim that
10  is not conventional?  Like, what -- because you can't just
11  say, "Bots are not conventional."  The claim actually has to
12  claim something that's not conventional and not abstract.
13  We're talking about conventional, the step two stuff, but
14  claim one, what is not abstract about claim one -- sorry,
15  claim seven -- excuse me, excuse me -- claim seven, the one
16  we're looking at right now?

17      So you say bots are not conventional technology as of
18  this time, but what is actually being claimed here that is
19  an advance?  What is -- just using the word "intelligent
20  agent"?  That doesn't seem to be sufficient --

21          MR. MCDONOUGH:  No.  I think --

22          THE COURT:  -- especially if that has no content,
23  right, except software?

24          MR. MCDONOUGH:  So, again, I'm not sure it has no
25  content except software.  I think -- and, again, I'm not

40

1  trying to go down the road of claim construction here.

2          THE COURT:  Yes.  I know you're not.  Yes.

3          MR. MCDONOUGH:  I'm just --

4          THE COURT:  But that makes it challenging, right,

5  because -- just to be clear where I'm going with this, it's

6  like, if "intelligent agent" was something that was novel

7  and had some specific meaning that made it not abstract,

8  then that would be really important for this discussion, for

9  me to know that, but, if it's like "Here's a thing," that's

10 the height of abstraction.

11    Like, replace the word "intelligent agent" with "a

12 thing," with the word "thing."  "Here's a thing that

13 receives instructions, and can record and audit

14 communications in a group."  Like, that's the height of

15 abstraction.

16          MR. MCDONOUGH:  So I think you would replace

17 "intelligent agent" with what we now call a "bot."

18          THE COURT:  Okay.  So I guess one thing that's

19 useful is to understand that Orion views the words

20 "intelligent agent" as essentially equivalent with the term

21 "bot" used in the other patents, like those things -- the

22 Court should not make a distinction between those things?

23          MR. MCDONOUGH:  I don't think there's a meaningful

24 distinction between those things.

25          THE COURT:  Okay.  That's helpful.  All right.

41

1          MR. MCDONOUGH:  I think it's really a verbiage.  I

2  think, like, if you look at the spec of the '430, they talk

3  about the intelligent agent.  They talk about "the bot," and

4  "virtual robot," a couple -- I just don't think there was a

5  uniform term at the time, or at least the patentee didn't --

6  wasn't aware of that, and used "intelligent agent."  I think

7  later, in the later patent applications, they used the term

8  "bot" exclusively.  And so I think it is really just a way

9  to describe what later became termed a "bot," ubiquitously.

10         THE COURT:  Okay.  Thank you for that.  I think it

11 might be helpful for me if we moved on to beyond the '430

12 patent family and talked about some of the other groupings.

13 So the bot messaging patents, '433 and '636, what is Orion's

14 position regarding whether there is a representative claim

15 or claims, and, if so, what is it?  Because I get the sense

16 from your papers that it's like '430, claim one, not

17 representative of these others, but then it's like the

18 argument is "Well, they're all distinct."  So is there a

19 representative claim for this subgroup of two patents that I

20 could rely on?

21         MR. MCDONOUGH:  Sure.  I think, honestly, I don't

22 believe there is one that you could say is representative,

23 at least -- like, let's take them one by one.  You've got

24 the '433, which I think focuses on the use of, we'll call

25 it, general voice libraries, right, not specific to a

42

1  particular bot, and then I think the '633 is more focused

2  on -- or at least claims -- sort of using specific voice

3  libraries in order to -- you know, in assigning a bot a

4  voice library that it can access and use.

5      But I don't think that -- I mean, I think those are two

6  distinct things, and I don't -- you know, looking at -- I

7  mean, we looked at the claim one here, but I don't -- I

8  wouldn't say that is representative, because there's, again,

9  a lot of dependent claims.  For instance, like, if you look

10 at claim -- sorry, not claim -- slide 36 -- and, you know, I

11 guess, before I go into this, can I address something really

12 quick?

13          THE COURT:  Sure.

14          MR. MCDONOUGH:  I know there is -- you didn't say

15 that we waived the argument about representative claims, but

16 you said that wasn't necessarily the case there, or

17 something along those lines.  I don't think -- I mean, I

18 think we've -- at least as much as the Defendant argued for

19 representativeness, I think we, you know, in several spots

20 in our -- I want to go to our opposition.

21      I mean, we -- pretty much with each set of patents, we

22 at least -- you know, like, for claim seven of the '430

23 patent, for instance, we argued that claim one -- and this

24 is -- again, claim one of the '430 is the claim that

25 Defendant represented -- or said is representative.

43

1    I know we heard some more argument today, although
2  they're different than that, but we argued that claim one is
3  not representative, claim seven, because seven contains
4  additional limitations, including the non-transitory medium
5  and a distributed group communication application and a
6  couple other things that are part of that claim.  So we did
7  make that argument.  We also made it --

8         THE COURT:  Yes.  I'm actually asking, like, a
9  slightly different question, which is yes, you oppose
10 TalkDesk's representative claim arguments, but what does
11 Orion think is a representative claim for a given patent or
12 grouping of patents?

13        MR. MCDONOUGH:  Got it.  Yes.

14        THE COURT:  Because it strikes me as a little bit
15 strange to take the position that all claims are patentably
16 distinct for purposes of the 101 analysis.  Yes, they're
17 patentably distinct in a formal way, but, for purposes of
18 what I'm trying to evaluate here, you know, the footnotes'
19 arguments were -- well, I'll have a comment about footnotes
20 that I'll save to the end, but they weren't particularly
21 revealing about why any particular additional limitation in
22 a dependent claim would matter for this discussion.  So
23 that's really what I'm asking, is what are the
24 representative claims, properly, for this analysis?

25        MR. MCDONOUGH:  I guess, for -- best way to

44

1   address this.  I don't -- again, I don't think that there is

2   a claim that I would say is representative.  I think all

3   claims stand and fall on their own, for the reasons you

4   said.  I think that they have to be patentably distinct to

5   issue in the first place, even if there's minor differences.

6   That said, in the briefing, we focused on claim one of the

7   '433 patent and claim one of the '636 patent, and some of

8   the dependent claims there.

9           THE COURT:  Okay.  And my understanding of the

10  arguments on these bot messaging patents is that the claimed

11  improvement is an improvement to bot technology.  Can you

12  elaborate on that?

13          MR. MCDONOUGH:  Sure.  So I think our view of it

14  is that -- just again focusing on the two different patents,

15  the '433 patent, I think, teaches advancement over bot

16  technologies of March of 2017, which is the prior date on

17  these particular ones, by introducing group messaging

18  services that allow interaction between user nodes and bots,

19  using these general voice libraries that allow for

20  translation in real time, effectively, and that's not

21  just -- I guess the advance, say, is not just translation of

22  English to Hebrew or, you know, Chinese to English.  It is

23  also the format of the voice, the recorded voice, that comes

24  across the computer, whether it's a WAV format to an MP3

25  format or an MP3 to a WAV.

1    So, if you look at the specification, it talks -- in

2   figure 10, which I know was mentioned earlier, if we look

3   at -- like, I have that on slide 39, if you want to take a

4   look at that.  It shows that there are -- there's the -- you

5   know, the voice libraries are speech to text, and, you know,

6   a natural language to that, as well, that's taught, but

7   then, also --

8           THE COURT:  So the claim that -- sorry.  The

9   argument that Orion is making is that its invention includes

10  improvements to the speech-to-text library that's in --

11  that's represented in figure 10, and the natural language

12  unit that's represented in figure 10, or are those

13  conventional speech-to-text and natural language libraries?

14          MR. MCDONOUGH:  So I would say the latter.  We're

15  not claiming to have improved, like, natural language

16  processing, or invent it.

17          THE COURT:  You didn't -- the inventors didn't

18  claim to invent anything having to do with speech to text or

19  natural language processing.  Okay.

20          MR. MCDONOUGH:  No.  I think what they've done is

21  sort of create a system using -- which is, in fact, a lot of

22  inventions, or most inventions -- using things that existed,

23  and using it in a way that was new, and that includes -- my

24  only point there was to say you have -- it seemed like we

25  focused a lot on talking about whether it's an abstract idea

46

or not on, you know, the idea of the UN and having speech

translators in real time that translate, and I think it's

not just translating languages.

It's also translating -- it is taught in here that you

can translate from a PCU format, for instance, to a WAV

format, because you may have different computers. Some of

them might have their, you know, phone, and maybe that's

sending a voice file in a WAV format, and then someone might

be on their computer or on this system. I'm not sure how it

might take in a WAV format. It has to be translated into

text, and so there's that aspect of it, as well, that is

strictly computer-based.

THE COURT: And do the inventors claim to have

invented those techniques, to do those kinds of

transformations or translations between different computer

formats?

MR. MCDONOUGH: No, your Honor, they do not claim

that.

THE COURT: Okay. So where in the claims does it

claim this advance? Let's just take the '433 as an example,

because I need to -- the specification can describe whatever

it describes, but I need to look at what is claimed, and

whether what's claimed is an abstraction, or whether there's

an actual advance that's claimed. So I'm trying to

understand that part. So, if there's an improvement to bot

47

1 technology, where is that claimed, I guess, is the simple

2 question -- not simple question, but simple formulation of

3 the question.

4          MR. MCDONOUGH:  Sure.  So, previously, bot

5 technology did not have the ability to take in -- well,

6 let's look at the claim itself.

7          THE COURT:  Yes.

8          MR. MCDONOUGH:  It's probably the easiest thing to

9 do.

10          THE COURT:  I've got them in front of me.

11          MR. MCDONOUGH:  Okay.  So let's look at the '433,

12 claim one.  It claims selecting a -- this is the second

13 clause:

14          "Selecting a selected voice library from

15          a plurality of voice libraries to

16          process the recorded audio of voice

17          library, including both speech-text

18          engine and natural language unit,

19          configured to convert or receive message

20          into enhanced text in a format suited to

21          processing by the bot."

22      And so, I mean -- and, again, this is why this is such

23 a difficult thing.  We're starting to talk about novelty,

24 right, and where the invention is, and so our contention,

25 and our allegations in the first amended complaint, are that

48

1   bot technology up to that date was not capable -- or this

2   had not been done with bot technology.  Let's say that.

3        And it's -- if you go to the next step, the method

4   there is "Processing by the selected voice library, recorded

5   audio to produce the enhanced text comprising the request,"

6   and, again, you're -- this is the claim language.  We're

7   talking about processing this recorded audio, which is, you

8   know, a WAV file or whatever it is, and then being able to

9   extract the text from that, and, obviously, you know, from

10  an enablement perspective, I think we're talking -- we've

11  got the disclosures in the spec that teach how this is done.

12          THE COURT:  So, if I go back and -- let's just

13  focus on the selecting limitation.  So, if I go and look at

14  the specification, it talks about the selecting limitation.

15  I'm going to find discussion that is not just -- and this

16  can be done using any conventional, you know, computer

17  programming or algorithm or networking or whatever.

18       I'm going to find something in there that tells me

19  what -- that the selecting is not conventional computer

20  stuff, right?  Because you can imagine selecting from a

21  library in the abstract, without more, is something that

22  computers do all the time, no matter what the application,

23  right?  That's kind of a standard thing, to select something

24  from a library.

25          MR. MCDONOUGH:  Okay.  Yes.

49

1          THE COURT:  Okay.  So even I know that.  Okay.  So

2  I'm going -- so what you're saying is the specification will

3  support that this is the advancement in bot technology, that

4  this is an example of the advancement in bot technology that

5  you're focused on?

6          MR. MCDONOUGH:  Yes.  I think, in sort of a group

7  messaging environment, right, where -- the issue here is

8  when you have multiple different bots, meaning there's a

9  potential for different formats, both from a file format and

10 from a language perspective.  That can be different.  You

11 know, you don't have that with a single bot, of course.  So

12 I think, in that context, that's what I was saying.  Yes.

13         THE COURT:  Okay.  Thank you for that explanation.

14 You know, I have similar questions with respect to the '733

15 and the '130.  It's not clear to me from the briefing what,

16 exactly, the technological improvement is.  So, for example,

17 if we could focus on the '733 for a moment, is it an

18 improvement to transcription technology?  Is it an

19 improvement to communications network technology?  It's not

20 clear, really, from the opposition what the claimed

21 improvement is.  And, similarly, for the '130, is it an

22 improvement to transcription technology, or is it an

23 improvement to, you know, network communications technology?

24   The discussion in the opposition is along the lines of

25 the patent -- this is the '130, and this is the opposition

50

1  at 21 and 22 -- is that there is claimed a specific method

2  of translating speech into -- input into preferred languages

3  for group communication devices in real time, and also

4  improved methods of real-time speech translation that would

5  enable users to communicate effectively in their preferred

6  languages, without delays or interruptions.

7      You know, we have real-time translation in the

8  courthouse all the time by a human, right?  And so, again,

9  it's not entirely clear what the -- what technology is being

10  improved, and what that improvement is, for both the '733

11  and '130, with transcription and translation, respectively.

12  So I would appreciate your argument on that point.

13          MR. MCDONOUGH:  Sure.  I think, if we were to look

14  at, again, claim one of the '733 as an example -- I have

15  it -- the text of it is on slide 46.

16          THE COURT:  Okay.

17          MR. MCDONOUGH:  And, anyway, I think the

18  high-level argument on this is very similar to what the

19  argument was for the bot messaging patents, and that it is

20  sort of directed to improving bot technologies, and,

21  specifically, we're talking about, you know, within a group

22  situation, multiple user nodes within that, and using a bot

23  node member to both identify audio transcription requests

24  from users, and also, you know, sort of transcribing them,

25  and delivering transcribed content messages to a destination

51

1  service, and, again, I think you have -- there's the aspect

2  of the file format and the language, the actual language

3  itself, and basically delivering that to the bot that sought

4  it, right?

5      And so I think -- and, again, that's why -- so a lot of

6  this stuff is difficult when you're talking about an

7  inventive concept, as opposed to an abstract idea, versus

8  novelty, right?  And that's why, a lot of times, at this

9  stage of a case, it's, in my view, difficult, because you --

10 I mean, even the Federal Circuit cases do this.  They talk

11 about stuff that is probably a novelty argument in terms of

12 inventive concept, and even obviousness, because they're

13 saying, "Look.  All this stuff using conventional means."

14     It's, I think, a difficult analysis, and I think, on

15 this record, our position is that this is improving what was

16 then -- this is -- at the same time -- I think this is

17 September of 2017, so a few months after the '433 and '636

18 priority dates.  So we're still talking -- bot technologies

19 had developed.  I think, by that time, they were

20 conventional, I would say.  Again, I don't agree that they

21 were conventional in 2015, as to the first patents, but, as

22 of this time, I think it's fair to say that, and this is

23 ways to improve the use of bots, right?

24          THE COURT:  Okay.  So improvement to bot

25 technology is kind of the short answer to my question,

52

1  and -- okay.  I would like to just focus on sort of the

2  procedural issues here.  So no claim construction to

3  resolve?  Orion concedes that?

4          MR. MCDONOUGH:  Yes.  I'm not aware of any claim

5  construction position.

6          THE COURT:  Or for any of the patents?

7          MR. MCDONOUGH:  Correct.

8          THE COURT:  Okay.  And then are there any

9  questions of fact that preclude the Court from deciding this

10  motion?  And, if so, what are they?

11         MR. MCDONOUGH:  So I -- so let's -- I have some

12  slides that we can kind of walk through on this.  I'll get

13  that focused.  So, if you could go to slide nine.

14         THE COURT:  Okay.

15         MR. MCDONOUGH:  And so I think -- let me know when

16  your Honor is there.

17         THE COURT:  Yes, I'm there.

18         MR. MCDONOUGH:  Okay.  I don't want to spend too

19  much time here, but I think setting some guardrails here is

20  important, especially in a one-to-one analysis, when it can

21  be a difficult tasks, especially when you're dealing with

22  this many claims.  I think, you know, certainly there are

23  factual underpinnings to what is ultimately a legal

24  question, right, on the 101 issue.  Ultimately, it's a legal

25  question.

53

1        The factual issues can arise with respect to what is

2   effectively the state of the art at the time the patents

3   were filed, and that is specifically -- I'm sure you're

4   aware of this, but, under <u>Berkenheimer</u> (phonetic) and some

5   of the other cases, whether something is well understood,

6   routine, and conventional to a skilled artisan is a factual

7   determination.  Now, that -- the courts, it seems, look at

8   that inquiry at step two, right?

9           THE COURT:  Right.  That was my -- so is the short

10  summary -- I don't want to short-circuit your argument,

11  necessarily, but the argument that Orion is making is that

12  there are fact questions at step two?

13          MR. MCDONOUGH:  Correct.

14          THE COURT:  Step one, no, but step two, yes?

15          MR. MCDONOUGH:  Yes.

16          THE COURT:  Okay.  And can I -- so, to that point,

17  can I not -- if there is discussion or admissions,

18  acknowledgment, whatever the right noun is, in the

19  specification about what was known in the art, I can rely on

20  those.  I don't have to consider those factual disputes.  If

21  the specification says, you know, bot technology was known,

22  or this, you know, networking technology was known, or

23  whatever it may be, I can rely on that at the 12(b)(6)

24  stage, right?

25          MR. MCDONOUGH:  Yes.

54

1          THE COURT:  Okay.  That's helpful.  But, drilling

2 down, what are the fact questions that you think can't be

3 resolved by looking at the specification and just sort of

4 reading it, and saying, "Okay.  It's there.  It's not

5 disputed"?

6          MR. MCDONOUGH:  Sure.  So I think one of them is

7 this idea -- I don't mean to -- I'm going to tread some old

8 ground.  Then I'll go to some new ground, really, really

9 fast, or I'll attempt to.

10      So I think whether something -- whether certain things

11 that are claimed are conventional or not is a question of

12 fact.  I think, on the record, what TalkDesk has focused

13 on is disclosures in the '433 patent to claim that the

14 patents that were filed two years earlier -- specifically

15 regarding bot technology, saying bot technologies were

16 conventional.

17      So I think there is no -- I don't think there's

18 sufficient evidence in the record on -- or at least for the

19 first three patents, the intelligent agent patents -- to

20 show that -- and this is -- I believe it is TalkDesk's

21 burden to show that -- you know, by clear and convincing

22 evidence, that these elements, whatever they're relying on

23 saying it was conventional technology are, in fact,

24 conventional.

25          THE COURT:  Okay.

1          MR. MCDONOUGH:  I think, looking at the

2   specification, I think it in fact supports our position,

3   because there's several -- you know, there's like three or

4   four mentions of "the bots," of "virtual robot," and there's

5   a couple others in there, that make it clear that, at that

6   time, certainly bot technology was not conventional, right?

7   There wasn't even really a good name for it.  They were

8   still kind of fiddling around, figuring out what to call

9   this.  Later it's clear.  Two years later, it's "bots,"

10  right?  And the bots are everywhere now.

11          But I think, on this record at the time, they haven't

12  shown by clear and convincing evidence that bot technology

13  was conventional.  So I think, given that, what we contend

14  the -- again, assuming abstract idea -- and you're gotten

15  through step one, and say yes, this is abstract idea.  We're

16  on step two.

17          Whether those -- the use -- whether the claims are just

18  directed to the use of conventional or sort of well-known

19  technology to the industry at the time, I think, is a

20  question of fact, and I think we have allegations in our --

21  not I think.  I know we have allegations in our complaint

22  saying, in fact, that the use of these technologies in these

23  claims was not conventional or routine at the time, and, you

24  know, in terms of whether that is some kind of conclusory

25  allegation, I think there's a difference between, you know,

56

1  sort of concluding that something is an inventive concept,

2  which I know there are allegations in there saying that,

3  too.

4       You know, I think a court could say that's the

5  conclusion, right, because that's ultimately what you look

6  at as the judge, to try to figure out whether there's, you

7  know, something inventive here, but I think the allegations

8  that we have in the complaint, which are highlighted in each

9  section in the brief for the relevant patents, that

10  basically say that, on this record, and as far as a skilled

11  artisan knew, these -- let me see if I can get the exact --

12            THE COURT:  That's okay.  I can look at the

13  details.  You're right.  There are citations in the

14  briefing.  I also have your slides.  But the argument you're

15  making right now, if I understand it correctly, is

16  specifically about the intelligent agent patents, the '430,

17  the '003, and '339.  So, then, what are the questions of

18  fact, if any, for the others, the ones where bot technology

19  is already well established?

20            MR. MCDONOUGH:  Yes.  So I think -- with respect

21  to those, I think, again, I disagree that they're an

22  abstract idea, but, assuming you've gotten -- concluded that

23  it is, and we're at step two, I think there are similar

24  questions of fact, and I think you need to have enough

25  evidence in the record to conclude not just -- we're saying

1 we're improving bot technology in there, right?  So we're

2 not saying we're just claiming bot technology.  So I think

3 that it's a little bit of different question than when

4 you're talking about the first set of patents.

5        THE COURT:  Right.  So what are the questions of

6 fact at step two for those?

7        MR. MCDONOUGH:  So it is whether the use of these

8 things, like, for instance, the general voice libraries,

9 converting language from -- you know, language from one

10 language to another -- sorry, speech from one language to

11 another -- or converting the file formats from one to

12 another -- the use of that collectively within a bot group

13 technology environment is invented, right?  And so, yes --

14        THE COURT:  So use in a group is essentially the

15 focus?

16        MR. MCDONOUGH:  Because the group creates the need

17 for that, the being able to translate all this stuff,

18 whether it's file format or language, right?

19        THE COURT:  Okay.

20        MR. MCDONOUGH:  So it creates that issue.  And so

21 I think we again have our expert that -- you know, I think

22 you have to look at the record now.  There's no -- I don't

23 think TalkDesk has established that these -- the use of

24 these things collectively was conventional, and one way you

25 might do this -- and I know we're getting into anticipation

58

1   and obviousness, but would be to show, "Of course it was

2   conventional.  Here's three other patents where they used

3   these types of technologies."  And maybe it's not the same,

4   and maybe we'll have an argument that it doesn't anticipate,

5   but, like, the way to do that would to show (sic) where the

6   stuff was used routinely, you know, in the art, around the

7   same time period or before.

8           THE COURT:  Yes.  I am generally reluctant to,

9   like, start converting, like, these 101 discussions at step

10  two into, like, an examination of the prior art and

11  whatever.  I am focusing on what's in the specification and

12  what the patentee acknowledges is conventional techniques,

13  or invokes as conventional techniques as they appear.

14      So that kind of dovetails which I asked TalkDesk, as

15  well.  Should I, must I look at the declaration that's

16  attached to your first amended complaint?  Because

17  ordinarily I would not be considering a declaration at the

18  pleading stage.  It's just sort of wrong.  But maybe I view

19  it as, like, the thing that highlights for me what the

20  factual questions are, if any, right?

21          MR. MCDONOUGH:  Yes.

22          THE COURT:  I'm just -- it's a strange technique.

23  So I'd like your views on that.

24          MR. MCDONOUGH:  Sure.  The reason we put that in

25  there is because there are very few sources of evidence that

59

1 you can find on the state of the art, right?  There are --

2 you know, if you look at Federal Circuit case law -- and I

3 think we cited this in the brief, but let me --

4          THE COURT:  I mean, what I would normally expect

5 in a Rule 12 motion would be something like "These are the

6 factual issues that will require development in discovery

7 and will be the subject of expert testimony," not the actual

8 expert testimony about it.  So maybe I should just kind of

9 get over it, and just say, "Okay.  Just treat the expert

10 declaration as the thing that highlights what will maybe be

11 disputed expert testimony in the future."

12          MR. MCDONOUGH:  Yes.

13          THE COURT:  If that's how I should think about it,

14 okay, maybe, but I just -- it's not -- I'm not turning this

15 into summary judgment.  Nobody is asking me to, and I don't

16 plan to.  So I'm not really planning to rely on the expert

17 declaration, like, for the merits of anything.  Does that

18 make sense?  And --

19          MR. MCDONOUGH:  Yes.  I think the issue there is,

20 I think you have to, in this scenario, and I know there's

21 case law that says that it's not a written instrument,

22 right?  And there's Ninth Circuit case law on that that

23 says, you know, a declaration is not a written instrument.

24 I've seen it.  I'm not sure if they -- I've dealt with this

25 issue a couple times.

1      There's other districts or circuits that say, "Well,

2  it's part of the complaint.  I accept it."  Here, I think we

3  have the allegations about conventionality, let's call it,

4  or whether something is routine, or, you know, the routine

5  use of generic technology.  We have allegations, and then we

6  have citations to an expert declaration attached, and so --

7           THE COURT:  So I can just rely on the allegations

8  in the complaint, from your perspective?

9           MR. MCDONOUGH:  Yes, and that's what I think,

10  because everything that's in the expert declaration -- and

11  we designed it that way because we were worried that the

12  Court might not consider it, because I have case law where

13  courts have not considered it.

14           THE COURT:  Yes.  Got it.  Okay.

15           MR. MCDONOUGH:  And so we put that there in the

16  hopes that the Court will see, "Well, okay.  Here's these

17  allegations.  Is it plausible?," because I know you have to

18  look at that, the question, "Is it plausible?"  "Well, yes,

19  it's plausible, because they have someone who's going to

20  testify to that."

21           THE COURT:  Got it.  Okay.  That's a helpful

22  explanation.  I'll think about how I exactly deal with that

23  issue, but, okay.  I don't think it's going to drive the

24  outcome of this proceeding.  So are there any other

25  arguments that you'd like to make?  I don't need you to go

61

1  through the entire, whatever, 50-page slide desk.  I think

2  we've covered a lot of material in here already, but I don't

3  want to prevent you from responding to arguments or making

4  any additional arguments you'd like.

5          MR. MCDONOUGH:  Can you just give me one second?

6          THE COURT:  Sure.

7          MR. MCDONOUGH:  I'm just scanning to make sure.  I

8  think -- I actually think I have everything that was

9  important.  I guess, on this last point that we were just

10 discussing, so there's Federal Circuit precedent.  There's

11 Alexum -- we cited in the brief Alexum v. Edna (phonetic),

12 and it wasn't a 101 issue, but it was on infringement,

13 whether the complaint was well pleaded, which is, again, a

14 plausibility analysis.

15     So Defendant can get out of an infringement case if

16 they can show, "There's no plausible way that we infringed,

17 because, you know, we don't even use -- we don't use bots at

18 all," or, you know, "We only sell hardware.  We don't sell

19 software."  Right?

20     So there's -- the Federal Circuit, in considering that

21 issue on plausibility, looked at -- basically found and

22 relied on an expert declaration in that case, and it

23 actually is this same -- this Ivan (phonetic) -- our expert

24 was actually the one that was used in that one, not that

25 that makes a huge difference, but our expert has been

62

1  specifically considered by the Federal Circuit on the

2  plausibility issue, and the Court said it found it helpful,

3  and eventually it reversed that particular decision from the

4  lower court.  I think it was out of Texas.

5      Anyway, I think -- and let me just make sure.  There's

6  one thing I wanted to look at.  That's all the argument I

7  have, your Honor.

8          THE COURT:  Okay.  Thank you very much.

9      Anything, briefly, in reply?  I don't need you to

10  repeat anything, but, if there's anything you'd like to

11  respond to.

12          MS. REEVES:  Yes, your Honor.  The first thing I

13  wanted to reference was whether or not the intelligent

14  agents and bots were well known as of 2015.  If you look at

15  our slide six, the '430 patent, at seven -- that should be

16  seven, 33 through 41 -- at the end there, you'll see that

17  they actually stop their quote after "assistant bot" or

18  "bot."  It mentions a capital echo node.  That's the Amazon

19  echo node.  So that's our submission from the patent

20  specification itself that these were well known and

21  commercialized at the time.

22      I also wanted to bring to the Court's attention pages

23  12 and 13 of our opening brief, where we do go into more

24  detail about the components and the functions of the '433

25  patent, and how it's describing translation at the steps,

63

1 right, like receiving a request, so asking a question in

2 Spanish with an English-speaking court reporter, locating

3 the translator, which would be selecting that voice library,

4 translating the question to English, or processing through

5 the selected voice library the request, and then receiving,

6 you know, the reply from the bot indicating the completion,

7 so confirming that everyone has that translation.

8      So I just wanted to point to our briefing that goes

9 into greater detail about how these steps really are using a

10 bot to translate, and that we know from case law that we

11 cite, Intellectual Ventures, the issue of incapability in

12 communications has existed as long as language itself.

13 Translation has always been the solution, and reformatting

14 the information does not solve a problem arising in a realm

15 of computer networks.  That's at page 10.

16          THE COURT:  Yes.  I think the secret sauce or the

17 advance here is doing it in a group messaging environment.

18 That's what I'm getting from Orion, is that there's

19 something -- there's -- that's an additional challenge

20 beyond merely translating, and that's what the advance, the

21 bot technology, is.

22          MS. REEVES:  And while that may be novel, that's

23 still not patent eligible, and you talked with opposing

24 counsel about, you know, improvement is maybe choosing these

25 voice libraries, that that's the difficult part.  If we look

64

1    to the specification on column 14 -- it should be 14.

2              THE COURT:  Of the '433?

3              MS. REEVES:  Of the '433 patent, 14, starting at

4    four.  It talks about how these data structures need to be

5    configured as to whether voice libraries are required to be

6    used or not.  If multiple voice libraries are available,

7    data structures may indicate which voice library is used for

8    each bot.  That's what we get when it comes to choosing the

9    voice library.

10        We can also look to -- I believe the specification

11   points to this flowchart on figure 11 of the '433 patent,

12   where it talks about, if you receive a message, and if

13   there's, you know, a bot involved, then you just select a

14   voice library.  We're getting, again, that collection of

15   black boxes that says, "Yes, you get the translation, and

16   you choose the voice library," but there's nothing in the

17   specification that talks about the improvement, and we know

18   that these voice libraries already exist.  They make

19   reference to the PCU, to WAY conversions.

20        And so, again, we assert there is no inventive concept

21   here.  This is just using conventional technology.  Even if

22   it is choosing voice libraries, it's all to the greater idea

23   of translating using generic computer components.

24              THE COURT:  Okay.

25              MS. REEVES:  And that's what I have, your Honor.

65

1          THE COURT:  All right.  Thank you very much.

2          MR. MCDONOUGH:  Could I just make two points,

3  super brief?

4          THE COURT:  Okay.  Super brief.

5          MR. MCDONOUGH:  Okay.  First, the <u>Berkenheimer</u>

6  case which we cite talks the idea of whether a particular

7  technology is well understood, and this is a quote:

8  "Routine and conventional goes beyond what was simply known

9  in the art."  So it can be just shown that "Yes, this

10 existed," which goes to the --

11         THE COURT:  Right.  It's different from

12 invalidity.

13         MR. MCDONOUGH:  It's got to be, you know --

14         THE COURT:  Got it.

15         MR. MCDONOUGH:  -- ubiquitous, so to speak.

16     And then, regarding the couple times we've heard

17 references to black boxes, I mean, that's an indefiniteness

18 argument, right?  So we're again conflating --

19         THE COURT:  Or written description, or enablement,

20 or any of the other --

21         MR. MCDONOUGH:  I know.  It's just --

22         THE COURT:  -- whatever things.  Yes.  All the

23 streams start to merge at some point.

24         MR. MCDONOUGH:  Yes, unfortunately.

25         THE COURT:  Okay.  Yes.  Those are always

66

1  challenges, and we have these kinds of issues come up.  So I

2  appreciate your highlighting them.  It's good to be aware of

3  the different doctrines that come into play.

4      All right.  Thank you all very much for your argument.

5  I did say there was one thing I wanted to share with you at

6  the end, and that's just for future reference in this case.

7  Please avoid the use of lengthy footnotes.  Orion, I'm

8  looking at you.  They're hard to read, and they create the

9  impression that the party using them is trying to evade the

10  page limits for briefing, which is not an impression you

11  want to create.

12      I'm not going to give any weight to that in terms of

13  the merits of the argument, but just -- I don't want to see

14  lengthy footnotes.  I don't have a hard-and-fast rule, like

15  some of my colleagues here, but just put the arguments that

16  are, like, substantive things in the text.  Okay?  That's

17  what I need you to do, both sides.  All right?

18          MR. MCDONOUGH:  Understood.

19          THE COURT:  So, with that little housekeeping

20  issue, thank you all for your argument, and I will issue a

21  written order.

22          MR. MCDONOUGH:  Thank you, your Honor.

23          MS. REEVES:  Thank you, your Honor.

24      (Proceedings adjourned at 11:32 a.m.)

25

67

CERTIFICATE OF TRANSCRIBER


I certify that the foregoing is a true and correct
transcript, to the best of my ability, of the above pages of
the official electronic sound recording provided to me by
the U.S. District Court, Northern District of California, of
the proceedings taken on the date and time previously stated
in the above matter.

I further certify that I am neither counsel for,
related to, nor employed by any of the parties to the action
in which this hearing was taken; and, further, that I am not
financially nor otherwise interested in the outcome of the
action.


Echo Reporting, Inc., Transcriber

Monday, December 16, 2025